**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| VICKY STOKES, RODNEY BARNETT, | ) | |
| AND MICHAEL BARNETT, AS THE | ) | Civil Action No.: 2:25-cv-02110-BHH |
| PERSONAL REPRESENTATIVES OF | ) | |
| THE ESTATE OF JOHN M. BARNETT, | ) | |
| | ) | |
| PLAINTIFFS, | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| vs. | ) | |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

COMES NOW Plaintiffs Vicky Stokes, Rodney Barnett, and Michael Barnett (collectively, "Plaintiffs"), as the Personal Representatives of the Estate of John M. Barnett, complaining of the Defendant, The Boeing Company ("Boeing"), and who allege and aver before this Honorable Court upon personal knowledge and upon information and belief as follows:

## I.    INTRODUCTION

1. This is a civil action for wrongful death and abuse of process brought by Plaintiffs Vicky Stokes, Rodney Barnett, and Michael Barnett, as the Personal Representatives of the Estate of John M. Barnett, a long-term Boeing Quality Manager.

2. The failure of quality control at Boeing over the last decade is well known and well documented, as are the consequences of that failure, which include planes crashing and coming apart in the air.

3. The causes of the dangerous decline in Boeing's quality control are also well documented, which include:

- the company's emphasis on speed and production at the expense of quality and safety;

- the failure to follow Federal Aviation Administration ("FAA") standards, procedures, and regulations, including the failure to properly document and remedy defects and the failure to properly document the aircraft build record, especially since some of these failures constitute felonies and all of which threaten the safety of the flying public; and

- a deep-rooted culture of concealing defects and safety violations, and of harassing, denigrating, and retaliating against employees who tried to follow the law, FAA's rules and regulations, and Boeing's own purported processes and procedures.

4. Shockingly, Boeing's upper management not only failed to adhere to their internal and legal obligations but pressured other personnel to ignore and conceal defects and to not properly document aircraft build records.

5. John M. Barnett ("John") was a dedicated, idealistic Quality Manager at Boeing's 787 plant in North Charleston, South Carolina, known as Boeing South Carolina ("BSC"). John believed in his calling and believed in Boeing. He was proud of his job and was initially proud of Boeing. He took his role seriously in protecting the flying public, and he believed that he had a personal, legal, and moral obligation to ensure, to the best of his ability, that every possible defect was identified, documented, and remedied.

6. When John tried to do his job, Boeing Management pressured him to not document defects or to not properly document the aircraft build record in order to avoid production delays. When John persisted, Management embarked on a concerted campaign of harassment, abuse, and intimidation intended to discourage, discredit, and humiliate him until he would either give up or be discredited.

7. In addition, John was given low Performance Management ("PM") scores, was socially isolated and separated from his team, was moved to other areas in the plant, was blocked from transferring to more favorable shifts, and was blacklisted from other Boeing divisions.

8. John did his best to stay positive and persevere. However, eventually the concerted harassment and abuse were too much.

9. In early 2017, John's medical provider diagnosed him with post-traumatic stress disorder ("PTSD"), depression, panic attacks, and anxiety stemming from his exposure to BSC's hostile work environment, and John was forced out of Boeing.

10. One example of the retaliation and abuse John suffered for reporting safety issues at Boeing was highlighted by the Permanent Sub-Committee on Investigations of the U.S. Senate Committee on Homeland Security & Governmental Affairs in a hearing concerning Boeing's "Broken Safety Culture" on June 18, 2024. One of John's senior managers called John 19 times within an 8-hour period in late October 2016, and then 21 times within 8 hours a few days later. The senior manager told John, "I'm going to push you until you break." Senator Blumenthal told Boeing's former CEO David Calhoun that Boeing was successful and that "[John] broke."

11. In January 2017, John filed a complaint with the Department of Labor's Occupational Safety and Health Administration ("OSHA") against Boeing for unlawfully retaliating against him in violation of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century[1] ("AIR21"), 49 U.S.C. § 42121. *See* **Exhibit A**, AIR21 Amended Complaint (Redacted). The AIR21 case is still pending as of the filing of this Complaint.

---

[1] The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century "prohibits discrimination against employees of [the] U.S. air carrier industry and U.S. manufacturers who report information related to air carrier safety." *AIR21 Whistleblower Protection Program*, FAA, https://www.faa.gov/about/initiatives/whistleblower (July 24, 2024).

12. During the pendency of the AIR21 case, Boeing engaged in a scorched-earth series of repeated abuses of process, including failing to comply with three court orders to produce documents, some of which would have confirmed John's allegations and provided information on how the serious safety concerns he raised were handled. The court in the AIR21 case sanctioned Boeing for its discovery abuse.

13. After leaving Boeing, John repeatedly tried to move on with his life. However, on March 9, 2024, the weight of years of Boeing's harassment, abuse, and humiliation became too much for John to bear, and he took his own life on what was to be the third day of his deposition in the AIR21 case. Boeing had threatened to break John and break him it did.

14. The police report regarding John's death quotes an email that John sent on February 28, 2021, that provides an insight into the pain Boeing's actions were causing. That email is quoted in the Police Report, which is attached as **Exhibit B** at pages 41-42, and states:

> I'm trying to figure out what it would take to "make me whole again". I really don't know where to start answering that question. Looking at the definition, I found where it states… To restore (someone) to a sound, healthy, or otherwise favorable condition. To repair or restore (something). I fully understand the direct costs that we can establish, i.e. lost pay, lost bonuses, etc. What I am struggling with is, how do you repair or restore a person's overall outlook on life? I used to be a very happy go lucky guy that loved his job, his Company and the products they built. I had a very positive outlook on life. Boeing has absolutely destroyed my outlook on life. I often sit here and think, what's the use, what's the point of life? A person works hard all their life, trying to do the right thing, treating others with respect, just to have their entire professional life destroyed because they were doing as they were trained and expected to do...follow the rules. What is a person's "outlook on life" worth? And looking at the mental toll it has had on me. I suffer from anxiety attacks, depression, panic attacks, PTSD... I've got an anger inside me that I've never experienced before and I don't understand how to control... How do you put a price on that? Sometimes I think...maybe if I go out and find a job, it will help. And then the anxiety hits just thinking about having to report to someone that has control over me and my performance ratings. I don't have the mental fortitude to put myself in that position again...I just can't do it, not right now anyway. How do you put a price on that? Each time I do an interview, deposition or other stressful discussion on what happened with me and Boeing, I re-live those years all over again. It puts me in a deep depression for a week or two, (depending on the intensity level of the

discussion). I shut myself in, I don't want family or friends coming over, I am angry at the world!...

15. As he was taking his life three years later, John left a note underscoring the depths to which Boeing's conduct had driven him. The note in its entirety follows:



16. Whether or not Boeing intended to drive John to his death or merely destroy his ability to function, it was absolutely foreseeable that Boeing's conduct would result in PTSD and John's unbearable depression, panic attacks, and anxiety, which would in turn lead to an elevated risk of suicide. Boeing may not have pulled the trigger, but Boeing's conduct was the clear cause, and the clear foreseeable cause, of John's death.

## II.    JURISDICTION AND VENUE

17. This civil action for wrongful death and abuse of process arises under the common law of South Carolina between citizens of Louisiana and a corporate citizen of Delaware, with its

principal place of business in Virginia, in which damages exceed $75,000.00. Thus, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

### III.    PARTIES

19. Plaintiffs are the Personal Representatives of the Estate of John M. Barnett. Plaintiffs are citizens of Louisiana, and John was also a citizen of Louisiana. *See* 28 U.S.C. 1332(c)(2). John was employed by Boeing for more than 32 years and worked as a First-Level Quality Manager at BSC for approximately seven years until his constructive discharge in March 2017.

20. Defendant, The Boeing Company, is a corporation duly organized and operating under the laws of Delaware with its principal place of business in Virginia.  Boeing does business in South Carolina, maintains offices and transacts business in Charleston County, South Carolina, and is listed as active by the South Carolina Secretary of State.

### IV.    STATEMENT OF FACTS

### A.    JOHN'S QUALIFICATIONS AND EXPERIENCE.

21. John worked for Boeing for 32 years, including 17 years as a Quality Manager (approximately seven of which were at BSC).

22. Prior to his transfer to BSC, John worked at Boeing's Everett facilities in Everett, Washington, where he worked as an electrician on the 747 program.

23. John also worked as an inspector, planner, auditor, Quality Inspector, and First-Level Quality Manager in a number of programs (including the 747, 767, 777 and 787 programs).

24. John worked as a Quality Manager for the Everett Receiving Inspection Organization, which had a $10 million annual budget and supported the entire Boeing Everett site.

25. He traveled to various countries as a Boeing Quality Representative developing, implementing, and driving quality improvement plans with suppliers and assuring they met Boeing's quality requirements and delivery schedules.

26. John also traveled around the United States representing Boeing Everett in high-level executive meetings.

27. John took over 1,000 hours of specialized Boeing training in areas such as auditing, production, inventory management, and communication across cultures. He had also taken college courses at night working towards a bachelor's degree in production and inventory control systems with an emphasis in management.

28. He was constantly and consistently recognized as a top performer regardless of the area or organization. John was one of the most knowledgeable and respected Quality Managers at Boeing, which is why he was recruited in 2010 by a Senior Quality Manager at BSC to help start the Quality program for the new plant.

29. John began working as a First-Level Quality Manager at BSC in November 2010.

30. On or about January 23, 2017, John went on a medical leave of absence at the advice of his medical provider because of the employment-related stress and emotional distress he suffered as a result of Boeing's retaliatory conduct and hostile work environment.

31. Although he had planned to work at Boeing for at least another ten years, John was constructively discharged on March 1, 2017.

**B.     FAA SAFETY AND QUALITY STANDARDS AND REGULATIONS.**

32. The FAA's safety and quality standards and regulations require aircraft manufacturers to document **all** work performed, **all** defects detected, and **all** remedial work conducted. They also require the tracing of every part installed on an aircraft.

33. As a result, Boeing is required to document and trace every part of its aircraft. *See* 14 C.F.R. § 21.146. For the 787 program, Boeing accomplishes this through its proprietary software system known as Velocity. The documentation contained in Velocity constitutes the build record for each 787 aircraft.

34. Intentionally failing to log into Velocity is a violation of Boeing's Quality Management System.

35. Intentionally failing to document a defect in Velocity is a violation of Boeing's Production Certificate granted by the FAA under 14 C.F.R. § 21.146.

36. Intentionally falsifying an aircraft build record is a violation of 14 C.F.R. § 43.12.

37. Falsifying or concealing a material fact or making a materially false writing is a crime under 18 U.S.C. § 38.

38. As a Quality Manager, John was legally obligated to follow the FAA's safety and quality standards and regulations. John also had an ethical obligation to the flying public to ensure the legal obligations set forth above were properly fulfilled.

39. To comply with the law and to ensure the safety of the flying public, it is essential for Quality Managers at Boeing to require (1) FAA safety and quality standards be strictly followed, (2) Boeing's own processes and procedures be strictly followed, (3) all violations and defects be documented, (4) all defects be corrected, and (5) all parts be properly traced and documented. To do otherwise violates, among other things, Boeing's Code of Conduct. It is also important to ensure that corners are not cut and that work is not performed in the "grey areas"—i.e., outside of Boeing's processes and procedures.

C.     **BOEING'S EMPLOYEE CORRECTIVE ACTION PROCESS REQUIREMENTS ENCOURAGE AND PERPETUATE FRAUD AND ILLEGAL CONDUCT AND FACILITATE AND ENCOURAGE A HOSTILE WORK ENVIRONMENT.**

40. Boeing has Employee Corrective Action Process Requirements ("ECAPR") designed "to provide information and procedural guidance regarding implementation of employee corrective action (ECA) per the requirements set forth in" Boeing's Procedures. The ECAPR was published in 2014, which was within the timeframe of many of John's complaints.[2]

41. The ECAPR states, "[t]he goal of ECA is to correct unacceptable conduct and to avoid its repetition." It was "designed to establish fair and consistently applied rules of conduct."

42. The ECAPR defines various forms of corrective actions for various violations. Far from acting to deter serious misconduct, these procedural guidelines impose light sanctions, such as time off or verbal/written warnings for misconduct, which should require immediate discharge and referral to the appropriate criminal authorities because such misconduct violates the law.

43. In the ECAPR, Boeing lays out the "Expected Behaviors for All Boeing Employees." This includes some of the following expected behaviors: "process[ing] and report[ing] information accurately, honestly, and properly;" "build[ing] and maintain[ing] a safe and healthy environment for our employees, customers, suppliers, and local communities;" "adher[ing] to company agreements, policies, and procedures;" and "abid[ing] by applicable laws and regulations." A violation of these expected behaviors "will result in appropriate corrective action measures being taken, up to and including discharge."

44. However, the real effect of the ECAPR is to provide Boeing with power to coercively demand its employees, through the implicit creation of a hostile work environment, to place profits over safety, and to violate the law by informing employees that they will receive little more than

---

[2] The ECAPR is publicly available at: https://www.speea.org/Member_Tools/Council_Rep_ Information/Training_Manual/ECAPR_04_14.pdf

a slap on the wrist if they bow to pressure to violate safety rules. For instance, for agreeing to falsify records, they only risk a sanction of "time off."

45. The following chart, based on the ECAPR, illustrates the disconnect and disparity between Boeing's broken system and a company that "hold[s] [itself] to the highest standards of safety, quality, and integrity."[3]

| OFFENSE | ECAPR MANDATED RESPONSE | SOURCE |
|---|---|---|
| Harassment that creates a hostile work environment | Time off | p. 7 |
| Touching or "unwanted physical contact of a sexual nature"[4] | Time off and sexual harassment training required | p. 8 |
| Intimidation or coercion[5] | Written warning | p. 10 |
| Physical confrontation | Time off | p. 10 |
| Threats | Time off | p. 11 |
| Foreign object debris/damage | Written warning | p. 17 |
| False statements | Written warning | p. 20 |
| Falsification of records[6] | Time off | p. 20 |
| Inaccurate or improper processing or reporting of information[7] | Written warning | p. 20 |
| Weapons or explosives | Time off | p. 23 |
| Ethical misconduct | Time off | p. 28 |
| Government classified material | Verbal or written warning | p. 30 |
| Insider trading | Time off | p. 31 |

---

[3] *See* Boeing, *Boeing 2019 Annual Meeting of Shareholders*, YouTube (Apr. 29, 2019), https://www.youtube.com/watch?v=zzDk4dVHo4k (videotape at 2:01–2:09).

[4] Most, if not all, states would consider "unwanted physical contact of a sexual nature" to be a **crime** (e.g., assault and battery) and result in **arrest and criminal charges**.

[5] Defined as "an action or behavior that reasonably causes a person to be fearful for his or her well-being, personal safety, or condition of employment" and "[p]ressuring or influencing others against their will."

[6] Defined as "**[p]roviding false information or omitting pertinent information on records or documents** submitted to or on behalf of the company, customers, or suppliers." (emphasis added). This is a crime pursuant to 18 U.S.C. § 38.

[7] Defined as "**[f]ailure to properly and accurately complete, process, or report information, including compliance violations**." (emphasis added).

46. Other conduct, seemingly less serious and certainly no more serious, resulted in discharge:

| OFFENSE | ECAPR MANDATED RESPONSE | SOURCE |
|---|---|---|
| Sabotage | Discharge | p. 14 |
| Theft | Discharge | p. 14 |
| Insubordination | Discharge | p. 17 |
| Concealing defective work | Discharge | p. 20 |

47. Boeing's ECAPR facilitates the continued existence of a hostile work environment that has been allowed to thrive within the company.

48. When employees can sexually harass others, push or shove others, engage in insider trading, threaten others, intimidate or coerce others, carry weapons or explosives, leak government classified material, and falsify the build record and **not** get arrested or immediately discharged, there is not just an implicit but an explicit culture of concealment.

49. Boeing's self-instituted policies and procedures for the falsification of the build record of an aircraft, at the time of John's complaints, called for **time off** even though the falsification of the build record is a direct violation of federal law. *See* 18 U.S.C. § 38; 14 C.F.R. § 43.12.

50. By not seriously penalizing the falsification of the build record, as well as the intimidation or coercion of employees, Boeing opened the door for the criminal and fraudulent conduct discussed throughout this Complaint.

51. Therefore, Boeing helped create a hostile work environment by establishing lenient corrective actions for conduct that constitutes a criminal violation under federal law while levying harsh penalties for problematic (but less serious) conduct such as insubordination, which was punished by immediate discharge.

**D.    JOHN WAS SUBJECTED TO A RETALIATORY CAMPAIGN THAT AMOUNTED TO A HOSTILE WORK ENVIRONMENT.**

52. During his employment at Boeing, John engaged in protected activity:

- He repeatedly objected to creating and maintaining the Multi-Function Process Performer ("MFPP") Program, which was not approved by the FAA and which allowed mechanics to inspect and approve their own work.

- He repeatedly insisted, orally and in writing, that Boeing's processes and procedures be followed and that defects be properly documented in the face of management pressure to deviate from the rules to allow Production to meet deadlines.

- He sent emails in 2012 to the BSC Director of Quality complaining about Senior Manager 2.

- In 2014, he filed an internal ethics complaint against Senior Manager 3.

- He refused to "pencil whip"[8] lost non-conforming parts.

- He complained of Foreign Object Debris ("FOD") found in the form of titanium slivers from e-nuts located within various areas of the aircraft with potentially catastrophic consequences.

- He began to investigate defective oxygen squibs and insisted that the investigation be completed.

- He was removed from an investigation after he found that missing and incorrect serial numbers were entered in the build records for parts installed on aircraft, and after he insisted that the build records on all delivered aircraft be corrected.

---

[8] "Pencil whipping" is a term used to describe the documentation of an inspection or other activity that is not actually performed.

- In 2016, he filed another internal ethics complaint against Senior Manager 4 for retaliation, for creating a hostile work environment, and for blacklisting him from transferring to another Boeing division outside of BSC.

53. Boeing retaliated against John and discriminated against him in several ways because of his ethics complaints and his refusal to compromise on safety and quality standards including, but not limited to, the following intentional and malicious conduct:

- John's Senior Quality Managers continually harassed, denigrated, and humiliated him, and treated John with scorn and contempt alone and in front of others.

- His Senior Quality Managers started and promulgated a rumor that John did not get along with his peers.

- John's Senior Quality Managers downgraded John's PM scores.

- One of John's Senior Quality Managers issued a 60-Day Corrective Action Plan ("CAP") against John without cause and without notifying him of the CAP until almost a month after it issued.

- John was removed from multiple investigations into defects because of his insistence that problems be fully investigated and remedied, including investigations into the defective e-nuts causing titanium slivers to litter the tops of flight control wires and equipment, defective oxygen squibs, and missing and incorrect serial numbers.

- John was blacklisted from transferring to other Quality Manager positions, including a position on third shift in Final Assembly at BSC, a position at Boeing's Aerospace Division in New Orleans, Louisiana, and a position at the Propulsion Division in North Charleston, South Carolina.

54. Retaliation is a violation of Boeing's Code of Conduct.

1. **FROM THE START, BSC'S UPPER MANAGEMENT UNLAWFULLY DEVIATED FROM BOEING'S RULES IN ORDER TO ALLOW PRODUCTION TO MEET DEADLINES.**

55. John was recruited in 2010 by a Senior Second-Level Quality Manager ("Senior Manager 1") at BSC to help start the Quality program for the new plant.

56. Senior Manager 1 pushed the Quality Managers under his supervision to strictly follow FAA safety and quality standards and regulations, as well as Boeing's own processes and procedures.

57. However, BSC's upper management pushed the Quality Managers to deviate from the rules to allow Production to meet deadlines. This is a violation of Boeing's Code of Conduct and its own company values.

58. In particular, BSC's upper management implemented the Multi-Function Process Performer ("MFPP") Program, where mechanics were given authority to inspect and approve their own work.

59. The MFPP Program was executed without FAA approval and violated Boeing's Production Certificate granted by the FAA under 14 C.F.R. § 21.146.

60. When Senior Manager 1 objected to implementation of the MFPP Program and insisted that Boeing not deviate from the rules, he was threatened with termination. So, in 2012, Senior Manager 1 transferred back to Washington with a demotion to avoid termination.

61. John vocally supported Senior Manager 1's position that the MFPP Program was unlawful and that FAA safety and quality standards and regulations, as well as Boeing's own processes and procedures, should be strictly followed.

62. Throughout John's tenure at BSC, he refused to deviate from the FAA's safety and quality standards and regulations and Boeing's own processes and procedures.

63. As a result, BSC's upper management retaliated against John.

2.  **JOHN WAS MOVED TO SECOND SHIFT IN RETALIATION FOR HIS COMPLAINTS AGAINST SENIOR MANAGER 2.**

64. In 2012, one of John's supervising managers was appointed as his second Senior Second-Level Quality Manager ("Senior Manager 2") to replace Senior Manager 1, and he began pushing John to violate Boeing's processes and procedures.

65. That same year, John emailed the BSC Director of Quality **twice**, complaining that Senior Manager 2 was pushing him and his inspectors to deviate from processes and procedures. The BSC Director of Quality told John that he did not believe him, so no investigation was conducted.

66. John continued to insist the proper procedures be followed.

67. John then learned about numerous instances where parts were taken from one airplane and installed on another airplane without any documentation, traceability, or engineering review. John took steps to stop this practice.

68. BSC's upper management ignored this problem and insisted that John stop documenting the issue in emails and on corrective action Emergent Process Documents ("EPDs"). All corrective action EPDs for transferred parts were cancelled per BSC's upper management direction without any investigation or corrective action.

69. In October 2012, Senior Manager 2 publicly denigrated John in front of his team and moved him to second shift in retaliation for insisting that proper procedures be followed.

70. In response, John's team submitted an internal ethics complaint against Senior Manager 2 for his conduct.

71. In June 2013, Senior Manager 2 was demoted and removed from management for his "unethical behavior."

72. Nothing was done to remedy the retaliatory action taken against John.

### 3.     JOHN WAS SUBJECTED TO A HUMILIATING PATTERN OF RETALIATORY ACTION BY ANOTHER MANAGER.

73. In or around July 2013, a new manager was appointed as John's third Senior Second-Level Quality Manager ("Senior Manager 3"), and he immediately separated and reassigned the members of John's Quality team in retaliation for the ethics complaint against Senior Manager 2.

74. Following in Senior Manager 2's footsteps, Senior Manager 3 continued to subject John to a gaslighting[9] campaign in retaliation for John's refusal to violate the safety and quality standards, regulations, processes, and procedures.

75. John was continually harassed, denigrated, humiliated, and treated with scorn and contempt by BSC's upper management.

76. For example, John's Quality team had weekly meetings. During these meetings, Senior Manager 3 announced several times that John was responsible for a production delay or for the team having to work overtime away from their families.

77. When John questioned decisions that violated safety and quality standards, regulations, processes and procedures, Senior Manager 3 raised his hands and waved them around in an animated manner to imitate John and mockingly stated, "John, are you just waving your hands in the air or do you have an idea."

78. These comments were the result of John's documentation of process and procedure violations, documentation of defects, and his refusal to conceal problems. The comments were disrespectful, denigrating, sarcastic, degrading, humiliating, mean, and unprofessional.

---

[9] The *Merriam-Webster* dictionary defines "Gaslighting" as follows: "psychological manipulation of a person usually over an extended period of time that causes the victim to question the validity of their own thoughts, perception of reality, or memories and typically leads to confusion, loss of confidence and self-esteem, uncertainty of one's emotional or mental stability, and a dependency on the perpetrator." *Gaslighting*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/gaslighting (last visited Mar. 18, 2025).

79. These retaliatory attacks continued throughout John's time at BSC.

80. John never saw this type of behavior displayed towards other managers or employees.

81. This campaign against John was to punish him for identifying problems, insisting on compliance with the rules, and documenting all process and procedure violations and defects. It was also done publicly to discourage John from continuing to report and document defects and to discourage others from supporting him or following his example.

82. The denigrating comments caused John enormous stress, making it difficult for him to concentrate and perform his job.

### 4. JOHN'S PERFORMANCE MANAGEMENT SCORES WERE DOWNGRADED IN RETALIATION.

83. PM scores determine yearly raises, bonuses, eligibility for transfer to other Boeing divisions, participation in special leadership teams, and other perks for top performing managers.

84. After John vocally supported Senior Manager 1 regarding the MFPP Program and demanded that Boeing adhere to FAA safety standards and regulations and Boeing's own processes and procedures, Boeing retaliated against John by giving him lower PM scores, which continued throughout the remainder of his tenure at BSC.

85. In John's July 2014 PM review, Senior Manager 3 explained that John was very knowledgeable but that his knowledge got in the way because John liked to be correct and raised concerns that had already been resolved.

86. As part of that review, Senior Manager 3 faulted John for not timely completing a performance review for one of the employees under John's supervision, even though Senior Manager 3 told the other supervisors (but not John) that the due date for the performance reviews had been accelerated. Senior Manager 3 intentionally withheld information from John about the new due date.

87. One example of a concern that John insisted on correcting was about Manufacturing's push to use a spreadsheet in place of writing Emergent Removals ("ERs") for products removed from an aircraft after installation and inspection.

88. Per Boeing's Process Instructions ("BPI"), ERs are required for each part removed from an aircraft after its final quality inspection and approval. Quality must determine whether the part removal would interfere with any FAA conformity inspections previously completed. If so, Quality was required to contact the FAA prior to removing the part to put the FAA on notice and to determine whether the part removal will void the FAA's conformity inspection.

89. While a spreadsheet may be used to document build information in some circumstances, there are specific procedures that must be followed under Boeing's Procedures to ensure that, in the event of a catastrophic failure, the aircraft's build record is traceable and there is accountability for all parts.

90. John was asked to approve the use of a spreadsheet for ERs for Line 172,[10] and he was told that a spreadsheet had been used in place of ERs on Line 168. John had been advised by Manufacturing that at least 25 parts had been removed for Line 168. He discovered that the spreadsheet for Line 168 was purposefully left blank and did not comply with the BPIs, nor did it provide traceability of part removals.

91. John was pressured by Manufacturing to use a spreadsheet instead of ERs because that was how it was done on Line 168. John warned that this was not the proper process. After being urged by Senior Manager 3 to use the spreadsheet, John explained that he did not agree with using the spreadsheet because it did not follow procedure. John then elevated the issue of Line 168's noncompliance, but no action was taken to correct the flawed documentation.

---

[10] Boeing refers to each aircraft as a line number, so Line 172 is the 172nd 787 aircraft being built.

92. John's PM score was downgraded because he continued to complain that build records were not properly completed and maintained. John was also penalized on his PM reviews for documentation of process and procedure violations in emails.

93. In June 2014, John submitted an internal complaint to Corporate Ethics against Senior Manager 3 for violating Boeing's processes and procedures, ignoring process violations, pushing John to work in the "grey areas," and having another manager spy on John.

94. One month later, in retaliation for his complaint, Senior Manager 3 downgraded John's PM score and penalized John for not working in "grey areas" of procedure, for documenting process violations, and for not agreeing to allow Manufacturing to approve their own work—even though allowing them to do so would violate processes. The downgraded score was also based on false rumors started by upper management that John did not have a good relationship with his peers. When Senior Manager 3 learned that John was writing to Human Resources ("HR") regarding his PM score, Senior Manager 3 threatened to pull and read John's emails.

95. In John's July 2014 PM review, he received a score of 2 out of 5 in a category about improvement opportunities as a result of documenting problems. John was faulted for following Boeing's safety procedures. In particular, John was instructed to learn how to engage in face-to-face communication when following up on concerns rather than through written emails.

96. In response to Senior Manager 3's review, John inputted a comment to his review and addressed the need for documentation of process violations and a lack of grey areas in Boeing's processes.

97. On September 11, 2014, Senior Manager 3 once again chastised John for documenting process issues and explained that using emails to discuss issues was one of the reasons his PM score was lower.

98. Senior Manager 3 and other Senior Quality Managers continued to pressure John to work in grey areas and to avoid documenting process violations in writing.

99. As stated previously, Boeing's upper management started rumors that John did not get along with his peers and used this as a further basis for downgrading his PM scores.

100. John continued to be penalized, and his PM scores were wrongfully downgraded throughout his time at BSC because of his refusal to compromise and work in the grey areas, his insistence that defects be documented, and his adherence to FAA standards and regulations as well as Boeing's processes and procedures.

## 5. JOHN WAS WRONGLY ISSUED A 60-DAY CORRECTIVE ACTION PLAN IN RETALIATION.

101. On September 12, 2014, John was advised that Senior Manager 3 had issued a 60-Day Corrective Action Plan[11] ("CAP") against him for documenting process violations and was told that his manager would provide John with a copy.

102. In fact, the CAP was issued about one month earlier on August 15, 2014, but John was not made aware of it until September 12, 2014—a violation of Boeing's rules, which specifically require that any individual who is the subject of a CAP be notified **immediately**.

103. On September 13, 2014, John finally received a copy of the CAP from Senior Manager 3.

104. Once again, John was criticized for not communicating via face-to-face or phone call to resolve concerns and was instructed to stop using emails to emphasize concerns or discuss quality requirements.

---

[11] The 60-Day Corrective Action Plan is used to document "deficiencies" in an employee's performance and if those deficiencies are not "corrected" in 60 days, the employee, in almost all cases is terminated, typically losing all retirement benefits, pensions and health insurance.

105. On September 15, 2014, John wrote an email to himself about the CAP and noted the untimely notice, calling it a "surprise attack." He also stated, "Leadership wants nothing in e-mail so they maintain plausible deniability." He concluded, "It is obvious Leadership is just looking for items to criticize me on so I stop identifying issues. I will conform!"

106. Additionally, the CAP referenced a discussion between John and Senior Manager 3 on September 9, 2014. But John was not made aware of the CAP until September 12, 2014. Therefore, it was impossible for John and Senior Manager 3 to have discussed the CAP on September 9, 2014.

107. John met with BSC's Ethics Manager and complained about being placed on a 60-Day CAP based on false information and misrepresentations and because he was not timely notified. BSC's Ethics Manager explained he could not do anything because it was an HR matter.

108. John emailed BSC's Vice President of Quality asking for a short meeting to discuss his concerns with his upper management. John never received a response or acknowledgement.

**6.    JOHN WAS REMOVED FROM INVESTIGATING FOREIGN OBJECT DEBRIS ("FODs").**

109. It takes 20,000 fasteners to secure the passenger deck floorboards to the 787 aircraft frame. These fasteners are composed of titanium bolts and e-nuts. In August 2014, John discovered that when the fasteners were tightened, they produced razor sharp titanium slivers up to 3 inches long, which dangled and fell onto bundles of thin-walled flight control wires, electrical boxes, and electronic components located between the floor panels and cargo compartment ceiling panels, as well as above the center fuel tank area containing wires and electronic equipment.

110. John was aware of a number of commercial aircraft disaster investigations in which passenger planes crashed because of electrical shorts.

- One catastrophe that is well known to Boeing occurred on September 2, 1998, when Swissair Flight 111, a McDonnell Douglas MD-11 bound for Geneva, Switzerland, crashed off the coast of Nova Scotia, Canada. The investigation found that the most likely cause was an entertainment wire above the cockpit that shorted out and caused a fire. The pilots smelled smoke and called the closest air traffic control for emergency clearance to land. The fire quickly spread, and the cockpit was engulfed in flames when the plane crashed approximately five miles off the coast.

- Another disaster well known to Boeing occurred on July 17, 1996, when TWA Flight 800, a 747 bound for Paris and then Rome, crashed off the coast of Long Island, New York. The investigation revealed that the explosion was most likely caused by a short in the wires to a fuel sensor in an empty fuel tank.

111. John was concerned that the razor-sharp titanium slivers would work their way between the bundles and interfere with the pilot's control of the aircraft or cause a fire.

112. Further, while the titanium slivers, referred to as FOD, could be cleaned under the deck if done meticulously, there are areas of the plane that are inaccessible, such as above the center fuel tank. Based on his concerns, John internally communicated that the problem needed to be fixed and the FOD needed to be completely removed.

113. When John sought to have the FOD issue investigated, Senior Manager 3 ordered him to stop because it would be too costly to remove and clean all the ceiling panels, and it would risk damaging the ceiling panels during removal. John strongly disagreed and insisted that the panels be removed and the electrical components be cleaned to eliminate the risks of electrical shorting.

22

114. John was removed from the investigation, and another employee was put in charge. BSC's upper management let the FOD remain rather than removing the cargo ceiling panels or cleaning the FOD.

115. John later filed a whistleblower complaint with the FAA, which inspected the titanium slivers on surfaces below the passenger deck. The FAA ordered Boeing to clean the FOD from the aircraft still at the factory, vindicating John's concerns. But it remains unclear whether the inaccessible areas above the center fuel tanks were cleaned or what was done for the hundreds of aircraft previously delivered.

116. John was deeply concerned and experienced nightmares that his complaints had been ignored and that the titanium slivers remaining on previously delivered 787 aircraft posed a threat to the flying public.

117. In the AIR21 litigation, John requested that Boeing produce records documenting what action was taken, if any, to remedy the titanium slivers problem. Boeing refused to produce these records despite the court ordering Boeing to do so on three occasions. Following John's tragic death, the court sanctioned Boeing for its intentional failure to produce these records.

**7.     JOHN WAS ASSIGNED TO THE MATERIAL REVIEW SEGREGATION AREA ("MSRA") IN RETALIATION.**

118. In February 2015, John was reassigned to MRSA, which made him report to a new, fourth Senior Second-Level Quality Manager ("Senior Manager 4").

119. As John packed his desk before relocating to MRSA, Senior Manager 3 told John that he could not believe that John reported "The Quality Organization to Ethics" and that he should be ashamed because it "made the whole organization look bad."

120. At MRSA, John became responsible for handling lost non-conforming part Shop Order Instance[12] ("SOI") closures.

### 8. EVEN AFTER JOHN'S RETALIATION COMPLAINT WAS SUBSTANTIATED, BSC'S UPPER MANAGEMENT CONTINUED TO RETALIATE AGAINST HIM.

121. In April 2015, John received an email from BSC's Ethics Manager stating they had substantiated John's complaints from June 2014 and informed him they had opened a second investigation against Senior Manager 3 for "related behaviors."

122. John provided HR with emails and other documents to support his complaint about a hostile work environment, the ambush of the 60-Day CAP, the misrepresentations and false information in the 60-Day CAP, and his punitive reassignment by the person against whom John filed a complaint.

123. BSC's upper management continued to set John up for failure. For example, in July 2015, John was informed that some of his team had been reassigned without his knowledge. This left areas over which John had responsibility unsupported and without the necessary critical skills.

124. Multiple complaints were submitted by Manufacturing against John for a lack of support.

### 9. JOHN WAS UNLAWFULLY ORDERED TO COVER UP LOST PARTS.

125. While at MRSA, John learned that Manufacturing Managers were provided keys to the MRSA cage, which was where defective, scrapped, or non-conforming parts were kept. He also learned that the managers and leaders were illegally taking the defective and scrapped parts without

---

[12] SOIs are the instructions for the build process on the airplane. Each SOI contains everything one needed to know to complete a specific operation. When the operation is bought off, or approved, by both Manufacturing and Quality, the SOI is closed. If it is not bought off, work can be transferred to an NCR. The electronic work instructions in Velocity are electronically stamped based on a person's ID login for both Manufacturing and Quality.

any documentation and installing them on aircraft. Non-conforming parts and defects were required to be documented through Non-Confirming Reports ("NCR").

126. John had the locks to the MRSA cage changed as a result, but BSC Quality Management had new keys made and distributed.

127. FAA regulations call for lost parts to be reported to the FAA. But for hundreds of parts that somehow disappeared from the MRSA cage, the NCRs disappeared as well and were considered lost.

128. When John was ordered to sign off on the NCRs without conducting a full investigation and without disclosing the issue to the FAA, he refused.

129. Ultimately, Boeing found another Quality person to "pencil whip" the paperwork related to these non-conforming parts.

**10.     JOHN FILED A SEPTEMBER 2016 ETHICS COMPLAINT AGAINST SENIOR MANAGER 4 FOR PROCESS AND PROCEDURE VIOLATIONS.**

130. John remained concerned that the defective and scrapped parts that were placed onto new aircraft could result in a catastrophic event.

131. For example, in September 2016, Senior Manager 4 removed an oxygen tube from the scrap bin and gave it to Manufacturing for installation on an aircraft without any documentation, rework, or authority, which violated FAA requirements.

132. Not only did Senior Manager 4's action violate Boeing's processes and procedures, but it also created a risk of a catastrophic event. Oxygen tubes come hermetically sealed to prevent them from contamination, which could cause an explosion when oxygen flows through the tube. The oxygen tube that Senior Manager 4 used was damaged and highly contaminated as a result of being placed in the scrap bin.

133. John's team tried to stop Senior Manager 4 and reported the violation to John, who then made a complaint to HR. Ethics contacted John about his report to HR, and he provided information and documentation of the incident.

134. In July 2016, John was given two days to "close out" over 400 lost non-conforming part SOIs without investigating them. John had discovered close to 200 SOIs that had already been "pencil whipped" and closed out by another group without investigation.

135. John strongly objected and pressed upper management to report their investigations. He was ordered to stop, which would have required him to violate FAA regulations regarding documenting and reporting lost parts to the FAA. Moreover, the lost non-conforming parts themselves were evidence of processes and procedures not being followed since Boeing's policies and procedures, when followed, do not allow parts to be lost.

136. As with the titanium slivers, John reported the lost parts to the FAA, which corroborated his complaint.

**11.     JOHN WAS REMOVED FROM THE INVESTIGATION OF DEFECTIVE OXYGEN SQUIBS IN RETALIATION.**

137. As with all modern commercial aircraft, Passenger Safety Units ("PSUs") that provide safety and comfort to the passengers are installed above the passenger seats. The 787 PSUs include emergency oxygen masks that are released in the event of a decompression event at high altitudes and also emergency oxygen tanks with squibs that release the oxygen into the mask when activated.

138. In August 2016, MRSA was tasked with scrapping a number of PSUs, which required the oxygen tanks to be emptied. During this project, John became aware that the squibs in the oxygen tanks were defective and failed to activate and release oxygen as expected. John was criticized for documenting this issue.

139. In September 2016, after John had placed the defective squibs (that were removed from the oxygen bottles) in quarantine and pushed upper management to have them analyzed, John was removed from the investigation.

140. John subsequently learned that Boeing had done nothing to investigate further.

141. John had reported the defective oxygen tank squibs to the FAA. These squibs acted as a firing mechanism to trigger the release of oxygen from the oxygen tank and into the masks.

142. Boeing misrepresented to the government investigators that John's complaint was that the oxygen tanks installed on the 787s were empty.[13]

143. Because of Boeing's misrepresentations, the FAA checked whether empty oxygen bottles had been installed on the aircraft and whether the empty bottles in the MRSA were marked as scrap with red ink or paint.

144. The FAA determined the empty oxygen tanks should have been labeled with more prominent markings identifying them as non-conforming products.

145. On December 13, 2017, John wrote to the FAA and explained the circumstances of his complaint and why he remained concerned. In his letter, John stated:

> It appears that the oxygen issue was not identified properly nor investigated. Next is a quick history that explains my concern.
> . . .
> There were an additional 200 PSU panels and oxygen bottle assemblies quarantined in MRSA [August 2016] for failure analysis and testing. I am aware the local FAA located the 200 oxygen bottles and panels in MRSA due to my initial complaint, but only wrote them up for not being marked correctly for scrap, they missed the fact that they were the ones set aside for failure analysis. No action has been taken to determine why the squibs are failing and no actions have been taken to insure the flying public is safe.
>
> My concern is that Boeing has had data for over a year that shows 25% of the emergency oxygen bottles currently in service will not operate in the event of an

---

[13] BSC Quality Management has provided various excuses as to why they have failed to perform the failure analysis on the defective squibs.

emergency. So far it has been ignored and gone unaddressed. I feel it is imperative the defective squibs not go unaddressed any longer. I wanted to make you aware of my concern in hopes that you can help drive the appropriate actions to assure the aircraft being delivered and those that have already been delivered are safe.

146. In a January 13, 2017 email, John explained to Senior Manager 4 why he was so concerned about the defective squibs:

I have a serious safety concern I feel needs to be addressed. As you know, last year, we discovered that the oxygen bottles that were being removed from the airplanes (due to the PSU panel damages) were showing a 25% failure rate when they were being discharged for scrap. I had taken numerous steps to define root cause and determine if the failure rate was indeed accurate or if there were other causes for the failures. As you recall, the investigation was turned over to QAI for continuation and root cause analysis. To date, I have not seen much action on this issue and the investigation seems to have stalled. We still have over 200 oxy bottles in our area that are slated for defect analysis, but as I said, the investigation seems to have stalled. The oxygen bottles are still in our area. I believe it is imperative that the proper resources are dedicated to this issue to determine if there is actually a failure rate with the squibs on the bottles. These oxygen bottles are the ones that would supply oxygen to the passengers in the event of decompression and or the pilots and flight attendants. I can't imagine being on a plane and have a 75% possibility of having functioning oxygen supply in the event it is needed. I urge you to please take action to get the investigation moving forward, the root cause identified, and if founded, we need to take the necessary actions to assure our fleet and the flying public are safe.

I am more than willing to get re-involved to help drive the root cause and take the necessary steps. Let me know how I can help.

147. John remained deeply concerned and experienced nightmares that his complaints had not been adequately addressed and that the defective squibs posed a threat to the passengers flying on the 787 aircraft.

148. In the AIR21 litigation, John requested that Boeing produce records documenting what action was taken, if any, to remedy the problem with defective squibs. Boeing refused to produce these records despite the court ordering Boeing to produce the records on three occasions.

149. Boeing's refusal to produce records reinforced John's concerns, which were further magnified when a door plug blew out of an Alaska Air 737 MAX, causing a decompression event during which a number of oxygen masks failed to work.

150. Following John's death, the court sanctioned Boeing for its intentional failure to produce these records.

## 12. JOHN WAS REMOVED FROM HIS INVESTIGATION INTO MISSING AND INCORRECT SERIAL NUMBERS ENTERED IN BUILD RECORDS FOR PARTS INSTALLED IN THE AIRCRAFT.

151. FAA regulations require that serial numbers for all parts installed on aircraft be accurately recorded in the build record for each aircraft. In the event of a recall, this would allow the recalled parts to be identified and replaced. In the event of a catastrophic failure, this requirement would allow crash investigators to determine the cause of the failure by examining the part's manufacturing and installation history.

152. On August 18, 2016, John was assigned to lead a Serial Number FAA Audit Response Team which was tasked with conducting a Serial Number Audit to determine whether serial numbers were accurately entered into build records, and if not, to identify the cause and the actions needed to correct the problem through Boeing's detailed problem-solving method.

153. In September 2016, after finding that serial numbers were not accurately entered into the build records for all previously delivered aircraft built at BSC, John stated that the build records on all delivered aircraft needed to be corrected and that BSC customers needed to be notified of the problem so that they could address it.

154. In response, John was removed as the Serial Number FAA Audit Response Team Leader.

155. John reported the serial number problem to the FAA.

156. Boeing failed to notify its customers about the problem. In addition, Boeing misrepresented to the FAA that no such problem existed. As a result, the build records for many, if not all, 787 aircraft contain parts with incorrect part numbers in violation of FAA regulations.

### 13.    JOHN'S SENIOR MANAGER TRIED TO PUSH HIM UNTIL HE BROKE.

157. One example of the retaliation and abuse John suffered for reporting safety issues at Boeing was highlighted by the Permanent Sub-Committee on Investigations of the U.S. Senate Committee on Homeland Security & Governmental Affairs in a hearing concerning Boeing's "Broken Safety Culture" on June 18, 2024. *See supra* ¶ 10. As Senator Blumenthal found, Senior Manager 4 had called John 19 times within an 8-hour period in late October 2016, and then 21 times within 8 hours a few days later because he intended to "push [him] until [he] br[oke]."

158. When questioning Boeing's and the manager's conduct, Senator Blumenthal stated to Boeing's former CEO David Calhoun his conclusion was that "[John] broke."

### 14.    JOHN WAS BLACKLISTED AND BLOCKED FROM TRANSFERRING TO OTHER DIVISIONS AND POSITIONS OUTSIDE OF BSC IN RETALIATION.

#### a.    QUALITY MANAGER POSITION ON THIRD SHIFT IN FINAL ASSEMBLY

159. In September 2014, during a morning meeting with all first-line managers, a second-level manager announced they had a third-shift Quality Manager position becoming available and were looking for volunteers. The second-level manager stated they would select the individual with the most experience in BSC Final Assembly, and in the event of a tie, they would select the employee with the most time at Boeing.

160. John immediately volunteered for the position.

161. Another manager spoke up and stated that John had the most time with Boeing and had been in Final Assembly since day one, so he should have the job. The second-level manager agreed.

162. John was then denied the position by a different Senior Quality Manager in retaliation for his complaints. Instead, this manager gave the position to another employee who had been with the company far **less** time than John.

b.     **QUALITY MANAGER POSITION AT BOEING'S AEROSPACE DIVISION IN NEW ORLEANS, LOUISIANA**

163. In March 2016, John applied for a Quality Manager position at Boeing's Aerospace Division in New Orleans, Louisiana.

164. In August 2016, after a telephone call, John was notified that he had passed the first phase and was one of two finalists for the position. He was invited by the hiring manager to New Orleans for an in-person interview.

165. During the in-person interview, John spoke with the NASA Director, other Quality Managers, and the Quality Team. During each conversation, John successfully addressed each department's struggles and offered his expertise in finding solutions for each struggle.

166. At the conclusion of the interview, the hiring manager informed John that his expertise was a perfect fit for the needs of the position and that he would be a great asset to the team.

167. Despite this, John was later informed that he did not obtain the job.

168. John informed Senior Manager 4 about the results of his interview, and his reaction implied to John that someone in upper management had yanked the job out from under him.

169. While the hiring manager later told John that she was "looking for a different skill set," she had initially told John that he had precisely the skills they were looking for. And when

the position was re-posted, the job description and qualifications were exactly the same as the initial posting—there was no change in the skills needed.

170. During HR's investigation, an HR representative claimed that the job had to be handled by someone with "government contract" experience. But as explained above, the job description and qualifications did not change in the re-posting, which **failed** to state that government contract experience was a requirement. In fact, the job postings were identical, except for changing the position to a "second shift."

171. Boeing has disputed that John was retaliated against and has provided a slew of contradictory reasons as to why John was not hired for the position in the Aerospace Division.

172. Boeing claimed that "second shift" was a qualification for the job, but the hiring manager neglected to place that qualification in the initial job posting. Whether a manager is first, second, or third shift should not matter. John was ready, willing, and **qualified** to work on any shift.

c.     **QUALITY MANAGER POSITION AT THE PROPULSION DIVISION IN NORTH CHARLESTON, SOUTH CAROLINA**

173. In January 2016, BSC internally circulated an email containing a job opening for a Quality Manager position at the Propulsion Division in North Charleston, South Carolina.

174. This position did not go through the standard hiring and interviewing process, but rather it was a "no-post" job, meaning there was no job requisition posted on the Boeing Employment page. Instead, the hiring decision was handled via email with no interview process and no documentation or other evidence to support the hiring decision. No-post jobs are handled in secrecy, behind closed doors, and with no transparent oversight of how decisions are made.

175. John immediately replied expressing his interest in the position and attached his resume.

176. On or around October 2016, the hiring manager for this position asked two Propulsion Quality Managers to select their top three candidates out of an extensive list of names. Both Quality Managers selected John as the first applicant on the list, indicating their desire to work with him because of his expertise and skill set. Their final decision was to hire John.

177. After requesting John through the Quality Skill Team, the hiring manager was told that "Barnett is not going anywhere, we don't care how bad you want him." A Boeing employee in Propulsion was also warned by their manager to "stay out of the Barnett thing" and to "[f]orget it ever happened."

178. Boeing claims that John was deemed ineligible from the Propulsion job because of his low PM scores and other metrics. However, these low scores and metrics were punitively imposed in retaliation for John's complaints and his refusal to work outside the processes and procedures. In other words, but for John's whistleblowing activities, he would not have been excluded from the job.

### 15.     JOHN MADE AN OCTOBER 2016 ETHICS COMPLAINT AGAINST UPPER MANAGEMENT FOR RETALIATORY CONDUCT.

179. In October 2016, John filed an internal complaint against his upper management with Boeing Corporate Ethics department at its headquarters in Chicago, Illinois for retaliation, a hostile work environment, and the fact that he was blacklisted and blocked from other positions. He requested that his complaint be investigated by personnel outside of BSC. After assurance that it would be handled outside of BSC, the investigation was nonetheless carried out by BSC's local HR. As a result, John withdrew his complaint for "fear of additional retaliation."

180. Later that month, John emailed the Vice President of Boeing Corporate Ethics in Washington D.C. and voiced his concerns about how his complaint was handled. The Vice

President of Boeing Corporate Ethics assured John that his concerns would be properly investigated. Even so, it was once again turned over to local HR for BSC.

181. BSC failed to conduct an adequate investigation.

182. On January 5, 2017, John was informed that his ethics complaint about being blocked from the New Orleans and Propulsion jobs was found to be "unsubstantiated." The other complaints involving the hostile work environment and retaliation were not investigated.

183. On January 13, 2017, John was notified that his name was on a list of managers to be laid off.

184. On January 16, 2017, John filed a complaint through the AIR21 program with OSHA for Boeing's retaliation against him for engaging in protected conduct, and also for maintaining a hostile work environment and blacklisting and blocking him from transferring to other Boeing divisions.

### 16.    JOHN'S MENTAL STRESS CAUSED HIM TO GO ON MEDICAL LEAVE.

185. On January 17, 2017, John was seen by a board-certified physician assistant after visiting the emergency room for chest pain. He reported high stress from work and worried that filing an AIR21 action would end his career. His medical record shows that John had been taking prescription medications for anxiety and depression since February 2016.

186. On January 23, 2017, John had a follow-up appointment with his physician assistant because he was still experiencing high stress at work and an exacerbation of his medical conditions.

187. That same day, John went on a medical leave of absence at the advice of his medical provider because of the severity of his stress-related conditions due to Boeing's retaliatory conduct.

188. From February 2, 2017 to February 16, 2017, John was seen by a mental health counselor for symptoms of depression and severe anxiety. He reported feelings of sadness, hopelessness, sleep disturbances with nightmares, and an overwhelming sense that something bad was going to happen.

He feared further retaliation for reporting his complaints to OSHA and the FAA. He continued to fear that people would die due to improper work on the assembly line at Boeing. His fears were heightened as a result of the plane crashes and accidents that he already witnessed related to the same quality issues he had identified. He expressed feelings of survivor's guilt for being unable to convince Boeing to prevent these tragedies. John's mental health counselor diagnosed him with PTSD.

### 17.     JOHN WAS CONSTRUCTIVELY DISCHARGED FROM BOEING.

189. Knowing he was going to be terminated, John took an early retirement on March 1, 2017, due to his employment-related stress, as a result of being subjected to a retaliatory hostile work environment.[14]

190. After leaving Boeing, John moved back to Louisiana to be near his family.

191. From 2017 until his death, John continued to suffer from PTSD, with symptoms of depression, stress, anxiety and panic attacks, and nightmares about planes falling from the sky. He spoke about these worries with his brothers and conducted media interviews.[15] John feared that the issues he had complained about while working at BSC had not been resolved and would someday result in a catastrophic event. His fears were soon realized.

192. On October 29, 2018, a Lion Air 737 MAX crashed off the coast of Indonesia, killing 189 people.

---

[14] John had planned to work at Boeing for at least another ten years.

[15] John's courage and bravery to speak out to protect the flying public did not go unnoticed. In 2019, John was awarded The Joe A. Callaway Award for Civic Courage. *See* Mark Worth, *Boeing 787 Whistleblower Mitch Barnett Honored by Ralph Nader*, LinkedIn (Nov. 6, 2019), https://www.linkedin.com/pulse/test-mark-worth?trk=public_post_feed-article-content. John was also post-humously awarded the Blueprint North America Whistleblowing Prize for 2024. *See 2024 Blueprint North America Whistleblowing Prize*, Blueprint for Free Speech, https://www.blueprintforfreespeech.net/en/prize/recipients/2024/boeing-whistleblowers; *Blueprint for Free Speech Whistleblower Prizes 2024*, Byline Times (Dec. 5, 2024), https://byline.tv/video/blueprint-for-free-speech-whistleblower-prizes-2024/.

193. On March 10, 2019, an Ethiopian Air 737 MAX crashed shortly after taking off from the airport in Ethiopia, killing 157 people.

194. The U.S. House Committee on Transportation and Infrastructure investigated the Boeing 737 MAX crashes, and it released a Final Report on September 15, 2020, wherein it enumerated five central themes concerning the 737 MAX failures. Of these, the Committee noted that Boeing engaged in "extensive efforts to cut costs, maintain the 737 MAX program schedule, and avoid slowing the 737 MAX production line." And the Committee noted a "culture of concealment" as a result of Boeing withholding "crucial information from the FAA, its customers, and 737 MAX fleet."

195. On January 5, 2024, a door plug blew off an Alaska Airlines 737 MAX while the plane was at approximately 16,000 feet, causing a depressurization event that forced the pilots to make an emergency landing. Immediately upon depressurization, the force ripped a passenger's shirt off and sucked oxygen, debris, and cell phones out of the plane. Other interior parts of the plane were also damaged. Some of the passengers suffered physical injury and all implicitly suffered emotional injury and trauma.

196. Reports claim that the door plug blew out because of undocumented work, which violated processes and procedures required by law, and that some of the emergency oxygen masks did not work.[16]

197. Following this event, the FAA found that the door plug blowout resulted from Boeing's failure to follow processes and procedures. The FAA subsequently conducted a major

---

[16] *See* David Shepardson, *Boeing Unauthorized 737 Work Issue Should Have Been Caught Years Earlier, NTSB Says*, Reuters (Aug. 7, 2024, 7:27 PM), https://www.reuters.com/business/ aerospace-defense/us-safety-board-scrutinize-faa-oversight-boeing-2024-08-07/; Pete Syme, *Alaska Airlines Passengers Were Hit in the Face By Debris, Struggled with Oxygen Masks, and One Had a Seizure After Landing, Lawsuit Says*, Bus. Insider (Jan. 19, 2024, 7:58 AM), https://www.businessinsider.com/alaska-airlines-passengers-hit-by-debris-faulty-oxygen-masks-lawsuit-2024-1.

audit of Boeing's quality management system and found that Boeing failed to comply with manufacturing quality control requirements.

198. These incidents only increased John's stress because he was aware of the process and procedure violations on the 787 aircraft and remained deeply concerned that the quality defects he reported to the FAA, including the defective e-nuts that resulted in sharp titanium slivers falling on wires below and the defective oxygen tank squibs, had not been adequately addressed.

199. Boeing knew that John remained deeply concerned. Despite being ordered by the AIR21 Administrative Law Judge on three occasions to produce all records that would have informed John what action had been taken to remedy the defects he had documented, Boeing refused to produce responsive documents.

200. Following the two 737 MAX crashes and the 737 MAX door plug blow out, and because he knew that processes and procedures at BSC were ignored, that defects were not properly documented, that serious defects had not been addressed, and as a result of Boeing preventing John's co-worker friends from having any contact with him, John's PTSD symptoms were exacerbated after the two 737 MAX crashes and the 737 MAX door plug blow out, because John knew that processes and procedures at BSC were ignored, because defects were not properly documented, because serious defects had not been addressed, and because Boeing prevented John's co-worker friends from having any contact with him. As a result, he suffered additional depression, anxiety, and panic attacks.

201. While in Charleston for his deposition, John contacted two close friends who were still working at Boeing because he was scheduled to get together with them during that time. The friends cancelled and told John that Boeing advised them to have no contact with him. This was an example of Boeing's further retaliatory conduct by blocking his friends from even spending time with or talking to John.

202. On March 4, 2024, John was seen again by his same mental health counselor. He reported ongoing nightmares involving people dying in airplanes. He continued to exhibit symptoms of PTSD: anxiety, sadness, fear of impending deaths of others, and intrusive thoughts. In her notes, the mental health counselor stated:

> 3/4/24 Client seen at request of attorney Robert Turkewitz. Client is in legal procedures w/former employer (Boeing) and Mr Turkewitz is his attorney. Client continues to take an antidepressant for his anxiety but reported anytime he must engage with legal case he experiences increased anxiety. Has a call into PCP for increase of meds. Had client briefly review life events since we last met before focusing on current anxiety. Client reported ongoing nightmares involving people dying in airplanes. He reported he wakes in a panic state and can't return to sleep after this. Reported these increased w/recent incident of door not being properly secured and blowing off plane while in the air. Client discussed feelings of anticipatory grief of loss of life due to poor adherence to production regulations of former employer. Client continues to exhibit sxs of PTSD: anxiety, sadness, fear of impending death of others and intrusive thoughts.

203. On March 7, 2024, and March 8, 2024, John gave deposition testimony in Charleston, South Carolina for his AIR21 litigation.

204. On the morning of March 9, 2024, John was scheduled to finish his deposition testimony but failed to show. John was later found dead in his truck in the parking lot of his hotel. John went out to his truck at about 8:45pm on March 8. **Exhibit B**, at 37; **Exhibit C**, Coroner's Report, at 2. Based on the hotel's surveillance tapes, the Coroner's Report and Police Report concluded that John spent the *entire night* in his truck and never left. **Exhibit B**, at 37; **Exhibit C**, at 2. The police and coroner's investigations determined he died from a self-inflicted gunshot wound to the head. **Exhibit B**, at 51; **Exhibit C**, at 2.

205. John left a note, which is above in this Complaint, that demonstrates the retaliation, harassment, and maltreatment he experienced at the hands of Boeing caused his PTSD, which, in turn, caused his suicide and untimely death.

206. Boeing is responsible for John's wrongful death, as it was foreseeable that Boeing's hostile work environment and failure to address his quality concerns for seven years would cause John to suffer from PTSD, severe stress, anxiety, and depression, which are all well known to be associated with an increased risk of suicide.

207. Further, after John's constructive discharge, Boeing knew John was deeply concerned about the defects he documented, some of which he reported to the FAA, and that he continued to suffer from PTSD, severe stress, anxiety, and depression. It was foreseeable that by intentionally withholding information about how these concerns that John raised were addressed and by preventing John's friends from having any contact with him, it would cause John to suffer further mental distress and exacerbate his PTSD.

208. The hostile work environment, retaliation, gaslighting, social isolation, devaluation of his work, disrupted sense of purpose, bullying, and blocking potential for professional growth all caused John's PTSD, anxiety, panic attacks, and depression, which in turn caused his suicide.

## E.     OTHER BOEING WHSTLEBLOWERS HAVE ALSO SUFFERED RETALIATION.

209. John's experience at Boeing was far from unique.  Rather, he was one of numerous employees subjected to retaliation for engaging in protected activities.

210. Cynthia Kitchens ("Kitchens") worked at BSC as a Product Quality Manager K from November 16, 2009, until June 30, 2016, when she was forced to resign due to a hostile work environment. *See* **Exhibit D**, Kitchens Affidavit, at ¶ 2.

211. During her assignment to the 787 BSC-Mid Assembly Quality Department at BSC, she observed numerous quality, development, and assembly issues, including:

- metal shavings (FOD) in the aircraft, including FOD on and inside wiring bundles, which were being installed on aircraft, with knowledge that these bundles contained FOD embedded within these and/or being routed improperly;

- instructions from management to make repairs without the required documentation and engineering dispositions;

- the voiding of non-conformances in order to meet production schedule by senior managers;

- installing of damaged and/or non-conforming parts onto the aircraft at the direction of senior managers;

- individuals being told by upper management to not find or write non-conformances;

- individuals being instructed to write pick-ups, instead of non-conformances, in order to meet production deadlines; and

- pick-ups were destroyed on a regular basis to prevent a paper trail for the build record.

**Exhibit D**, at ¶ 4.

212. Kitchens also observed the failure to follow the ISO9001 building guidelines of the aircraft certification; the failure of employees to log into Velocity to make an accurate build record of the aircraft (employees were having other employees sign in to do the work on their behalf, in violation of FAA regulations); and other serious safety issues, including the use of improper lubricant on the jackscrew fittings on several 787 aircraft. **Exhibit D**, at ¶ 4.

213. She, along with several other colleagues, reported many of these observations in a 2011 written complaint, including photographs of substantial defects, submitted to the U.S. Department of Transportation Office of Inspector General. *See* **Exhibit D**, at ¶ 4.

214. In 2011, Kitchens made an ethics complaint against a co-manager, where she addressed several issues about him and his aggressive behavior towards employees and others. **Exhibit D**, at ¶ 5. A week later, Kitchens' co-manager physically assaulted and battered her on the plant floor. *Id.* He charged at her on the plant floor and shoved and pinned her with his forearm and elbow up against a metal railing. *Id.* He placed his face inches from hers, raised his other hand, and shoved his pointed finger into her face and screamed that she "needed to learn to get on the good old boy system" or she would go "nowhere in the company." *Id.* Kitchens' co-manager was upset that Kitchens checked out Boeing-issued cameras that she was using to photograph and document defective work approved by him and his crew, which she had complained about before. *See id.*

215. Shortly thereafter, a witness of the assault on Kitchens complained to Corporate Ethics about the incident. **Exhibit D**, at ¶ 6. Instead of Boeing immediately reporting Kitchens' co-manager's conduct to law enforcement, he was promoted just a few weeks later to Kitchens' direct supervisor. *Id.*

216. In 2012, Kitchens' Performance Management ("PM") scores were reduced in retaliation for reporting her supervisor for inappropriate remarks in the workplace and for reporting unprofessional behavior of other senior managers. **Exhibit D**, at ¶ 8.

217. The following year, Kitchens was diagnosed with cancer. **Exhibit D**, at ¶ 9. She underwent extensive treatment and was out of work. *Id.* Before this, she had a PM score of 19. *Id.* While she was out of work receiving treatment, her supervisor reduced her PM score to l4. *Id.* She was never informed that her PM score was being lowered. *Id.*

218. During 2015, Kitchens applied for 14 positions and, despite being qualified for them all, she was not selected for any of the positions. **Exhibit D**, at ¶ 10.

219. The hostile work environment at Boeing caused Kitchens to have a high level of stress. **Exhibit D**, at ¶ 11. The daily stress that she had accumulated caused her doctor to put her on medical leave for two weeks, and soon thereafter, she started seeing a cardiologist. *Id.*

220. Kitchens continually and repeatedly insisted that FAA regulations be followed. **Exhibit D**, at ¶ 14. As a result, she faced a repetitive and systematic pattern of being requested to violate or ignore the law or otherwise was threatened with unwanted discipline or placed on performance watch. *Id.*

221. Several other current or former Boeing employees have claimed that Boeing retaliated against them after they blew the whistle about Boeing's safety violations.[17]

## V. CLAIMS

### FIRST CAUSE OF ACTION
### (WRONGFUL DEATH)

222. Plaintiffs reallege and reiterate paragraphs 1 through 221 as if fully set forth in this paragraph in its entirety.

223. Boeing had a duty to maintain a safe work environment for its employees, free from pressure to cut corners and violate the law, as well as free from hostility and retaliation.

224. Boeing breached its duty of care by intentionally pressuring John to violate the law and subjecting John, an employee, to a hostile workplace that not only inflicted severe emotional distress but was also certain or substantially certain to cause such distress.

---

[17] *See* Sayak Basu, *The Curious Case of Boeing Whistleblowers Dying*, Deccan Herald (May 3, 2024, 8:54 AM), https://www.deccanherald.com/business/companies/the-curious-case-of-boeing-whistleblowers-dying-3006364; s*ee also 2024 Blueprint North America Whistleblowing Prize*, Blueprint for Free Speech, https://www.blueprintforfreespeech.net/en/prize/recipients/2024/boeing-whistleblowers; *Blueprint for Free Speech Whistleblower Prizes 2024*, Byline Times (Dec. 5, 2024), https://byline.tv/video/blueprint-for-free-speech-whistleblower-prizes-2024/.

225. Boeing acted intentionally, with an intent to inflict harm on John, to "break him" and in fact harmed John by driving him to suicide.

226. It was foreseeable that Boeing's conduct in subjecting John to a hostile work environment and preventing quality and safety processes and procedures from being followed would cause John to suffer from PTSD, depression, anxiety, and panic attacks.

227. John's emotional distress was so severe that no reasonable person could be expected to endure it.

228. Therefore, Boeing's actions, which include subjecting John to a hostile work environment, were the proximate cause of John's mental injuries such as PTSD, depression, anxiety, and panic attacks.

229. It is well known that individuals suffering from PTSD, depression, anxiety, and panic attacks are at much greater risk of suicide, and accordingly, John's suicide was also foreseeable, especially given the severity and prolonged nature of the hostile work environment he experienced at Boeing.

230. John's PTSD, depression, anxiety, and panic attacks, all caused by Boeing's wrongful conduct, caused him to take his own life, which he would not have done but for being subjected to Boeing's hostile work environment and its continuing retaliatory conduct.

231. Boeing's conduct was willful, wanton, and reckless.

232. As a result of Boeing's conduct, John met an untimely death. The beneficiaries of John have endured and continue to endure: (1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, and (5) deprivation of the use and comfort of the decedent's society, the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries.

## SECOND CAUSE OF ACTION
### (ABUSE OF PROCESS)

233. Plaintiffs reallege and reiterate paragraphs 1 through 221 as if fully set forth in this paragraph in its entirety.

234. During the pendency of the AIR21 litigation and to this day, Boeing's litigation tactics have been intentionally used in part for an improper ulterior purpose.

235. Boeing willfully engaged in conduct not proper in the regular course of the proceeding, including its refusal to comply with three court orders to produce highly relevant documents in the AIR21 case regarding serious safety and quality defects in the 787 aircraft and Boeing's failure to adequately address those safety and quality defects, as well as documents reflecting misrepresentations made by Boeing to the FAA and to OSHA in the AIR21 litigation.

236. Boeing's ulterior purpose was to withhold the production of key documents to prevent John from further pursuing his whistleblower complaints with the FAA concerning serious safety and quality defects on 787 aircraft, and to prevent the FAA, OSHA, Congress, and the public from learning how Boeing violated safety regulations to save money.

237. Boeing's ulterior purpose in withholding the production of key documents was also to weaponize the legal process and to push John to his "breaking point," to silence him, and to push him to stop pursuing his complaint and to stop him from speaking out about Boeing.

238. Boeing's tactics were intended to prevent disclosure of its misrepresentations to OSHA and the FAA to prevent John from further pursuing his pending FAA whistleblower complaints and the AIR21 case, and to keep him from demonstrating that Boeing had failed to adequately address those complaints.

239. Boeing abused the litigation process in withholding these key documents to gain a collateral advantage by concealing its conduct from the government and from the public, and to ratchet up the pressure on John in an effort to "break" him.

240. The U.S. House Transportation and Infrastructure Committee found during its investigation of the 737 MAX crashes that Boeing had a "culture of concealment," and media outlets reported that Boeing sought to conceal information even from the political leaders of our country. *See supra* ¶ 194.

241. Boeing again recently sought to conceal documents from the Permanent Sub-Committee on Investigations of the U.S. Senate Committee on Homeland Security & Governmental Affairs regarding Boeing's safety culture when it provided thousands of pages of "gobbledygook" to the Committee's request for production of documents.[18]

242. Boeing was sanctioned by the court in the pending AIR21 case and had one of its defenses struck for violating the court's orders to produce the key documents referenced previously.

243. Boeing's concerted efforts to withhold evidence and documents in litigation under the circumstances (i.e., to hinder John from further pursuing his FAA whistleblower complaint regarding serious defects that were concealed from the FAA; to hide relevant and material information from the FAA, OSHA, Congress, Department of Labor, and the public; and to further retaliate against John) rise to the level of the tort of abuse of process.

244. Boeing's conduct was willful, wanton, and reckless.

245. Boeing's conduct harmed John.

---

[18] Bloomberg Quicktake, *Sen. Blumenthal Calls Out Boeing's 'Gobbledygook' Safety Data*, YouTube (June 18, 2024), https://www.youtube.com/watch?v=PhtY5igpvl0.

246. As such, Plaintiffs are entitled to actual, special, and punitive damages due to Boeing's abuse of process, as Boeing's conduct contributed to John's ongoing mental distress and avoidable death.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment against the Defendant for (1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, and (5) deprivation of the use and comfort of the decedent's society, the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries, as well as funeral and burial expenses, together with punitive damages in an appropriate amount, for the costs of this action, reasonable attorneys' fees and for such other and further relief as this Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all issues raised in this Complaint.

-Signature Page to Follow-

Dated: March 19, 2025                Respectfully submitted,

                                     *s/ Robert M. Turkewitz*
                                     Robert M. Turkewitz (Fed ID No.: 4902)
                                     **LAW OFFICE OF ROBERT M. TURKEWITZ, LLC**
                                     768 St. Andrews Blvd.
                                     Charleston, SC 29407
                                     T: 843-628-7868
                                     F: 843-277-1438
                                     rob@rmtlegal.com

                                     Brian M. Knowles (Fed ID No: 9694)
                                     **KNOWLES LAW FIRM, PC**
                                     768 St. Andrews Blvd.
                                     Charleston, SC 29407
                                     T: (843) 810-7596
                                     F: (877) 408-1078
                                     brian@knowlesinternational.com
                                     www.knowlesinternational.com

                                     David Boies *(pro hac vice forthcoming)*
                                     **BOIES SCHILLER FLEXNER LLP**
                                     333 Main Street
                                     Armonk, NY 10504
                                     T: (914) 749-8201
                                     F: (914) 749-8300
                                     dboies@bsfllp.com

                                     Sigrid McCawley *(pro hac vice forthcoming)*
                                     Carl Goldfarb *(pro hac vice forthcoming)*
                                     Sara Murray *(pro hac vice forthcoming)*
                                     **BOIES SCHILLER FLEXNER LLP**
                                     401 East Las Olas Blvd., Suite 1200
                                     Fort Lauderdale, Florida 33301
                                     T: (954) 356-0011
                                     F: (954) 356-0022
                                     smccawley@bsfllp.com
                                     cgoldfarb@bsfllp.com
                                     smurray@bsfllp.com
                                     www.bsfllp.com

                                     *Attorneys for Plaintiffs*

# EXHIBIT A

**IN THE UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | |
|---|---|
| JOHN M. BARNETT, | ) CASE NO.: 2021-AIR-00007 |
| | ) |
| Complainant, | ) |
| | ) |
| v. | ) **FIRST AMENDED COMPLAINT** |
| | ) |
| THE BOEING COMPANY, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

     Complainant John M. Barnett, by and through his counsel, Robert M. Turkewitz, of the Law Office of Robert M. Turkewitz, LLC, and Brian M. Knowles of Knowles Law Firm, PC, respectfully submits this First Amended Complaint alleging the following:

## I. INTRODUCTION

1)    This is an action for wrongful retaliation under Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"), in which Complainant, John M. Barnett ("Barnett"), a long-term Boeing Quality Manager, alleges that throughout his seven-year tenure at Boeing South Carolina ("BSC") made numerous ethics complaints about a deep-rooted and persistent culture of concealment at BSC in which he and other quality personnel were pressured by Boeing upper management to violate Federal Aviation Administration ("FAA") Standards and Regulations, as well as Boeing's processes and procedures by not properly documenting and remedying defects. Notably, failing to properly document and remedy defects results in an incomplete build record, which constitutes a criminal felony offense and has the potential to adversely impact the safety of the flying public. Barnett refused to bend to the pressure and continually raised issues that needed to be properly documented and addressed. In retaliation for his complaints and identifying issues that needed to be properly documented and addressed, Barnett was given low Performance Management ("PM") scores, he was separated from his team

and moved to other areas in the plant, and blacklisted and blocked from transferring to other Boeing divisions outside of BSC. In addition, he was subjected to a gaslighting campaign in which he was harassed, denigrated, humiliated, and treated with scorn and contempt by upper management, which was calculated to discourage him and others from raising such issues and complying with the law. Based on the totality of the circumstances, such conduct amounted to a hostile work environment and it led to Barnett's constructive discharge.[1]

## II. FACTUAL BACKGROUND REGARDING BARNETT'S EMPLOYMENT WITH BOEING

2)     Barnett worked for Boeing for 32 years, 17 of which he worked as a Quality Manager. Prior to his transfer to BSC, Barnett worked at Boeing's Everett facilities, where he worked as an electrician on the 747 program, and as an inspector, planner, auditor, Quality Assurance Inspector ("QA"), and First Line Quality Assurance Manager in over dozens of programs (including 747, 767, 777 and 787, and included assignments in the Material Review Segregation Area ("MRSA"). He worked as a Second Level Manager over the Everett Receiving Inspection Organization with a $10 Million annual budget, supporting the entire Everett, Washington site. He traveled to various countries as a Boeing Quality Representative developing, implementing, and driving quality improvement plans with suppliers and assuring they met Boeing's Quality requirements and delivery schedules. Barnett also traveled around the U.S. representing Boeing Everett Quality in High Level Executive meetings. He was constantly and consistently recognized as a top performer regardless of the area or Organization he was in. Barnett took over 1000 hours of specialized off-hour Boeing training in auditing, production, inventory management, management, and

---

[1] Because of Boeing's culture of concealment, there is a mounting list of 787 defects needing to be addressed. Boeing's customers and shareholders are now paying that price, which could be in the billions. See   https://www.aerotime.aero/27357-boeing-costs-787-issues#google_vignette   Barnett remains concerned that the concealed issues will result in a catastrophic event.

communicating across cultures. He has also taken College courses at night working towards a Bachelor's Degree in Production and Inventory Control Systems with an emphasis in Management.

3)     Barnett began working as a Quality Multi-family Manager at BSC in November 2010. On Jan, 16, 2017, he filed this AIR-21 wrongful retaliation action with OSHA/FAA. On January 23, 2017, Barnett went on a medical leave of absence at the advice of his treating physician because of the stress and emotional duress that he was subjected to as a result of Boeing's retaliatory conduct. Although he had planned to work at Boeing for at least another ten years, he took an early retirement on March 1, 2017 due to the employment-related stress. As discussed below, Barnett was subjected to a hostile work environment that led to his constructive discharge.

4)     The FAA's safety and quality standards and regulations require aircraft manufacturers to document all work performed, all defects detected and remedial work conducted and trace every part assembled on an aircraft. As a result, Boeing is required to document and trace every single part of its aircraft. For the 787 program, Boeing accomplishes this with its proprietary software system known as Velocity. The documentation contained in Velocity constitutes the build record for each 787 aircraft.

5)     The basic premise of quality is if it is not documented, it did not happen. Because of that, FAA's Standards and Regulations, as well as Boeing's processes and procedures, require that all violations of such processes and procedures and defects be properly documented.

6)     As a Quality Assurance manager, Barnett was legally obligated to follow the FAA's safety and quality standards, which includes the requirement that all inspections of work performed on aircraft be properly conducted and documented, and that all defects be properly documented and

remedied. As a QA manager, Barnett also had an ethical obligation to the flying public to ensure that the legal obligations set forth above were properly fulfilled.

7)     In order to comply with the law and to ensure the safety of the flying public, it is essential for QA managers at Boeing to require FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed, that all process and procedure violations and defects be documented in writing, that any defects be noted and corrected, and that all parts be properly traced and documented. It is also important to ensure that corners are not cut and that work not be performed in the "gray area."

8)     Under FAA regulation 14 CFR §21.146, all Boeing employees who work on or inspect a 787 aircraft are required to log into Velocity and document all work and inspections performed. Defects in workmanship that require engineering disposition are noted with the use of "non-conformances," which are identified by mechanics and entered into Velocity by Quality Inspectors. Intentionally failing to log into Velocity is a violation of Boeing's Quality Management System ("QMS"), and intentionally failing to document a defect in Velocity is a violation of Boeing's Production Certificate granted by the FAA pursuant to 14 CFR §21.146 (c) and (f). Furthermore, intentionally falsifying an aircraft build record is a violation of 14 CFR §43.12 (Maintenance Records: Falsification, reproduction, or alteration). In addition, falsifying or concealing a material fact or making a materially false writing is in violation of 18 U.S.C §38.[2]

---

[2] 18 U.S.C. §38. Fraud involving aircraft or space vehicle parts in interstate or foreign commerce

(a)  Offenses.—Whoever, in or affecting interstate or foreign commerce, ***knowingly and with the intent to defraud***—

  (1)

    (A) **falsifies or conceals a material fact concerning any aircraft** or space vehicle part;

    (B) **makes any materially fraudulent representation concerning any aircraft** or space vehicle part; or

### III. BARNETT'S PROTECTED ACTIVITY

9)      During his employment at Boeing, Barnett engaged in the following protected activity: a) continually objected to Boeing creating and maintaining a program not approved by the FAA that allowed mechanics to inspect and approve their own work, known as the Multi-function Process Performer (MFPP); b) continually insisted verbally and in writing that BSC's processes and procedures be followed and that defects be properly documented in the face of management pressure to deviate from the rules in order to allow production to meet deadlines; c) sent emails in 2012 to BSC Quality Director ███████ complaining about Barnett's Senior Second Level Quality Manager, ███████; d) filed a 2014 Ethics Complaint regarding manager ███████; d) refused to pencil whip lost nonconforming parts[3]; e) objected to Foreign Object Debris ("FOD") found in the form of titanium slivers from e-nuts not being fixed and cleaned up; f) objected to the investigation of defective oxygen squibs being shut down; g) insisted that missing/incomplete/incorrect serial number data and Aircraft Readiness Log/Serial Number Control (ARL/SNC) data be corrected on all delivered aircraft; and h) filed an October 2016 Ethics

---

(C) **makes or uses any materially false writing, entry, certification, document, record, data plate, label, or electronic communication concerning any aircraft** or space vehicle part;

(2) **exports from or imports or introduces into the United States, sells, trades, installs on or in any aircraft or space vehicle any aircraft or space vehicle part using or by means of a fraudulent representation, document, record, certification, depiction, data plate, label, or electronic communication**; or

(3) **attempts or conspires to commit an offense** described in paragraph (1) or (2), shall be punished as provided in subsection (b).

(b) Penalties.—The punishment for an offense under subsection (a) is as follows:

(1) Aviation quality.—**If the offense relates to the aviation quality of a part and the part is installed in an aircraft or space vehicle, a fine of not more than $500,000, imprisonment for not more than 15 years, or both.**

[3] Pencil whipping is a term used to describe the documentation of an inspection or other activity that is not actually performed.

Complaint regarding his manager, ███████, and for retaliation, a hostile work environment and for being blacklisted and blocked from other positions.

    **a)** **Barnett's continuing objections to the MFPP program and his continuing insistence that Boeing's QMS processes and procedures be followed and that defects be properly documented in the face of management pressure to deviate from the rules in order to allow production to meet deadlines.**

10)    Barnett first reported to ███████ Senior Quality Manager at BSC. ███████ pushed his quality managers to insist that FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed, and that quality not be sacrificed, or corners cut. Notably, Boeing management pushed for quality to deviate from the rules in order to allow production to meet deadlines. In particular, BSC upper management implemented the MFPP program whereby Boeing mechanics were given authority to inspect and approve their own work. Notably, the MFPP program was implemented without FAA approval and was in violation of Boeing's Production Certificate granted by the FAA pursuant to 14 CFR §21.146 (c) and (f). When ███████ objected to implementation of the MFPP program and insisted that Boeing not deviate from the rules, he was threatened with termination. He utilized his contacts at Seattle and arranged to be transferred back to Washington State with a down grade in 2012.

11)    Notably, Barnett was very vocal in supporting ███████ position that the MFPP program was illegal and that FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed. Throughout Barnett's tenure at BSC, he was vocal in his refusal to deviate from FAA's safety and quality standards and regulations, as well as Boeing's processes and procedures.

    ~~b)~~ **Barnett's emails in 2012 to BSC Quality Director** ███████ **complaining about Senior Second Level Quality Manager,** ███████

12)    ███████, who was appointed as Senior Second Level Quality Manager began pushing Barnett to work outside the proper procedures. In 2012, Barnett emailed the BSC Director ███

████ twice complaining about being pushed to work outside the proper procedures. ████ told Barnett orally that he did not believe him. No investigation was conducted.

13)    Barnett continually insisted on the proper procedures being followed. Barnett complained about countless instances where parts were being stolen from one airplane and installed on an incomplete airplane without any documentation, traceability or engineering review. In most cases, the mechanic would come to work to find that the parts s/he installed the day before were gone. Upper Management ignored the stolen parts problem and insisted that Barnett stop documenting them in e-mails and on CA's (corrective action EPDs). All corrective action EPD's for stolen parts were cancelled per Leadership direction without any investigation or corrective action. (Ethics has the records).

14)    In October 2012, ████ denigrated Barnett in front of his team and moved him to 2nd shift in retaliation for insisting that the proper procedures be followed. Following up on Barnett's previous emails to the Quality Director ████, Barnett's team submitted an ethics complaint regarding ████ conduct. In June 2013, ████ was demoted and removed from management for his "unethical behavior."

c)    **Barnett's Objection to FOD in the Form of Titanium Slivers from E-Nuts Not Being Fixed and Cleaned up.**

15)    In August 2014, Barnett discovered that fasteners used to hold down the floorboards (screws and "e-nuts") were leaving up to 3" long titanium slivers when they were installed, allowing the titanium slivers to fall onto wire bundles, electrical boxes and electronic components located between the floor panels and cargo compartment ceiling panels, as well as above the center wing tank area and all of the electronic equipment located there. Slivers were found all over the wiring, in electrical boxes and other places.

16)    When Barnett discovered the FOD, █████ ordered him to let it go because it would cost too much to remove all the ceiling panels to clean and they might get damaged during removal. Barnett strongly disagreed at the time and insisted the panels be removed and the electrical components cleaned to eliminate the risk of electrical shorting in service. Barnett was removed from the project and another manager was put in charge of it. Leadership decided to let the FOD remain instead of removing the cargo ceiling panels and cleaning the FOD.

**d)   Barnett's June 2014 Ethics Complaint Regarding Manager ████████**

17)    ████████ was appointed as Senior Quality Manager, and he immediately split up Barnett's quality inspection team in retaliation for them submitting the ethics complaint. Notably, █████ continued where █████ left off on insisting that quality not document work performed outside the proper procedures, that process violations be ignored, that parts being stolen from completed aircraft be ignored, etc. In June 2014, Barnett submitted a complaint to Corporate Ethics against █████ for violating procedures, ignoring process violations, pushing Barnett to "work in the grey areas," and having another manger spy on Barnett. Although Barnett's complaint was substantiated by Corporate Ethics, no action was taken to address the complaints. One month later, in retaliation for his complaints, █████ downgraded Barnett's performance rating to a 15, and penalized Barnett for not "working in the grey areas of the procedures," for documenting process violations, for not agreeing to allow Manufacturing to violate processes. The downgraded rating was also based on false rumors started by Leadership that Barnett did not get along with his peers.

18)    When █████ learned that Barnett was writing to HR regarding his rating, █████ threatened to pull his emails.

19)    In September 2014, Barnett learned that █████ had previously placed him on a 60-day corrective action plan without even notifying Barnett. Barnett met with █████, the BSC Ethics Manager, and complained about being placed on a 60-Day Corrective Action Plan without being

notified and based on false information and misrepresentations. ████ said it was an HR issue and that he couldn't do anything about it. Barnett e-mailed the BSC VP of Quality, ████████████ asking for a short meeting with him to discuss Barnett's concerns with the Leadership Team. Barnett never received a response or acknowledgement of any kind from ████

20)     In February 2015, ████ and ████████ reassigned Barnett to MRSA, reporting to ████████. As Barnett was packing his desk later that day to relocate to MRSA, ████ told him he couldn't believe that Barnett reported "The Quality Organization to Ethics" and that he should be ashamed. It "made the whole Organization look bad."

21)     In April 2015, Barnett received an e-mail from ████████ stating they substantiated his complaints from June 2014 and informed him they opened a second investigation against ████ for "behavioral issues." Barnett provided HR with e-mails and other documents to support his complaint of a hostile work environment, being set up for failure, the ambush of the 60-Day Corrective Action Plan, the misrepresentations and false information in it, the fact that he had been reassigned in retaliation by the very person against whom he filed a complaint. Barnett was not provided a close out meeting to report the results of his complaint (as he should have been), and from Barnett's perspective, no action was taken.

22)     In July 2015, Barnett was informed that some of his team had been reassigned without his knowledge. This left areas over which Barnett had responsibility unsupported and without the critical skills needed to accomplish the mission. This generated multiple complaints from Manufacturing against Barnett for not supporting them.

### e)   Barnett's Refusal to Pencil Whip Lost Nonconforming Parts

23)     In July 2016, Barnett was assigned to handle lost nonconforming parts Shop Order Instance (SOI) closure activity at MRSA, and was given 2 days to "close out" over 400 lost nonconforming parts SOIs without investigating them. Barnett had discovered close to 200 SOIs had already been

pencil whipped and closed out by another group without investigating them. Barnett strongly objected and pressed that they be reopened and investigated. He was ordered to let it go, which would be a violation of FAA regulations which required that lost parts be documented and reported to the FAA.[4]

### f)    Barnett's Objection to the investigation of Defective Oxygen Squibs Being Shut Down

24)    In August 2016, Barnett became aware that the squibs in the emergency passenger oxygen tanks in MRSA were defective and failed to activate and release oxygen as required. Out of a sample size of 300 PSU emergency oxygen bottles, 75 of them did not fire properly when activated. Barnett was criticized for documenting this issue and was immediately removed from any responsibility for investigating this problem. In September 2016, after placing the 75 defective squibs (that were removed from the oxygen bottles) in quarantine and pushing Leadership to have them analyzed for defect analysis, Barnett was removed from the investigation. Upon information and belief, no defect analysis has been performed on the squibs, no root cause has been positively identified and no actions have been taken to address the defects. Evidence shows 25% of the emergency passenger oxygen bottles in service on 787s will not operate when activated in an emergency.[5]

---

[4] The lost nonconforming parts themselves were evidence of processes and procedures not being followed since Boeing's policies and procedures do not allow for parts being lost when those instructions are followed.

[5] BSC Quality Leadership has told 3 different stories in response to Barnett's AIR-21 Complaint on why they have failed to perform the failure analysis on the defective squibs. BSC first stated that Barnett reported that the bottles were already empty, so there was no concern. BSC then claimed it didn't perform a defect analysis because there was "damage from handling that caused the failures. BSC later told the FAA there was a very large investigation ongoing with the squibs that included the Supplier. However, upon information and belief, no "large investigation" has to date been conducted.

### g) Barnett's Insistence that Missing/Incomplete/Incorrect Serial Number Data and ARL data Be Corrected on All Delivered Aircraft

25)      On August 18, 2016, Barnett was assigned to investigate the findings regarding a Serial Number Control ("SNC") FAA Audit Finding, and to identify root cause, actions needed to correct the issues, and complete follow through utilizing Boeing's BPSM ("Boeing Problem Solving Method") which is very detailed in all of its requirements.

26)      In September 2016, after leading a cross functional team identifying root causes, actions needed, etc., for the Serial Number FAA Audit Finding, Barnett noticed that all previously delivered airplanes built at BSC had missing/incomplete/incorrect Serial number data and ARL data. Barnett urged ████████ that they needed to investigate and correct all the records on all delivered airplanes and notify BSC Customers, so they could address their fleets. Barnett was removed as the SNC FAA Audit Response Team Leader.

### h) Barnett's September 2016 Ethics Complaint Against Manager ████████ for Process and Procedure Violations.

27)      In September 2016, Barnett's Manager, ████████ took a defective part from the MRSA scrap bin and gave it to Manufacturing for installation on an airplane without any documentation, rework or authority, which is a violation of FAA requirements as well as BSC's own procedures. Barnett's team tried to stop ████████ and reported the violation to Barnett, who then made a complaint to HR.

28)      Barnett was contacted by Ethics regarding his report to HR and he provided information and documentation of the violation, which was substantiated. Barnett was subsequently blocked from a 737 Propulsion Quality Manager position in North Charleston.

### i) Barnett's October 2016 Ethics Complaint Against his Leadership for Retaliatory Conduct, Including Maintaining a Hostile Work Environment and for Blacklisting and Blocking Barnett from Other Positions.

29)    In October 2016, Barnett filed an Ethics complaint in Chicago, Illinois against his Leadership for retaliation, a hostile work environment and for being blacklisted and blocked from other positions. He asked that his complaint be investigated by someone outside of BSC. After being assured it would be handled outside of BSC, the investigation was turned over to local HR in BSC.

30)    Later that month, Barnett sent an e-mail to ████████ (VP of Boeing Corp. Ethics, Washington, DC) and voiced his concerns about how his complaint was handled. ████ assured Barnett that his concerns would be properly investigated. However, it was again turned over to local BSC.

31)    BSC failed to conduct an adequate investigation. On January 5, 2017, Barnett was informed that his Ethics complaint of Oct. 2016 was found to be "unsubstantiated" and determined that the complaint that he was unlawfully blacklisted and blocked from the propulsion job was found to be "unsubstantiated." The other complaints involving the hostile work environment were not even investigated.

32)    On January 13, 2017, Barnett was notified that his name was 1 of 49 listed in an e-mail on Quality Director ████████ desk, entitled "Quality Managers to get rid of."

33)    On January 16, 2017, Barnett filed a complaint through the AIR21 with OSHA for Boeing's retaliation against him for engaging in protected conduct, including maintaining a hostile work environment and blacklisting and blocking him from transferring to another division. Barnett was informed that his complaint was left on a community printer for Boeing employees to see.

## IV. BOEING'S ADVERSE ACTIONS AGAINST BARNETT IN RETALIATION FOR THE PROTECTED ACTIVITIES

34)     Because of his ethics complaints and his refusal to compromise on safety and quality (as discussed previously and herein), Barnett was retaliated against and treated differently in a number of ways, including, but not limited to the following: a) Barnett's supervising managers, ███████ ███████████████ and ███████████ downgraded Barnett's performance management reviews; b) Barnett's supervising manager, ██████ issued a 60-Day Corrective Action Plan against Barnett without cause and without placing him on notice; c) Barnett was removed from investigations of defects in retaliation for his insistence that the problems be fully investigated and remedied, including investigations into defective e-Nuts causing titanium slivers to litter the tops of flight control and other wires and equipment, defective oxygen squibs, and incorrect serial numbers; d) Barnett was blocked from transferring to QA manager positions, including the third shift position in final assembly, Boeing's Aerospace Division in New Orleans, Louisiana, and a Quality Manager position at the Propulsion Division in North Charleston, South Carolina, and e) Barnett's supervising managers, including ███████, ██████████, ██████████ and ████ ████████ continually harassed, denigrated, humiliated, and treated Barnett with scorn and contempt.[6]

### a)   Boeing downgraded Barnett's Performance Management ("PM") Reviews.

35)     Performance Management scores and ratings determine yearly raises, bonuses, and eligibility for participation in special leadership teams, and other perks for top performing managers. At BSC, scores/ratings of 18 or higher is the threshold for satisfactory work.

36)     After vocally supporting ██████████ regarding the illegality of the MFPP program, demanding that Boeing adhere to FAA and Boeing safety standards and procedures, and for not

---

[6] This type of retaliatory conduct is known as gaslighting.

approving certain processes and procedures that violated a multitude of Boeing's Process Instructions and Procedures, including the illegal removal of parts from one aircraft after being installed and inspected to another aircraft without properly documenting the transfer, Barnett was retaliated against with lower performance ratings. Barnett's rating went from a 40 to 16. Barnett continued to have his performance ratings downgraded throughout his tenure at BSC.

37)     In Barnett's July 2014 PM, under the heading, "Interim Manager Comments," Senior Quality Manager, ██████████ stated, "John is very knowledgeable almost to a fault as it gets in the way at times when issues arise. John likes to be right and at times rechallenges issues that appear to [be] resolved at a round table."

38)     The round table discussion referenced by ████████ was a situation where Manufacturing was pushing to use a spreadsheet in place of writing Emergent Removals (ERs) for products removed from an aircraft after it had been installed and inspected. Per Boeing Process Instruction ("BPI") 1581, ERs are required for each part being removed from an aircraft after its final Quality inspection and approval ("buy off"). The ER has specific items that must be reviewed and approved (known as buying it off) by Quality <u>prior</u> to removing a part.[7] In particular, Quality is required to review whether the part removal will interfere with any FAA conformity inspections that had been previously completed. If it does, it is required to contact the FAA prior to removing the part so they are aware and can decide if it will void their conformity inspection or not.

39)     If a spreadsheet or form is used to document build information, it is required to be an official Boeing form and must have: 1) a form number showing it is in the Boeing system and

---

[7] In the past, Boeing referred to Quality as Quality Control, but stopped using this descriptive title because it could not control quality. Boeing then referred to it as Quality Assurance, but again, stopped using this descriptive title because it could not assure quality. As a result, Boeing now describes the title as simply, "Quality."

approved; 2) detailed instructions on how the form is to be completed; and 3) a documented process describing it's use. (*See* Boeing Procedure "PRO" 3019). In the event of a catastrophic failure of the aircraft, the build record must provide traceability and accountability for all parts.

40)     Barnett was asked to approve the use of a spreadsheet for ERs for Line #172,[8] and was told that a spreadsheet had been used in place of ERs on Line #168. Barnett reviewed Line 168's build records and discovered that manufacturing had failed to record any of the ERs for the parts removed and that the spreadsheet that was supposedly used to record part removals was purposefully left blank. Therefore, the build record did not comply with BPI-1581, nor did it provide traceability of what parts were removed.[9]

41)     In Barnett's June 9, 2014 email, he stated "Manufacturing is pressing us to use a spreadsheet instead of ERs because they did it on 168… That is not per process…" *Id*. After being urged by ▮▮▮▮ to make use of the spreadsheet, Barnett noted the problems with the data and stated, "based on this info, I do not agree that the spreadsheet should be used as it does not meet our procedural requirements. In addition, Line 168 had issues with the documentation used and bought off." *Id*. Barnett elevated the issue of Line 168 documents being out of compliance, but no action was taken to correct the documentation.

42)     Barnett's PM was downgraded because he continued to object and raise the fact that the build record was not being properly completed and maintained. Barnett was also penalized on his PM for documenting the process and procedure violations in e-mails.

43)     In Barnett's July 2014 PM, under the heading, "Delivers Results," Barnett received a score of 2 out of 5 "Opportunity for Improvement," because he addressed issues in writing. In particular,

---

[8] Boeing refers to each aircraft as a line number, so Line 168 is the 168th 787 aircraft being built.
[9] Barnett had been advised by Manufacturing that at least 25 parts had been removed for Line 168.

Barnett's PM stated, "John still needs to learn the art of F2F ("face to face") engagement to address and follow up on issues instead of using e-mail to express process violations."

44)     Further, Barnett was penalized on his PM Reviews for not working in the "grey areas" of the processes and procedures. In Barnett's July 2014 PM, under "Interim Manager Comments," ████████ stated, "I would like to see him use his knowledge and experience to find a way to work through issues and the grey areas." (*See Id.*, at 3).

45)     In response to the Interim Manager Comments, Barnett explained the need for process violations to be documented in writing and that there should be no "grey areas" in Boeing's processes:

> After a lengthy discussion regarding process violations, e-mail use and communication, we agreed to disagree with the opinions and assumptions made above. As we discussed, there are no grey areas in our processes once a person fully understands them. As a Quality Manager, it is my responsibility to assure our procedures are followed, we maintain configuration control of the product and we produce a safe conforming product.

*Id*. at 4.

46)     On September 11, 2014, Senior Quality Manager, ████████ sent Barnett an e-mail chastising him for documenting process issues in writing. In his e-mail, ██████ states, "This is one of the items on your PM that brought your score down."

47)     ████████ continued to pressure Barnett to work in grey areas and to not document process violations in writing. In addition, Barnett was pressured by other Boeing senior quality managers to work in grey areas and not document process violations in writing. These managers included ████████, ████████ and ████████.

48)     In addition, Boeing management started rumors that Barnett did not get along with my peers (which was untrue) and used this as a further basis for downgrading his performance evaluations.

49)    Notably, Barnett continued to be penalized and his PMs wrongfully downgraded throughout his time at BSC as a result of his refusal to compromise and work in the grey zone and his insistence that defects be documented in writing as required by FAA Standards and Regulations, as well as Boeing's processes and procedures.

**b)  Boeing issued a 60-day corrective action plan against Barnett.**

50)    On September 12, 2014, Barnett was advised by ██████████ that he issued a Corrective 60 Day Action Plan ("AP") against Barnett, and would send it to him via email. The next day, September 13, 2014, Barnett received ████████ email, attaching the AP issued against him for documenting process violations in writing. In Item 4, it states, "Use F2F (face-to-face) meetings and phone calls to resolve issues and stop using e-mail to argue or stress a point or quality requirement."

51)    Notably, the AP was issued on August 15, 2014 and Barnett was not made aware that the AP was issued until September 12, 2014 when ██████ informed Barnett about it.

52)    On September 15, 2014, Barnett submitted his comments and noted that the AP was provided to him almost one month after being issued, and that it was an example of a "surprise attack."[10]

53)    In Barnett's September 15, 2014 comments, he also stated, "Leadership wants nothing in e-mail so they maintain plausible deniability," and he concluded, "It is obvious Leadership is just looking for items to criticize me on so I stop identifying issues. I will conform!" *Id.*

---

[10]Boeing's rules specifically require that any individual who is the subject of an AP be notified <u>immediately</u>.

54)     In addition, the AP had several entries with the notation, "September Discussion 9/9/14." Since Barnett was not made aware of the AP until September 12, 2014, it was not possible for █████ and Barnett to have had a discussion regarding the AP on September 9, 2014.[11]

55)     Shortly after this surprise attack, Barnett began experiencing chest pains, shortness of breath, nausea and vomiting, which his treating physician attributed to the stress caused by being pressured to work in grey areas, to not document process and procedure violations, and from the hostile work environment that was created.

### c)   Barnett was Removed from Investigations of Defects in Retaliation for his Insistence That the Problems be Fully Investigated and Remedied.

56)     In October 2016, without any explanation, Barnett was removed from the investigation of the defects in the squibs (firing pins) for emergency oxygen bottles, the BPSM Team and all other connections with the Corrective Action Plan for the FAA. Barnett was also removed as the manager of the ARL Team. ███████████ told him that he was being "benched" and that if they needed him, they would "pull him off the bench."

57)     Barnett was removed from investigations of defects in retaliation for his insistence that the problems be fully investigated and remedied.

58)     At the time Barnett went out on Medical Leave, there had been no action taken to investigate and/or correct the already delivered build records, which is a violation of FAA regulations and Boeing's own process instructions.

---

[11] Falsifying records and providing false information to the Company is against Boeing's processes and procedures and is subject to corrective action, up to and including discharge. (*See* PRO-1909 and the ECA guidelines table, BPI-4332).

### d) Barnett was Black Listed and Blocked from Transferring to Various Positions.

### i) Quality Manager Position on Third Shift in Final Assembly

59)     In September 2014, Barnett applied for a 3rd shift position for which he was determined to be the most qualified by Senior Manager, ███████. He was then denied the position by ███████ in retaliation for his complaints.

60)     During a morning meeting with all First Line Managers, Second Level Manager, ███████ announced that they had a third shift Quality Manager position coming available soon and were looking for volunteers. When asked how they would decide if more than one Manager volunteered, ███ stated they would select the individual with the most experience in BSC Final Assembly and if that was a tie, they would select who had the most time with the Company. At that time, Barnett immediately volunteered for the position. Another manager spoke up and stated that Barnett had the most time with the Company and had been in Final Assembly since day one, so he should have the job and ███████ agreed. Notably, ███████ gave the position to ███████, who had been with the company far less time than Barnett and had transferred to Final Assembly the week before.

### ii) Quality Manager Position at Boeing's Aerospace Division in New Orleans, Louisiana

61)     In March 2016, Barnett applied for a Quality Manager Position at Boeing's Aerospace Division in New Orleans, Louisiana. In August 2016, after a structured interview over the phone, Barnett was notified that he had made it past the first phase and was one of two finalists for the position, and he was invited by the hiring manager, ███████, to New Orleans for an in-person interview.

62)     During the in-person interview, Barnett interacted with the NASA Director, other Quality Managers, and the Quality Team. During each conversation, Barnett successfully addressed each

department's struggles and offered his expertise in finding solutions for each struggle. At the conclusion of the interview, the hiring manager, ███████████, informed Barnett that his expertise was a perfect fit for the needs of the position and that he would be a great asset for the team.

63)     Despite the exceptional skill set Barnett presented to the hiring manager and the NASA team, and despite the fact that the hiring manager indicated that he possessed the exact skill set they were looking for, Barnett was informed that he did not obtain the job.

64)     Barnett informed his manager, ███████████, about the results of Barnett's interview and indicated that something was not right in the process. Barnett indicated that he believed someone in Leadership yanked the job out from under him.

65)     While ███████████ told Barnett that she was "looking for a different skill set," she had previously told Barnett that he had precisely the skills they were looking for. Further, the re-post for the job was exactly the same as the first post for the skills needed.

66)     On October 20, 2016, Barnett filed a complaint with Boeing's Ethics Department and asked for it to be handled by an investigator from outside Charleston, South Carolina. Over Claimant's objection, it was turned over to Boeing's local HRG. HR (███████) told Boeing that ████ ███████ decided she needed someone who had "Government Contract" experience.

67)     This explanation was highly questionable since the re-post of the job description did not change and it failed to state that Government Contract experience was a requirement. In fact, the job postings were identical, with the exception of the re-posting mentioning that the job would be for second shift.

68)     In Boeing OSHA Position Statement, it gave a third reason than the ones provided by ████ ███████ and ████████ as to why Barnett was not hired. ███████████ said they decided to hire

someone with a "different skill set," and ███████ said they "were looking for someone with government contracting experience." Boeing subsequently told a different story, that it was looking for a second shift manager, and the decision was based on the Employee Survey scores and PM scores and that "Boeing hired a much more qualified individual than Mr. Barnett…" BPS, at 6.

69)    Boeing's explanation did not comport with reality. First, Boeing seemed to be taking the position that "second shift" was somehow a qualification for the job. "The hiring manager, ███████, was looking for a second shift manager to fill the position. However, she neglected to place this in the initial job posting." BPS, at 6. Whether a manager is first, second or third shift would not have mattered, and Barnett was ready, willing, and <u>qualified</u> to work on any shift.

### iii) Quality Manager position at the Propulsion Division in North Charleston, South Carolina

70)    In January 2016, Boeing South Carolina plant circulated an electronic mail internally containing a job opening for a Quality Manager position at the Propulsion Division in North Charleston, South Carolina.

71)    This position did not go through the standard hiring process and structured interviewing process, but rather it was what is referred to as a "no-post" job. What this means is that there is no job requisition posted on the Boeing Employment page. The hiring decision is handled via e-mail. There is not an interview process, there is no documentation showing how the decision for hire was made or any other evidence to support a hiring decision. No-post jobs are handled in secrecy, behind closed doors with no transparent oversight on decisions made.

72)    Barnett immediately replied expressing his interest, attaching a copy of his resume.

73)    On or around October 2016, ███████ ███████ the hiring manager, asked two of the Propulsion South Carolina Quality Managers to select their top three candidates for the position,

out of an extensive list of candidates. The Quality Managers selected Barnett as the first applicant on the list, indicating their desire to work with Barnett especially because of his expertise and skills set. Their final decision was to hire Barnett.

74)    A few hours later, ███████████ stated that he was told that "We will not be getting John Barnett, they didn't care how bad I wanted him. They said John Barnett is not going anywhere."[12]

> **e)    Barnett was continuously denigrated, humiliated, and treated with scorn and contempt.**

75)    In addition to the previously mentioned adverse actions taken by Boeing in retaliation for Barnett's refusal to compromise and violate the above standards, regulations, processes, and procedures, Barnett was subjected to a gaslighting campaign in which he was continually harassed, denigrated, humiliated, and treated with scorn and contempt by upper management.

76)    For example, there were weekly quality meetings scheduled with Barnett's quality team. During these meetings, Barnett's senior manager, ███████████, on numerous occasions, announced in front of the team that Barnett was responsible for a certain production delay, or that Barnett was responsible for the entire team having to work over-time and being away from their families. These comments were the result of Barnett's documentation of processes, procedure violations, and defects in writing, and Barnett's refusal to work in grey areas and conceal problems.

77)    When Barnett questioned decisions that violated standards, regulations, processes, and procedures, ███████████ raised his hands in the air, waving them around in an animated manner and loudly and aggressively stated, "John, are you just waiving your hands in the air or do you have an idea". Barnett never saw this type of reaction displayed towards any other Manager or employee.

---

[12] This took place after Barnett filed his most recent ethics complaint. Notably, one of the witnesses in Propulsion was warned by their Manager to "stay out of the Barnett thing. Forget it ever happened."

78)    These meetings were always very tense, and the comments made about Barnett were disrespectful, denigrating, sarcastic, degrading, humiliating, mean, and unprofessional. Notably, this gaslighting campaign against Barnett was done in order to punish Barnett for identifying problems, insisting on the rules being followed, and documenting in writing all process and procedure violations and defects. This gaslighting was also directed against Barnett publicly in front of his team to discourage Barnett and others from complying with the law.

79)    The denigrating comments caused Barnett a tremendous amount of stress, made it very difficult for Barnett to concentrate and perform his job, and caused him emotional suffering to the point of taking medical leave of absence and ultimately leaving Boeing, at the advice of Barnett's physician and mental health counselor.

80)    These retaliatory attacks were continuing throughout Barnett's time at BSC and occurred within 90 days of the filing of Mr. Barnett's Air-21 complaint.

## V. Elements Under AIR-21

81)    Pursuant to AIR-21, "No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment" when the employee provides information regarding violations "relating to air carrier safety" to his or her employer or federal authorities. 49 U.S.C. §42121(a)(1); 29 C.F.R. §1979.104(b)(1).

82)    In order to establish a *prima facie* claim of retaliation under the AIR-21, one must allege the existence of facts and evidence sufficient to show that: (i) the employee engaged in protected activity; (ii) the employer knew or suspected that the employee engaged in protected activity; (iii) the employee suffered an adverse action; and (iv) circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action. 29 C.F.R. §1979.104(b)(1).

23

### i) Mr. Barnett engaged in protected activity

83)    Barnett's protected conduct is laid out in Section III. In general, Barnett was continuously pressured by senior quality management at Boeing to work in grey areas and to avoid documenting process and procedure violations and defects. This was seen with various issues, including: 1) the hundreds of defective parts that were missing and that Boeing's Quality Management insisted be "bought off" without any investigation; 2) Boeing's failure to investigate the 25% failure rate with emergency oxygen bottles; and 3) Boeing knowingly maintaining inaccurate and incomplete build records. Barnett refused to work in grey areas, cut corners and white wash problems, and vocally complained that to do so would be unethical and violate Boeing and FAA rules.[13] In addition, Barnett filed numerous ethics complaints against Boeing management for its violations and retaliatory conduct.

### ii) Mr. Barnett suffered adverse action.

84)    Boeing's retaliatory adverse action is laid out in Section IV. Through Boeing's adverse action, Boeing created and maintained hostile work environment that led to Mr. Barnett's constructive discharge.

### iii) Boeing black listed and/or blocked Barnett's transfers to other divisions within Boeing.

85)    As discussed in Section IV.d, Barnett sought to transfer to other Boeing divisions and was blocked by Boeing management in retaliation for his protected conduct.

86)    These positions offered numerous benefits in their conditions, terms and opportunities for advancement.

---

[13] In response to Mr. Barnett's insistence that Boeing follow the rules, he was denigrated, humiliated, and treated with scorn and contempt by senior quality managers at Boeing.

### iv) Boeing created and maintained a hostile work environment.

87)    Boeing–engaged in a pattern of conduct, which created and maintained a hostile work environment in retaliation for Barnett's protected activities (discussed herein a Section III.)

88)    The Supreme Court stated in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 103 (2002):

> Hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the "unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21. Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 23.

89)    In *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 221 (4th Cir. 2016), [14] the Fourth Circuit set forth the elements of a hostile work environment claim:

> To prevail on a hostile work environment claim, "a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" Okoli, 648 F.3d at 220 (quoting Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) ).

90)    Looking at the totality of the circumstances, including all of the adverse actions taken against Barnett, the elements set forth by the Fourth Circuit (*See Guessous*) are satisfied and

---

[14] In *Guessous,* the Court reversed the lower court's finding of summary judgment in favor of employer for the Court's failure to review the totality of the circumstances of allegations of the employee's claim of a hostile work environment.

amounted to a hostile work environment. Barnett has made a *prima facie* showing that he engaged in protected conduct and that he was subjected to a hostile work environment.

91)    The circumstances also amounted to a hostile work environment *per se*. It is a criminal felony offense to not properly document the build record of an aircraft. By pressuring Barnett to not follow processes and procedures and to not properly document defects in the build records, Boeing was ordering Barnett to commit a felony offense. Barnett faced a repetitive and systemic pattern of being requested to violate, circumvent, and ignore the law, and to place profits over safety and quality.

92)    Further, in "at will" states like South Carolina, an employer can fire an employee at any time and for any reason, except where it violates the law or is a violation of "public policy." For example, public policy is violated when an employee is terminated for refusing to take unlawful action. A myriad of cases exist that stand for the proposition (rightfully so) that an employer cannot wrongfully discharge an employee for refusing to violate the law. For instance, as the District of Columbia, Court of Appeals has stated:

> It seems to be universally accepted that an employer's discharge of an employee for the employee's refusal to violate a statute is a wrongful discharge in violation of public policy. **An employer cannot be allowed to require his or her employees to break the law as a condition of continued employment.** […] The employer engages in tortious conduct by affirmatively forcing the employee to choose between breaking the law and keeping his job. **The wrongful discharge of an at-will employee in violation of public policy is thus an intentional tort.**

*Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32; 1991 D.C. App. LEXIS 258 (*citations omitted, and emphasis added*). *See e.g. Burton v. Zwicker & Assocs., PSC*, 577 Fed. Appx. 555, 2014 U.S. App. LEXIS 16358 (6th Cir., 2014).

93)    As mentioned herein, Barnett was given responsibility for documenting lost defective parts while assigned to the MRSA. Barnett knew that FAA regulations require manufacturers to track

all parts, document the disposition of parts deemed to be defective, and to notify the FAA when the disposition of lost parts went unresolved. Boeing ordered Barnett to merely sign off on the lost parts without conducting a full investigation to determine the disposition of the parts. Further, Boeing forbade Barnett from disclosing to the FAA the fact that the disposition of numerous parts went unresolved.

94)     In fact, Boeing created an environment in which Barnett was being harassed, denigrated, humiliated, and treated with scorn and contempt by quality management in the presence of his team, all for insisting that regulations and laws be followed. Boeing certainly intended for Barnett to disregard and violate the law, and Boeing was aware that Barnett had an obligation to fully comply with the law. Boeing's conduct is illegal.

   **a)   Barnett was constructively discharged.**

95)     Barnett resigned because of the stress he experienced as a result of Boeing's insistence that he engage in illegal and unethical conduct. Further, such conditions as those imposed on Barnett are intolerable and actually mandate resignation. Notably, others have resigned because they were faced with the decision to either violate FAA rules and regulations and be rewarded, or follow the law, be harassed, and have no future with the company. Boeing's conduct resulted in the constructive discharge of Barnett.

   **b)   Barnett's complaint was timely filed.**

96)     Barnett anticipates that Boeing will claim that his hostile work environment and his constructive discharge claims are untimely. Barnett's complaint against Boeing for creating and maintaining a hostile work environment is not time barred because Boeing's adverse action took place within 90-days of filing and the hostile work environment was continuous and systemic. The law is clear that where such conduct is continuous and systemic, conduct outside the statute of limitations may be considered.

The question whether a court may, for purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, turns on the statutory requirement that a charge be filed within a certain number of days "after the alleged unlawful employment practice occurred." **Because such a claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," it does not matter that some of the component acts fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability. That act need not be the last act. Subsequent events may still be part of the one claim, and a charge may be filed at a later date and still encompass the whole.**

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 103 (S.Ct. 2002) (*emphasis added*).

97)      Further, Barnett's claim for constructive discharge is timely since the facts for this claim arise out of the conduct, transactions, and occurrences set out in Barnett's Air-21 complaint and to the extent the claim is not included, it relates back to his filing. In that event, Barnett moves to amend his complaint to add his claim for constructive discharge. *See Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 346 (4th Cir. 2014)( Under Rule 15(c), an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B)).

### i) Boeing Knew That Barnett Engaged In Protected Activities.

98)      Boeing knew that Barnett engaged in protected activity.

### ii) The Circumstances Are Sufficient To Raise The Inference That Barnett's Protected Conduct And Activity Were A Contributing Factor To The Unfavorable Action.

99)     Barnett's protected conduct was a contributing factor in the unfavorable action taken against him. First, Barnett's protected activity occurred at or shortly before the adverse action.[15] For example, it was in June 2016 that Barnett was assigned the missing parts in Buildings 88-19 and 88-20, and learned that 176 missing defective parts had been closed out without any investigation. Barnett insisted that these missing parts be fully investigated.   In the face of opposition, in mid-October Barnett attended Boeing's Quality Special Attention Meeting (QSAM) and argued that the parts needed to be fully investigated and that Boeing needed to self-disclose to the FAA if parts are not located. It was at this meeting that Boeing's Quality Director stated that Boeing would not disclose this information to the FAA

100)     Barnett's discussions and complaints regarding the 176 missing parts took place between June and October 2016. As in the past, he was treated like he was a troublemaker and gaslighted following his complaints. It was clear to Barnett that Boeing was isolating him. In addition to being denigrated and treated with scorn and contempt, he was stripped of responsibilities, including participation on the serial number ARL team and oxygen bottle investigation. As discussed below, it was around this same time period that Boeing blocked him from transferring to other positions in retaliation for his efforts to get the missing parts investigated and documented properly.

---

[15] "Normally the burden is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action." 29 C.F.R. §1979.104(b). *See also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2013) (citing cases in which temporal proximity of three months between protected conduct and retaliatory discharge was sufficient to show causation). *Hochstadt v. Worcester Found. For Experimental Biology, Inc.*, 425 F.Supp. 318, 324-25 (D.Mass.) (holding that discharge six months after EEOC settlement and a month after an informal complaint satisfies causation requirement), aff'd, 545 F.2d 222 (1st Cir. 1976).

101)    In addition, Barnett had become aware in September 2016 that his senior manager, ███

███ went into the MRSA, removed a scrapped part from the scrap bin and released it to the

production floor for installation on an aircraft without following proper procedures and in violation

of FAA Regulations and Boeing's own procedures. Barnett filed a complaint with HR on

September 17, 2016, and he submitted an ethics complaint against ███ on October 20,

2016.[16]

102)    The following facts and circumstances, when taken separately and together, are more than

sufficient to raise the inference that Barnett's protected activity was a contributing factor for the

adverse action taken against him:

> 1. Barnett's approach to Quality Assurance was to follow Boeing's procedures and
>    FAA regulations and standards and not compromise, work in grey areas, or cut
>    corners; In addition, Boeing's "Code of Conduct" that must be signed annually
>    by each Boeing employee as a condition of continued employment states
>    "Without exception, I will comply with all applicable laws, rules and
>    regulations". It also states "I will promptly report any illegal or unethical conduct
>    to management or other appropriate authorities (i.e., Ethics, Law, Security,
>    EEO);
>
> 2. Senior quality management at Boeing pressured Barnett to work in grey areas and
>    to avoid documenting in writing process and procedure violations and defects.
>    This was most recently seen with the issues involving missing defective parts,
>    incorrect build records and defective emergency oxygen bottles;
>
> 3. Barnett was subjected to a continuing pattern of retaliatory conduct directed against
>    him, including denigrating, humiliating, and treating him with scorn and
>    contempt;[17]
>
> 4. Barnett was denied job transfers for which he was qualified and under circumstances
>    where he had reason to believe that Boeing senior quality management prevented
>    him from being hired;

---

[16] Once again, it was around this same time period (September and October 2016) that Boeing blocked
Barnett from transferring to other positions.

[17] Retaliatory intent may be expressed through "ridicule, openly hostile actions or threatening statements."
*Frady v. Tennessee Valley Authority*, 1992-ERA-19 and 34, slip op. at 5 (Sec'y Oct. 23, 1995); *Mandell v.
County of Suffolk*, 316 F.3d 368, 383 (2ⁿᵈ Cir. 2003)(viewing protected activities as a "betrayal of the
department."

5. Barnett was denied the transfer positions at the same time he was pushing Boeing to fully investigate the missing parts, incomplete build records and defective oxygen bottle issues;

6. In its OSHA Position Statement, Boeing made numerous misrepresentations of the facts that seek to place the blame on Barnett for Boeing's failures.;[18] and

7. The FAA has found Barnett's complaints to be valid.[19]

## VI. RELIF SOUGHT BY BARNETT

103)     As a direct result of Boeing's retaliatory actions for protected activity, Barnett has incurred damages including, but not limited to: 1) back pay; 2) front pay for a period of 10 years; 3) lost bonuses, past and future; 4) lost health and life insurance benefits; 5) medical expenses; 6) loss of 401-K retirement and matching benefits, past and future; 7) emotional distress and mental anguish; 8) pecuniary losses; and 9) attorney's fees, expenses and costs.

## VII. STIPULATION OF UNCONTROVERTED FACTS AND LEGAL ISSUES

104)     Complainant's counsel has communicated with Respondent's counsel in a good faith effort to identify uncontroverted facts and legal issues to which the parties can stipulate. Counsel have agreed to continue discussions following counsels' receipt of the filed Pleadings.

## VIII. BARNETT'S ADMINISTRATIVE COMPLAINT FILED WITH THE OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

105)     On January 16, 2017, Barnett filed an administrative complaint with the Occupational Safety and Health Administration.

---

[18] *See Reeves v. Sanderson Plumbing*, 120 S. Ct. 2097, 2108 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that it is probative of intentional discrimination and it might be quite persuasive...in appropriate circumstances, the trier of fact can infer from falsity of the explanation that the employer is dissembling to cover up the discriminatory purpose.").

[19] Evidence that the whistleblower's concerns were correct and the magnitude of the problem identified by the whistleblower is circumstantial evidence that the protected activity was a contributing factor in the unfavorable action. *See Seater v. Southern California Edison Co.*, 95-ERA-13, D&O of Remand by ARB, at 4-6 (September 27, 1996).

LAW OFFICE OF ROBERT M. TURKEWITZ, LLC

<u>/s/Robert M. Turkewitz</u>
Robert M. Turkewitz
█████████████████████████
███████████████
████████████████████
██████████████
██████████████
████████████████

KNOWLES LAW FIRM, PC
Brian M. Knowles, Esquire (█████████████████████)
█████████████████████████
███████████████████████
████████████████████
███████████████████

Attorneys for Complainant

May 4, 2021
Charleston, South Carolina

# EXHIBIT B

# INCIDENT/INVESTIGATION REPORT

**Agency Name:** *Charleston Police Department*
**ORI:** *SC0100100*

**Case#:** *24-03740*
**Date / Time Reported:** *03/09/2024  10:49  Sat*
**Last Known Secure:** *03/09/2024  09:24  Sat*
**At Found:** *03/09/2024  10:13  Sat*

## INCIDENT DATA

**Location of Incident:** *301 SAVANNAH HWY, Charleston SC 29407*
**Gang Relat:** NO
**Premise Type:** *Parking Lot/parking*
**Beat/Tract:** 425

| | Crime Incident(s) | | Weapon / Tools | | | | Activity |
|---|---|---|---|---|---|---|---|
| #1 | *Death Investigation 947* | (Com) | | | | | |
| | | | Entry | Exit | Security | | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | | Activity |
| | | | Entry | Exit | Security | | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | | Activity |
| | | | Entry | Exit | Security | | |

**MO**

## VICTIM

**# of Victims:** *1*   **Type:** INDIVIDUAL/ NOT LAW   **Injury:**

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| **V1** | *BARNETT, JOHN M* | *1,* | Age *62* | *W* | *M* | | | |

**Home Address:** *, Pineville LA 71630-*   **Home Phone:** - -
**Employer Name/Address:**   **Business Phone:** -   **Mobile Phone:**

| VYR | Make | Model | Style | Color | Li | | VIN |
|---|---|---|---|---|---|---|---|
| *2015* | *DODG* | *RAM* | *PK* | *ONG* | | *LA* | |

**CODES:** V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

## OTHERS INVOLVED

**Type:** INDIVIDUAL/ NOT LAW ENFORCEMENT   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| *CO* | | | Age *42* | *B* | *M* | | | |

**Home Address:**   **Home Phone:**
**Employer Name/Address:**   **Business Phone:**   **Mobile Phone:**

**Type:** INDIVIDUAL/ NOT LAW ENFORCEMENT   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| *OT* | | | Age *36* | *W* | *F* | | | |

**Home Address:**   **Home Phone:**
**Employer Name/Address:** *Holiday Inn 301 SAVANNAH HWY (GENERAL MANAGER)*   **Business Phone:** *843-556-7100*   **Mobile Phone:**

## PROPERTY

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI# | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | 13 | 6 | $600.00 | | 1 | *FIREARMS* | *9/S&W/3913* | |
| *1* | 12 | *EVID* | $0.00 | | 1 | *2015 ONG ,     LA* | *DODG Ram* | |

**Officer/ID#:** *WARD, T. N. (PTL, TM4P) (2834)*
**Invest ID#:** *MALONE, D. R. (IDI, VCU) (2237)*
**Supervisor:** *FEETERS, R. J. (PTL, TM4P) (1423)*

**Status**   **Complainant Signature**   **Case Status:** *Pending Active*   *03/09/2024*   **Case Disposition:**   Page 1

## Incident Report Additional Name List

*Charleston Police Department*

OCA: *24-03740*

**Additional Name List**

| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | | Age | Race | Sex |
|---|---|---|---|---|---|---|---|---|
| **1 )** | *OT    2* | *POCKLINGTON, AMY M* | | ██████ | | *52* | *W* | *F* |
| | Address | , | | H: | - - | | | |
| | Empl/Addr | *Ogletree Deakins, Ogletree.com/people/*█████ | | B: | - - | | | |
| | | | | Mobile #: | ██████ | | | |
| **2 )** | *OT    3* | ████████ | | ██████ | | *63* | *W* | *F* |
| | Address | ████████████ | | H: | ███████ | | | |
| | Empl/Addr | | | B: | - - | | | |
| | | | | Mobile #: | - - | | | |
| **3 )** | *OT    4* | *TURKEWIZ, ROBERT* | | ██████ | | *64* | *W* | *M* |
| | Address | *768 SAINT ANDREWS BLVD , CHARLESTON, SC 29407-* | | H: | ███████ | | | |
| | Empl/Addr | | | B: | - - | | | |
| | | | | Mobile #: | - - | | | |
| **4 )** | *OT    5* | █████████ | | ██████ | | *32* | *B* | *M* |
| | Address | ██████████████ | | H: | ███████ | | | |
| | Empl/Addr | *Holiday Inn, 301 Savannah Hwy* | | B: | - - | | | |
| | | | | Mobile #: | - - | | | |
| **5 )** | *OT    6* | ████████ | | ██████ | | *28* | *B* | *M* |
| | Address | ████████████ | | H: | ███████ | | | |
| | Empl/Addr | | | B: | - - | | | |
| | | | | Mobile #: | - - | | | |

# INCIDENT/INVESTIGATION REPORT

*Charleston Police Department*

Case # *24-03740*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

# INCIDENT/INVESTIGATION REPORT

Narr. (cont.)  OCA: 24-03740                *Charleston Police Department*

N A R R A T I V E

   On 03/09/2024 at approximately 1017 hours, Officer Ward responded to 301 Savannah Highway (Holiday Inn), located in the City of Charleston, in reference to a welfare check.

   Officers on scene located an unresponsive male in a vehicle in the aforementioned parking lot. The victim was pronounced deceased by Seth Croutcher (Delta3) at 1033 hours. CPD Central, Crime Scene, and the Coroner were advised and responded to the scene. This incident was recorded on Officer`s CPD issued BWC.

   The investigation is ongoing.

## Incident Report Related Vehicle List

*Charleston Police Department*

OCA: *24-03740*

| | VehYr/Make/Model | | Style | | Color | | Lic/Lis | | VIN |
|---|---|---|---|---|---|---|---|---|---|
| **1** | *2015 DODG, Ram* | | *PK* | | *ONG* | | ███ *LA 2024, 2024* | | ████████ |

| IBR Status | | Date | | Location |
|---|---|---|---|---|
| *Evidence (non Scibr)* | | *03/09/2024* | | *301 SAVANNAH HWY, CHARLESTON SC* |

| Condition | Value | Offense Code | Jurisdiction | State # | NIC # |
|---|---|---|---|---|---|
| | *$0.00* | *980* | *Locally* | | |

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| *Barnett, John M* | | ████████ |
| | | *PINEVILLE, LA 71630* |

| Business Address |
|---|
| |

| DOB | Age | Race | Sex | Hgt | Wgt | Scars, Marks, Tattoos, or other distinguishing features |
|---|---|---|---|---|---|---|
| ████ | *62* | *W* | *M* | *511* | *215* | |

Notes

## Incident Report Related Property List

*Charleston Police Department*

OCA: *24-03740*

| 1 | Property Description | | Make | Model | Caliber |
|---|---|---|---|---|---|
| | **FIREARMS** | | **S&W** | **3913** | **9** |

| Color | Serial No. | | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|---|
| **Silver Or** | ████████ | | **$600.00** | **1.000** | | **Locally** |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| **Seized** | **03/09/2024** | **G826212751** | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| **\* No name \*** | | | | |

Notes

**CASE SUPPLEMENTAL REPORT**    Printed: 05/13/2024  09:42

*Charleston Police Department*    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *WARD, T. N. (2834)* | **Date / Time:** *03/09/2024 11:28:53, Saturday* |
| **Supervisor:** *FEETERS, R. J. (1423)* | **Supervisor Review Date / Time:** *03/09/2024 15:00:56, Saturday* |
| **Contact:** | **Reference:** *Crime Scene Log* |

OCA#: 24-03740
Incident Type: Suicide
Incident Location: 301 Savannah Highway
Victim: John M. Barnett

Crime Scene Log:

Personnel from Tower105:
James Wujcik
Eran McClary
Alex Wagers
Connor O`Rouke

Sgt. Feeters
CST Holly Bennett
Coroner Ella Butler
Seth Croutcher (Delta3)

Personnel from Rescue604:
Chief Mario Middleton
Chief Taylor Johnson
Brett Rahalewicz

Sgt. Brown
Det. Delucia

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024 09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | | |
|---|---|---|
| **Investigator:** *WARD, T. N. (2834)* | **Date / Time:** *03/09/2024 11:33:05, Saturday* | |
| **Supervisor:** *FEETERS, R. J. (1423)* | **Supervisor Review Date / Time:** *03/09/2024 16:40:40, Saturday* | |
| **Contact:** | **Reference:** *Supplemental Report* | |

OCA#: 24-03740
Incident Type: Suicide
Incident Location: 301 Savannah Highway
Victim: John M. Barnett

On 03/09/2024 at approximately 1017 hours, Officer Ward responded to 301 Savannah Highway (Holiday Inn), located in the City of Charleston, in reference to a welfare check. Officer Ward arrived on scene and made contact with a hotel employee, ▮▮▮▮▮▮▮▮ (Complainant), who advised there was a male in a "Clemson orange" Dodge Ram pickup truck with a firearm in his hand.

Sgt. Feeters, Officer Ward, and Officer Drayton cautiously approached the vehicle and attempted to make contact with the male party. It should be noted that there was no active stimulus in the vehicle. While visually clearing the vehicle Officers observed a white male in the driver`s seat with what appeared to be a silver handgun in his right hand resting on his lap, and his right pointer finger still remaining on the trigger. The male had what appeared to be a gunshot wound near his right temple, and showed no signs of life. Laying in plain view on the passenger seat was a white piece of paper that closely resembled a note.

CFD Tower105 was requested to assist in opening the passenger side door by utilizing a slim-jim device. Once access was gained into the vehicle, the aforementioned silver handgun was removed from the male`s hand for safety reasons. Shortly after, Medic 03 pronounced the victim deceased at approximately 1033 hours. It should be noted that a DMV search of the vehicle (LA Tag▮▮▮▮▮▮) yielded a registration return to a John M. Barnett (Victim).

Furthermore, Officer Ward spoke with the general manager, ▮▮▮▮▮▮▮▮ (Other), who advised the following:
On 03/02/2024, a guest by the name of John Barnett checked into Room 511, with the expected departure date of 03/06/2024. On 03/06/2024, Barnett extended his stay to 03/08/2024, and was expected to check out that morning. Surveillance video of Barnett exiting the hotel on the morning of 03/08/2024 is available upon request. It should be noted that the address provided on the guest paperwork from ▮▮▮▮ was ▮▮▮▮▮▮▮

▮▮▮▮ stated the hotel received a phone call from a "Rob" ▮▮▮▮▮▮▮), stating that he was a friend of Barnett`s, at approximately 1000 hours requesting a welfare check on his coworker John Barnett. "Rob" provided a description of the victim and his vehicle, which led employees to the aforementioned Dodge Ram in the parking lot.

Officer Ward spoke further with ▮▮▮▮, who advised the following:
▮▮▮▮ was advised by ▮▮▮▮ to check the victim`s room (511) before checking outside for his vehicle. ▮▮▮▮ along with a few additional employees, knocked on the victim`s door but did not get a response. This led ▮▮▮▮ to the parking lot, where he eventually found the victim in his vehicle. It should be noted that ▮▮▮▮ stated he

---

| Investigator Signature | Supervisor Signature |
|---|---|

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *PENDING ACTIVE* | **Case Mng Status:** | *PENDING ACTIVE* |
| **Offense:** | *DEATH INVESTIGATION* | **Occurred:** | *03/09/2024* |

| | | | |
|---|---|---|---|
| **Investigator:** | *WARD, T. N. (2834)* | **Date / Time:** | *03/09/2024 11:33:05, Saturday* |
| **Supervisor:** | *FEETERS, R. J. (1423)* | **Supervisor Review Date / Time:** | *03/09/2024 16:40:40, Saturday* |
| **Contact:** | | **Reference:** | *Supplemental Report* |

heard a "pop" sound near the vehicle at approximately 0924 hours when he was working on the exterior of the hotel, but he did not think anything of it at the time.

An SCDMV search of John Barnett yielded a return for a white male matching the description of the victim. Officer Ward ran the above name and date of birth provided by the SCDMV search through NCIC and discovered a "John M. Barnett" (Louisiana DL# ▮▮▮▮ residing at the address previously provided by ▮▮▮▮ Officer Ward was able to match these search results with the victim`s Louisiana DL that was found by CPD Central in his hotel room. The Coroner confirmed the victim`s identity with the same Louisiana DL.

CPD Central Sgt. Brown and Det. Delucia, Crime Scene, and the Coroner were all advised and responded to the scene, taking over the investigation. Officer Ward stood by and secured the crime scene. This incident was recorded on Officer`s CPD issued BWC.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**    Printed: 05/13/2024  09:42

*Charleston Police Department*    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *BROWN, Y. D. (1191)*    **Date / Time:** *03/09/2024 15:49:08, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *03/12/2024 18:32:33, Tuesday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident #: 24-03740
Incident Type: Death Investigation/Suicide
Incident Dater/Time: 3/9/2024 @ 1015hrs
Incident Location: 301 Savannah Hwy. Charleston, SC
Victim: John Barnett (W/M; DOB: ████)

On 3/9/2024 at approximately 1025hrs I, (Sgt. Y. Brown) was contacted by Sgt. R. Feeters in reference to a suicide that had occurred sometime prior. Sgt. Feeters advised that upon the arrival of responding officers they observed the victim located in the driver seat of a orange Dodge Ram pickup truck bearing Louisiana tags ███. Sgt. Feeters advised that the truck doors were locked and the responding Fire Department had to assist with entry. He noted that they had to strategically remove the firearm from the hand of the victim as it appeared he had his index finger still on the trigger.

Upon my arrival I observed a orange Dodge Ram backed into the parking spot located to the very rear of the hotel. The victim was observed with what appeared to be a small entry hole from a projectile surrounded by blood on the right side (temple area) of the victim`s head (his head was slightly shifted towards the right shoulder). The victim was located in the driver`s seat of the truck wearing a red, white and dark colored plaid sleeveless shirt that was mostly unbuttoned and open with his chest and stomach area exposed, dark jeans, no shoes (dark canvas material shoes were located on the floor of the driver`s side).

It should be noted that a gray colored Smith and Wesson 9mm hand gun (bearing SN:███; Model 3913) was located on the center arm rest with the magazine removed along with a single unfired bullet (CPD CSO advised 5 live rounds in the magazine). In addition I observed a small journal type book (red leather covering) placed on top of black leather jacket on the front passenger seat. The journal book was in the open position and from the outside of the truck you could read what appeared to a be a note/writing presumably done by the victim. A page read " I pray the motherfuckers that destroyed my life pay!!! I pray Boeing Pays!!! Bury me face down so Boeing and their lying ass leaders can kiss my ass To My Family and Friends, I Found My Purposes! I`m at Peace! I Love You More John I Mitch Barnett AKA Swampy Funcle Mitch" P.S. The Entire System For Whistlblower is Fucked up Too (a portion of this line was scratched through but still legible). On the other open page I observed the following writings " I Can`t Do This Any Longer!!! Enough!! Fuck Boeing!Trump 2024 Whislblowers Protection is Fucked Up Too!! America Come Together or Die!! And I wasn`t Stoned when I wrote This... Really! Family and Friends I Love You All. It should be noted that the above notation of writings is not documented in a sequence of order as the writings were all over the pages.

CPD Crime Scene Holly Saunders along with Deputy Coroner Ella Butler arrived on scene to for further process and take photos. Deputy Coroner Butler assumed the custody of the victim`s body. She further advised that she will make us aware of when the autopsy would be conducted.

---

Investigator Signature    Supervisor Signature

Page 9

**CASE SUPPLEMENTAL REPORT**    Printed: 05/13/2024  09:42

*Charleston Police Department*    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *BROWN, Y. D. (1191)* | **Date / Time:** *03/09/2024 15:49:08, Saturday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/12/2024 18:32:33, Tuesday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Additionally, it was learned from Holiday Inn General Manger, ███████████ that a call came into the hotel from a subject named Rob (Telephone #: ███████████) requesting a welfare check on the victim. She noted that a check of victim`s room was done and the subject wasn`t observed inside. ██████████ stated that Rob called a 2nd time requesting for staff to check the parking lot for a "Clemson orange" colored pickup truck (See Additional Supplementals) and this was when the victim was located.

Nothing Further...

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**                                   Printed: 03/13/2024  09:42

*Charleston Police Department*                                        OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *BROWN, Y. D. (1191)* | **Date / Time:** *03/09/2024 17:36:27, Saturday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/21/2024 16:03:22, Thursday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Incident #: 24-03740
Incident Type: Death Investigation/Suicide

Interviewee: Robert Turkewiz (W/M; DOB: ███ 1959; Law office located at 768 St. Andrews Blvd)

While on scene I, Sgt. Y. Brown made contact with Mr. Robert Turkewiz via telephone after being advised by Holiday Inn General Manger, ████████ that a welfare check was requested by a subject who called the hotel named "Rob". She provided me with Rob`s contact number ████████). The interview with Mr. Turkewiz was recorded via my CPD issued body worn camera and can be summarized as the following:

 I questioned if he was the subject that contacted the Holiday Inn regarding a check on the victim, John Barnett. Robert stated that he did contact the hotel and requested a check be done on his client/victim after he did not answer any of his calls (1st call to the victim was at 0907hrs with no response). He advised that he is representing the victim. Robert stated that he was currently at his law office along with 4 other attorney`s awaiting the victim`s arrival. He questioned multiple times about the victim`s status (was he alive, deceased or arrested, etc.). I stated to him that I would have to call him back to advise of information regarding his client before I secure for the day.

I questioned if his client was just visiting the area or was here on business and Robert advised that the victim was currently in the area on legal business. He continued to state the victim was a former Boeing employee and that he was visiting due to this weeks deposition and litigations that was taking place involving Boeing. He added that the victim was once employed by the local Boeing plant but is currently residing in Pineville, Louisiana. He stated that the victim has no family in the area but did have his mother and two brothers that resided in Louisiana (provided a possible brother name ████████ with an address of ████████████; possible phone number: ████████). Robert stated that the victim moved away in 2018. He noted that the victim was supposed to meet for the 3rd and final day of litigations at 1000hrs on today`s date.

He stated that he first contacted the hotel at approximately 0953hrs to conduct a welfare check on the victim. He stated he called back to have them look for the victim`s truck. He stated that the hotel staff never called him back so he reached out to the hotel again and they advise EMS personnel were coming on scene to attend to the victim.

Robert was provided my name and contact information. This interview can be heard in its entirety.

Nothing Further.....

_____                    _____
Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *FEETERS, R. J. (1423)* | **Date / Time:** *03/10/2024 10:56:13, Sunday* |
| **Supervisor:** *FEETERS, R. J. (1423)* | **Supervisor Review Date / Time:** *03/10/2024 11:19:42, Sunday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Supplement- 24-03740
Incident - Suicide
Location- 301 Savananah Hwy
Date- 3/9/24
Victim- John Barnett

On 9 March 2024 at 1013 hrs, I (Sgt. Feeters) responded to the parking lot of 301 Savannah Hwy in reference to suspicious person call. Prior to arrival a witness/employee advised he observed a male sitting in an orange pick up truck at the rear of the hotel holding a gun in his lap.

I arrived a short time later and was directed towards an orange Dodge Ram pickup truck bearing LA tag- ▮▮▮▮▮▮. I along with officers Drayton and Ward visually scanned the interior of the vehicle from outside.

I observed a white male seated in the drivers seat holding a silver hand gun in his right hand. His head was tilted upwards and what appeared to be a GSW was observed about his side of his head. I detected no movement in his chest and summoned EMS and FD to assist. Due to all the door being locked I requested the FD to open the drivers side door via a slim jim device.

Once inside the vehicle, for safety reasons I removed the handgun from his right hand due to his finger still being on the trigger. I moved said handgun to the center console allowing EMS to check his status, after which point he was pronounced deceased.

I when instructed Ofc. Drayton to secure the scene while Ofc. Ward began the field investigation. Central and CS were requested and responded.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:**  *PENDING ACTIVE*          **Case Mng Status:**  *PENDING ACTIVE*          **Occurred:**  *03/09/2024*

**Offense:**  *DEATH INVESTIGATION*

---

**Investigator:**  *BENNETT, H. R. (2442)*          **Date / Time:**  *03/10/2024 15:18:16, Sunday*

**Supervisor:**  *SPRATT, L. F. (2311)*          **Supervisor Review Date / Time:**  *03/12/2024 15:34:55, Tuesday*

**Contact:**          **Reference:**  *Crime Scene Log*

---

Crime Scene Supplemental Report

Case Number:  2403740
Date/Time of Response:     March 9, 2024/1106 hours
Location of Response:  301 Savannah Hwy.
Reporting CST:     H. Bennett
Evidence Collected:     Yes (4)
Evidence sent to Latent Recovery:  No
Photos taken:   Yes
Video taken:     No
Fingerprint processing at scene:     No
Number of latent lifts:  0
Weather:    Light rain to overcast, Strong winds

On March 9, 2024, at approximately 1106 hours, reporting Crime Scene Investigator (R/CSI) responded to 301 Savannah Hwy (Holiday Inn), in the City of Charleston, in reference to a death investigation and met with Sergeants Feeters and Y. Brown, Detective Delucia, Officer Ward, and Charleston County Deputy Coroner E. Butler.

R/CSI was informed that a welfare check had been called in for a male party staying at the hotel. Housekeeping checked the room of the party and noted all of his belongings were still in the room. Officers then arrived on scene and located the male, unresponsive, in his vehicle, with what appeared to be a wound to his head. Fire and EMS were called to the scene to check the status of the individual. Sgt. Feeters noted a firearm in the individual`s right hand, removed it, and placed it on the center console so EMS could check on the victim. EMS pronounced the victim deceased.

R/CSI photographed the scene for documentation. R/CSI noted that the victim`s vehicle, an orange Dodge Ram 1500 (tag: (LA ▮▮▮▮▮▮)), was backed into the last parking spot along the west side of the hotel. Due to heavy rain all morning, the parking lot in front of and around the vehicle had standing water. The decedent, John Barnett (DOB: ▮▮▮▮▮, W/M), was seated in the driver`s seat of the vehicle. His shoes were off and placed on the driver`s floorboard. His feet were bare and resting by the brake pedal. He was wearing blue jeans and a sleeveless red, plaid button-up shirt. The shirt was unbuttoned, which appeared to be due to EMS since there was a small ECG electrode sticker at the base of the stomach, as well as both upper arms. R/CSI noted a large tattoo on the left pectoral of an alligator. The decedent`s left arm was bent at the elbow and resting on his thigh. The hand was in a loose fist. The right arm was mostly straight out alongside his body and the fingers were curled, with the thumb sticking out. The head was back, against the headrest, and tilted to the right. The eyes were closed, and the mouth was open. On the right side of the head, at the temple, R/CSI noted a wound with apparent blood dripping from it onto the seat and floor below.

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024 09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | | |

| | | |
|---|---|---|
| **Investigator:** *BENNETT, H. R. (2442)* | **Date / Time:** *03/10/2024 15:18:16, Sunday* |
| **Supervisor:** *SPRATT, L. F. (2311)* | **Supervisor Review Date / Time:** *03/12/2024 15:34:55, Tuesday* |
| **Contact:** | **Reference:** *Crime Scene Log* |

On the center console, where it had been moved, was a Smith and Wesson model 3913 9mm handgun [S/N: ███████, NIC #: G826212751] (item 101). R/CSI rendered the firearm safe by removing the magazine and locking back the slide. R/CSI noted that the magazine had approximately five rounds in the eight-capacity magazine, and one round in the chamber. Also visible on the firearm was blood and hair at the end of the barrel. R/CSI photographed it for documentation. In the front passenger seat was a notebook. It was open to a page with several things written on it like "I found my purpose! I`m at peace!" and "I can`t do this any longer!!!" R/CSI photographed the note for documentation, which was collected by CCDC Butler.

CCDC Butler, along with R/CSI, began to search the vehicle. R/CSI photographed items located including two pill bottles with plant-like material. One pill bottle was located inside a Crown Royal bag found on the front passenger floorboard (item 102) and the other was located in the cup holder area of the center console (item 103). R/CSI collected the pill bottles of plant-like material. Det. Delucia advised they could be entered into evidence to be destroyed.

R/CSI then located a single-fired cartridge casing (FCC) in the vehicle`s backseat. It was on a jacket that was lying on the floorboard just behind the center console. R/CSI documented the FCC, a WIN 9mm luger (item 104), and collected it as evidence.

At approximately 1210 hours, County Rescue 604 arrived on scene to help remove the decedent from the vehicle. Once he was removed, R/CSI and CCDC Butler examined him in the back of the rescue van. R/CSI documented the wound to the right temple with a scale. The wound was approximately one inch in length. R/CSI also noted a small area of stippling around the wound, which is consistent with an entrance wound with close contact. R/CSI located similar stippling on the decedent`s right hand. CCDC Butler searched the decedent`s pockets and located his car keys in the front, right pocket, but nothing else. CCDC Butler collected the car keys. The decedent was then rolled over and his back was located. An exit wound was located at the back of the head. R/CSI photographed the exit wound with and without scale. The exit wound was approximately half an inch long. No other trauma or injuries were observed at the time. The decedent was secured in the body bag (tag # 0005227) and transported to the Coroner`s Office.

R/CSI then photographed the vehicle where the decedent had been sitting. R/CSI noted some red staining on the seat. Above the seat, in the roof lining, was a small hole. R/CSI photographed the hole for documentation. R/CSI looked and felt in and around the hole for any sign of a projectile, but nothing was located. R/CSI then looked on the exterior of the roof of the vehcile to see if it had potentially passed through the roof, but there was no hole indicating that it had. R/CSI then looked around the drivers area again, but no projectile was located.

R/CSI, along with Det. Delucia then went to room 511 where the decedent had been staying. R/CSI photographed the room for documentation. R/CSI noted that the decedent`s belongings were still laid out in the bathroom and

| | |
|---|---|
| _____ | _____ |
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**                    Printed: 05/13/2024  09:42

*Charleston Police Department*                                        OCA: **2403740**

<span style="background-color: yellow">THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</span>

**Case Status:** *PENDING ACTIVE*        **Case Mng Status:** *PENDING ACTIVE*        **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** BENNETT, H. R. (2442)                **Date / Time:** *03/10/2024 15:18:16, Sunday*

**Supervisor:** SPRATT, L. F. (2311)        **Supervisor Review Date / Time:** *03/12/2024 15:34:55, Tuesday*

**Contact:**                                                **Reference:** *Crime Scene Log*

the room, including clothing and a laptop with several USB drives. On the dresser in the room, the decedent`s wallet was located. R/CSI photographed it for documentation. Det. Delucia collected it and transferred it to CCDC Butler. A search of the room was done, but nothing of interest was located. Det. Delucia collected the laptop and USBs as evidence since the decedent`s cell phone could not be located. R/CSI and Det. Delucia secured the hotel room before leaving.

Nothing further was requested of crime scene.

No further information at this time.

_____

EVIDENCE SUMMARY

| Item # | Description | (sent to) |
|---|---|---|
| 101 | Smith & Wesson model 3913 9mm handgun | (evidence) |
| | (S/N: ▉▉▉▉, NIC #: G826212751) | |
| 102 | pill bottle with plant material | (evidence) |
| 103 | pill bottle with loose plant material | (evidence) |
| 104 | FCC: WIN 9mm luger | (evidence) |

END/ HB

_____                    _____
Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                                    Printed: 03/13/2024  09:42

*Charleston Police Department*                                  OCA: **2403740**

<mark>THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</mark>

**Case Status:** *PENDING ACTIVE*     **Case Mng Status:** *PENDING ACTIVE*     **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *DELUCIA, J. R. (2495)*                       **Date / Time:** *03/10/2024 18:35:46, Sunday*

**Supervisor:** *TUTTLE, E. M. (1604)*     **Supervisor Review Date / Time:** *03/18/2024 16:32:34, Monday*

**Contact:**                                                   **Reference:** *Supplemental Report*

---

OCA: 24-03740
Incident Date: 03/09/2024
Incident: Suicide
Incident Location: 301 Savannah Hwy. Charleston, SC, 29407
Victim: John Barnett

03/09/2024
-Responded to the incident location.
-Responded to Jennings Towing.

---

On 03/09/2024 Sgt. Feeters contacted central detectives in reference to a deceased at the above address. Sgt. Brown and I (assigned dayshift response detectives) responded to the incident location. I arrived at approximately 1040 hours and upon arrival I met with Sgt. Feeters and was briefed on the circumstances of the incident. His brief included the location of the victim & his vehicle as well as the location of the employee complainant (later determined to be listed other - ███████ inside the hotel. This individual was the person who located the deceased victim inside his vehicle with a gun held in his hand.

I then followed up inside the Holiday Inn and met with the manager ███████ ) and conducted an interview with her therein. The interview was recorded on my CPD issued BWC and can be summarized as follows:
**********
Interviewee:
Name: ███████
DOB: ███████
Address: ███████
Phone: ███████

███████ confirmed that the victim was a guest at the hotel.
-She advised that when she got in today (at about 9:40-9:45), she received a phone call from an individual named Rob (unknown phone number at this time).
-When she arrived at work, she parked near where the victim`s truck was located. She advised that she didn`t see anything of note at that point. Additionally, she couldn`t recall if the victim`s vehicle was already there.
-I asked about the phone conversation she had regarding Rob, and she advised that Rob expressed that he`s concerned about Mr. Barnett (victim), he`s in room 511, is supposed to be attending a conference this morning, and has not shown up/he can`t reach the victim. ███████ believes that Rob called at about 10:00.
-███████ sent staff up to the room (511) and afterwards called Rob back telling him that there was no one in the room & the room was intact/fine. She believes that she called Rob back within 10 minutes.
-Rob then told ███████ that the victim drives a Clemson Orange truck that can`t be missed and asked her to

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 03/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *DELUCIA, J. R. (2495)* | **Date / Time:** *03/10/2024 18:35:46, Sunday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/18/2024 16:32:34, Monday* |
| **Contact:** | **Reference:** *Supplemental Report* |

check if he`s in the parking lot.

- At about 10:13 ███████ went out the door, observed the truck, looked inside and stepped back. Additionally, she advised that another employee "Marvin" went outside with her.

-I asked ███████ what she saw, and she said that she saw his "open chest" (victim`s shirt was open), his head slumped over (to the left, shown rather than explained), and she saw him holding the gun (described as gray & black with a clip on the bottom). She advised what made her back up was seeing the individual holding the firearm.

*During the interview with ███████, another employee (███████████) advised that the victim`s attorney was on the phone and said that he had court this morning at 1000. She was asked to obtain a name and number and Sgt. Brown advised that we would reach out to the individual. The information later provided by ███████ was: ███████████, Robert Turkeweitz. *

*The above is a summary, review the recording for additional information. *
*****

███████ located the individual she went outside with to perform the wellness check and he provided a statement. This interaction was recorded on my CPD issued BWC & can be summarized as follows:

*****

Interviewee #2:

Name: ███████████
DOB: █
Address: ███████████
Phone: ███████

-He advised that he went outside the hotel to go to the victim`s vehicle with his manager ███████.
-I asked him what prompted them to go outside, and he said they received a call regarding a wellness check for a guest in room 511 (Mr. Barnett).
-He said that they checked the room & the restaurant, and the victim wasn`t up there. He clarified that he did not respond to room 511, he checked the restaurant.
-He said that the caller for the wellness check called back and told staff that the victim is in an orange truck.
-When he located the orange truck, he walked from the "back end", saw the gun in the victim`s hand and then backed off. He added that it looked like the victim`s finger was still on the trigger.
-I asked if he saw the victim inside the truck moving and he said no.
-███████ described the gun as silver in color.
-I asked Marvin if he saw any signs of disturbance and he responded in the negative.
-Once he and ███████ returned inside, they called 9-11.
-I asked him if he knows the victim personally and he responded in the negative. He advised that he saw the

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

## CASE SUPPLEMENTAL REPORT

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | | |
|---|---|---|
| **Investigator:** *DELUCIA, J. R. (2495)* | **Date / Time:** | *03/10/2024 18:35:46, Sunday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** | *03/18/2024 16:32:34, Monday* |
| **Contact:** | **Reference:** | *Supplemental Report* |

victim in the hotel but never talked to him at all.
████████ confirmed that the victim has been staying at the hotel and he responded in the affirmative.

*The above is a summary, review the recording for additional information. *
**********
████████ permitted me to review the business` surveillance system. The surveillance system was consistent with the real date but not the real time. Real time was noted as 11:06 AM, and the camera time was noted as 11:08:19 AM. As such the camera is approximately 2 minutes fast (to the minute).

While reviewing the video footage I spoke to an employee (████████, DOB: ████████, ████████, Address: ████████). He advised that, at about 9:24 this morning he was in the "shop", texting his boss, he heard a pop, and that was it. He said that he noticed the time because that was around the time he was texting the GM. I asked him if he was able to determine what the pop was from, and he said no. He added that it was raining/there was a storm. He thought it was something from under the pool/on top of the pool deck. Both Davon & ████████ confirmed that the shop is close to the incident location.

Also, while reviewing the video, ████████ provided me with a list of the door unlocks/keycard scans for room 511. The times recorded are inconsistent as labeled. The real time listed labeled as "read from the lock on" (03/09/2024 11:29:51 AM) and the recorded time is labeled as "lock`s clock" (03/09/2024 12:22:22 PM). As such the lock clock is 52 minutes and 31 seconds fast.
These scans were provided to me via text message/photo (received on my CPD issued iPhone). The photo was downloaded to a disc and entered into CPD evidence.

The last time the victim`s card was swiped prior to hotel staff was (lock clock time) 03/08 8:28 PM. Therefore, the actual time was 03/08 at 7:36 PM.

I was unable to locate the victim in the video footage review at this time.

I then observed the deputy coroner`s (Ella) examination of the victim`s body inside the transport van and the following was noted:
*****
-Gunshot wound to the right side of his head (temple area). She advised that it looked like there was some blowout; his head had close contact or contact with the firearm.
-Severely swollen lymph nodes.
-Exit wound at the back of his head.
-The keys to the victim`s vehicle were located in his right front pocket.
-The deputy coroner made 3 attempts to identify the victim via his fingerprints but was ultimately unsuccessful.
*****

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*  **Case Mng Status:** *PENDING ACTIVE*  **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** DELUCIA, J. R. (2495)  **Date / Time:** *03/10/2024 18:35:46, Sunday*

**Supervisor:** TUTTLE, E. M. (1604)  **Supervisor Review Date / Time:** *03/18/2024 16:32:34, Monday*

**Contact:**  **Reference:** *Supplemental Report*

---

At this time, the victim`s identity was unconfirmed (although highly likely to be John Barnett) and there was an investigative need to search the victim`s rented hotel room in an attempt to locate the victim`s wallet or cell phone.

CSI Bennett discovered a Holiday Inn room key inside the victim`s vehicle. I took the key to ▮▮▮▮▮▮, and she scanned the card into her system confirming that the keycard was registered to room 511. We requested to search the room and she obliged & a staff member escorted CSI Bennett and I to room 511.

Upon viewing the room, the following was observed:
*****
-There was a plaque outside the door depicting "511".
-The room was comfortably cool.
-The room appeared to have clutter.
-There were no signs of a struggle/disturbance.
-Garbage/refuse was located inside & next to the garbage can near the room adjoining door.
-The adjoining room door was locked.
-Toiletries were observed on the bathroom counter/sink basin area.
-Two pill contains were located both prescribed to John "Barnette" (Pantoprazole 40 mg tab & Duloxetine 60 mg cap).
-Garbage/refuse was located in the garbage can inside the bathroom as well.
-On the bench near the room adjoining door were bags and above that on a ledge was a dopp kit.
-The room appeared to have been occupied by one person & there was only a single bed.
-A phone charger was observed in an outlet plugged into a nightstand.
-Clothing was hung in the closet.
-Personal items were observed throughout the main living area of the room.
-On the dresser in front of the TV a black in color wallet was located.
-Inside the wallet was a Louisiana ID (Name: John M Barnett, DOB: ▮▮▮▮▮▮, Address: ▮▮▮▮▮▮ Pineville, LA, 71360, LADL #: ▮▮▮▮▮▮, Height 5`11", Weight 215). The photo observed in the driver`s license is consistent with the victim`s appearance.
-On a table near the bed/chair in the corner of the room a laptop, laptop charger, mouse, and a sandwich bag containing 5 flash drives were located.
*****
The laptop, laptop charger, mouse, sandwich bag containing 5 flash drives, and wallet were seized from the hotel room.

Based on the totality of the circumstances the victim was able to be identified as John M Barnett.

I contacted Lt. Krasowski and requested a field transfer of the victim`s wallet to the deputy coroner. He approved the transfer.

---

Investigator Signature    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** | *DEATH INVESTIGATION* | | |

| | | |
|---|---|---|
| **Investigator:** | *DELUCIA, J. R. (2495)* | **Date / Time:** *03/10/2024 18:35:46, Sunday* |
| **Supervisor:** | *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/18/2024 16:32:34, Monday* |
| **Contact:** | | **Reference:** *Supplemental Report* |

After searching the room, I met with the deputy coroner and provided her with the wallet. Additionally, she provided me with the keys of the victim`s vehicle. Due to the victim`s phone not being located in the hotel room it is likely that the phone is still inside his vehicle.

Of note: the wallet contained the victim`s LADL, several cards, a Red River Bank Account Identification slip (paper), and $39.00 USD.

Prior to leaving the incident location I requested that ████ download the needed footage from their surveillance system (from approximately 1900 hours on 03/08 through 1015 hours on 03/09). She advised that she would contact me when the footage is complete.

At approximately 1630 hours I followed up at Jennings Towing (2026 Meeting Street Rd. Charleston, SC, 29403) in an effort to locate the victim`s phone. While wearing gloves, I searched the inside of the victim`s vehicle, and I located an android phone (in a red case / screen or screen protector had minor cracks) underneath a plastic foldable flap in the rear passenger compartment. Additionally, I located a nylon style holster and magazine (containing 8 rounds) on the front passenger seat. The phone, holster, and magazine were seized.

At approximately 1710 hours I received communication from ████ advising that the surveillance footage download was complete, and the video was ready to be picked up at the hotel front desk.

All items I seized from the vehicle & hotel room were entered into CPD evidence.

My BWC footage was uploaded to the Getac Cloud.

Nothing further.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | | | |
|---|---|---|---|---|---|
| **Case Status:** | *PENDING ACTIVE* | **Case Mng Status:** | *PENDING ACTIVE* | **Occurred:** | *03/09/2024* |
| **Offense:** | *DEATH INVESTIGATION* | | | | |

| | | | |
|---|---|---|---|
| **Investigator:** | *LANCASTER, H. D. (2687)* | **Date / Time:** | *03/11/2024 06:18:33, Monday* |
| **Supervisor:** | *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** | *03/14/2024 16:25:16, Thursday* |
| **Contact:** | | **Reference:** | *Supplemental Report* |

OCA: 24-03740
Incident Date: 03/09/2024
Incident: Suicide
Incident Location: 301 Savannah Hwy. Charleston, SC, 29407
Victim: John Barnett

-On 03/10/2024 I conducted a follow up at the Holiday Inn during my shift. I retrieved the security camera footage from the night shift clerk who was identified as ████████ (DOB: ████████). The footage was later downloaded to a thumb drive and uploaded to the case file.

-I conducted a brief interview with the night shift clerk ████████. ███ stated that he works the front desk of the Holiday Inn from 2300-0900. He was working the night prior to John Barnett being discovered deceased in his vehicle. ████████ stated that he did not remember seeing John Barnett at any time during his shift and did not mention noticing anything unusual.

-I began reviewing the security footage from the Holiday Inn. On 03/08/2024 at 19:26, John Barnett can be observed entering through the front entrance and passing the front desk. He appears to be alone and is wearing the same clothing that he was discovered in by responding officers (Red sleeveless flannel and blue jeans). According to the Hotel staff maintaining room entry logs, the last time John Barnett`s key card was swiped to gain access to his room was at 19:28 on 03/08/2024 which is consistent with his entry to the hotel two minutes prior to this.

-I conducted an initial review of the other cameras, but noted that the victim`s vehicle is out of frame and not captured on any of the exterior security cameras.

The investigation continues….

_____          _____
Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*     **Case Mng Status:** *PENDING ACTIVE*     **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *FEETERS, R. J. (1423)*     **Date / Time:** *03/11/2024 11:33:51, Monday*

**Supervisor:** *TUTTLE, E. M. (1604)*     **Supervisor Review Date / Time:** *03/15/2024 10:06:29, Friday*

**Contact:**     **Reference:** *Supplemental Report*

Supplement- 24-03740
Incident - Death Investigation
Location- 301 Savananah Hwy
Date- 3/9/24
Victim- John Barnett

\*\*\*This supplement adds additional information that was not on the original supplemental report, of note that I was wearing nitrile gloves when I removed the handgun from Mr. Barnett`s right hand. The title of the report should have been death investigation as the coroner makes the determination of cause and manner of death.\*\*\*

On 9 March 2024 at 1013 hrs, I (Sgt. Feeters) responded to the parking lot of 301 Savannah Hwy (Holiday Inn) in reference to suspicious person call. Prior to arrival a witness/employee advised he observed a male sitting in an orange pick up truck at the rear of the hotel holding a gun on his lap.

I arrived a short time later and was directed towards an orange Dodge Ram pickup truck bearing LA tag- ████ parked and not running. I along with officers Drayton and Ward visually scanned the interior of the vehicle from outside.

Through closed windows, I observed a white male sitting in the drivers seat holding a silver hand gun on his lap, pointing toward the driver door. The handgun was gripped tightly in his right hand with his finger still on the trigger. The hammer on the handgun appeared to be cocked back. He did not appear conscious while his head was tilted upward. What appeared to be a GSW was observed about the right side of his head. I detected no movement in his chest and summoned EMS and FD to assist. Due to all the door being locked I requested the FD to open the drivers side door via a slim jim device.

Once inside the vehicle, for safety reasons I (wearing gloves) removed the handgun from his right hand due to his finger still being on the trigger. I moved said handgun to the center console allowing EMS to access him in a safe manner to check his status, after which point he was pronounced deceased.

I then instructed Ofc. Drayton to secure the scene while Ofc. Ward began the field investigation. Central and CS were requested, responded and were briefed.

Investigator Signature _____     Supervisor Signature _____

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *BROWN, Y. D. (1191)* | **Date / Time:** *03/12/2024 14:22:09, Tuesday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/20/2024 10:35:04, Wednesday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Incident #: 24-03740
Incident Type: Suicide
Incident Location: 301 Savannah Hwy. (Holiday Inn)
Incident Date: March 9, 2024

Interviewee: Attorney Robert Turkewiz (W/M; DOB: ███████ : Telephone #: ███████), Attorney Brian Knowles (Telephone #: ███████), Paralegal Marina Knowles

On March 9 , 2024 I, Sgt. Y. Brown along with Charleston County Coroner, Ella Butler meet with the above listed legal counsels in regarding their client/victim, Robert Barnett who was found deceased at the incident location (301 Savannah Hwy.). The brief meeting was to advise the attorneys of what occurred as did arrive at the scene during the process of the investigation. It was also to gain any information about Mr. Barnett that would be relevant to the investigation. The interview was recorded by my CPD issued Body Worn Camera and summarized as the following:

 It should be noted that Attorney Turkewiz was the person that contacted the Holiday Inn in regards to conducting a welfare check on the victim. Mr. Turkewiz also advised that they represented John Barnett in a whistleblower lawsuit against Boeing (started in 2017). He continued to state that Mr. Barnett had retired (previous job title was 1st Line Quality Manager) from Boeing under a term he called a "constructive termination" and they were in the middle of depositions (Mr. Barnett has been coming back and forth to Charleston for the past 3 weeks) and that the incident date was going to be the last day (scheduled for 1000hrs) for the final hearing. They noted that Mr. Barnett`s job with Boeing was to protect the safety of the air crafts and that he was very knowledgeable. They added that when Mr. Barnett was employed by Boeing he would find and report defects but faced retaliation from higher management.

Most of the interview was led by Coroner Ella Butler and she began by asking if Mr. Barnett had reached out them in 2017 for representation in which Attorney Turkewiz confirmed. He stated that Mr. Barnett filed an AIR-21 which he explained was an aviation statue for retaliation against employees for making complaints about safety issues. Attorney Turkewiz and Knowles explained that Mr. Barnett made very serious safety complainants against Boeing. They continued to explain that they were in the middle of  Discovery (formal process of exchanging information between parties about the witnesses and evidence that will presented at trial). He stated that this process was going to take place over a one month time frame. He stated Mr. Barnett was the first of twenty depositions. They stated that the depositions started on the previous Thursday with the opposing attorneys questioning Mr. Barnett for approximately 7-9 hours with breaks in between. They stated that on the day prior, Friday, March 8, 2024, Mr. Barnett was in a deposition that lasted approximately 4-5 hours. I questioned the time frame in which they ended on March 8, 2024 and they advised that it was approx. 1800hrs.

| | |
|---|---|
| _____ | _____ |
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** | *DEATH INVESTIGATION* | | |

| | | |
|---|---|---|
| **Investigator:** | *BROWN, Y. D. (1191)* | **Date / Time:** *03/12/2024 14:22:09, Tuesday* |
| **Supervisor:** | *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/20/2024 10:35:04, Wednesday* |
| **Contact:** | | **Reference:** *Supplemental Report* |

Mr. Turkewiz expressed that Mr. Barnett was under lots of stress and his doctor/Clinical Social Worker, Debra Still had diagnosed him with PTSD as a result of lawsuit and its proceedings. Mr. Turkewiz added that Mr. Barnett was seen by Dr. Still on the previous Monday (March 4, 2024) while in Charleston (the attorneys noted that the diagnosis of PTSD was in 2017). They stated that Mr. Barnett wanted to go back to Louisiana so he could get an increase of PTSD medication (unknown if he was also seeing a physician while in his home state; possibly a place called Freeman Clinic).

Coroner Butler questioned if there was something in particular that could have occurred on the previous date that was extremely hard or could have pushed Mr. Barnett to his limit and they stated Friday would have been easier than the deposition that occurred on the previous Thursday. Attorney Knowles expressed that Mr. Barnett appeared comfortable during the questioning timeframes (all of the hearings were recorded during the week).

Coroner Butler advised Mr. Knowles that she could not advise them of alot of information since they were not his next of kin when they began questioning if any foul play was involved. She continued to state that at the current time it did not appear that Mr. Barnett was hurt by anyone else. Coroner Butler continued to advised that her job is to asset the victim and that the incident possibly occurred within the past few hours (not confirmed).

I reiterated with Attorney Turkewicz from our previous conversation about his first attempt to reach the victim via telephone (#: ███████ ; email address of ███████████ ) approximately 0907hrs. Mr. Knowles added that he also attempted to reach the victim but the line would ring then go directly to voice mail. Mr. Turkewicz stated he began to worry when the victim did not answer his phone from his first call. They noted that it was unlike the victim to not answer their calls. I questioned about why would they get worried right at 0900hrs when the deposition wasn`t slated to start until 1000hrs. He simply stated that the victim was always cooperative and would have answered the phone knowing it was him.

They questioned about checking cameras to see if Mr. Barnett interacted with anyone because Mr. Barnett was going against a very powerful company and had very "damaging information" about the company which was revealed during this weeks hearing. He was advised that video footage would be viewed by Law Enforcement. They continued to ask about foul play and I advised that currently it did not appear to be based on the current view of the crime scene. Coroner Butler also advised that with time it would be something that could be ruled out but she could give a definite answer.

I questioned if Mr. Barnett mentioned anything this week about feeling low, having any extra stress, etc. Attorney Turkewicz stated on the previous day Mr. Barnett just stated he needed to increase his PTSD medication because he was stressed and wanted to return home so he could see his physician. They stated overall he was happy that this case was coming to an end. They did advise that Mr. Barnett suffered from hypertension and coronary pulmonary issues (they had his medical records). Attorney Knowles noted that on the day of the incident Mr. Barnett would

| Investigator Signature | Supervisor Signature |
|---|---|

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*       **Case Mng Status:** *PENDING ACTIVE*       **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *BROWN, Y. D. (1191)*       **Date / Time:** *03/12/2024 14:22:09, Tuesday*

**Supervisor:** *TUTTLE, E. M. (1604)*       **Supervisor Review Date / Time:** *03/20/2024 10:35:04, Wednesday*

**Contact:**       **Reference:** *Supplemental Report*

---

not have been under any added stress because the deposition on this day would have been more of him telling his story. It should be noted that trial for this case was scheduled for the end of June 2024. Attorney Turkewicz stated that he felt Mr. Barnett was feeling good about getting the opportunity to tell his side of the story. They stated that they were not aware of any threats being made to Mr. Barnett but it could have been and he did not make them aware of it. They noted that this case has received world wide coverage. They stated Mr. Barnett had a strong case it wasn`t a situation in which he was going to be jailed. The described Mr. Barnett as a brave person so if he was in fear for his life he would not have shown it.  Mr. Barnett did acknowledge that Boeing was a powerful company and that lots of people were angry about his coming forward with the claims.

The attorneys were questioned about having any knowledge of Mr. Barnett owning a firearm and they stated it was unknown. When questioned about having any thoughts that Mr. Barnett could have commited suicide when there was no phone response, the paralegal, Mrs./ Knowles stated she thought of it. The attorneys stated they did not believe Mr. Barnett was a heavy drinker and did not have any knowledge of drug usage. They advised that they have known Mr. Barnett for 7 years and he had become like a friend to them. They were advised about the investigation process from Law Enforcement and the Coroner Office.

Coroner Butler stated she would handle the family being notified about the victim`s status. Business cards were provided to everyone.

This interview was captured on my CPD issued BWC and can be viewed in its entirety.

Nothing Further

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*　　　　　　　　　　　　　　　　OCA: **2403740**

<div style="background:yellow">THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</div>

**Case Status:** *PENDING ACTIVE*　　**Case Mng Status:** *PENDING ACTIVE*　　　**Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *DELUCIA, J. R. (2495)*　　　　　**Date / Time:** *03/12/2024 16:24:56, Tuesday*

**Supervisor:** *TUTTLE, E. M. (1604)*　　　**Supervisor Review Date / Time:** *03/20/2024 10:23:44, Wednesday*

**Contact:**　　　　　　　　　　　　　　　　**Reference:** *Supplemental Report*

---

OCA: 24-03740
Incident Date: 03/09/2024
Incident: Suicide
Incident Location: 301 Savannah Hwy. Charleston, SC, 29407
Victim: John Barnett

---

\*03/10/2024\*
-Contacted the victim`s mother.

On 03/10/2024 at approximately 1047 hours I (Det. DeLucia) contacted the victim`s mother via phone. The phone number for the victim`s mother was provided by Deputy Coroner Ella ████████ . I conducted an interview with her which was recorded on my CPD issued recording device. The interview can be summarized as follows:
\*\*\*\*\*\*\*\*\*\*
Interviewee:
Name: ████████
DOB: ████████
Address: ████████████
Phone (Cell): ████████
Phone (Home): ████████

-She advised that the victim`s current address is ████████ . Pineville, LA, 71360.
-She said that he lived in Charleston, but he moved about 4-5 years ago.
-She advised that the victim was only in Charleston giving depositions to Boeing.
-She said that he was in Charleston for a week with his attorneys giving depositions and then there was the "flight thing" where the door blew out & the oxygen tanks that didn`t come down and open. She said that this is what the victim had reported 7 years ago, and they never did anything about it so he had to come back for depositions.
-She said that the last time that she spoke to the victim he couldn`t wait to get back home.
████████ said that she talked to the victim last Monday about four times.
████████ also said that she got a text from the victim on Friday afternoon. She said that he wanted her to send him his medication. She sent the medication to his lawyer`s office on Wednesday, she texted and asked him if he had gotten it Wednesday. The victim texted her back Friday after lunch responding in the affirmative.
-I asked her when the victim came to Charleston, and she said that it was the weekend before last and the victim had been here for two weeks.
-I asked if the seemed fine when she spoke to him and she responded in the affirmative. She added that he was just ready to come home.
-The victim told ████ that he will be home Sunday. She said that the victim was supposed to give the deposition yesterday morning and he was going to leave after that.
-████ said that the victim usually drives, gets tired, spends a night, and then comes home. She added that

---

Investigator Signature　　　　　　　　　　　　Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                              Printed: 05/13/2024  09:42

*Charleston Police Department*                              OCA: **2403740**

<div style="background: yellow">THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</div>

**Case Status:** *PENDING ACTIVE*       **Case Mng Status:** *PENDING ACTIVE*       **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *DELUCIA, J. R. (2495)*                  **Date / Time:** *03/12/2024 16:24:56, Tuesday*

**Supervisor:** *TUTTLE, E. M. (1604)*       **Supervisor Review Date / Time:** *03/20/2024 10:23:44, Wednesday*

**Contact:**                                               **Reference:** *Supplemental Report*

---

sometimes he will try to drive the whole way.

-I asked ████ if the victim has ever expressed any suicidal ideations/attempts in the past and she said no.

-I asked her if he had any history of depression and she said that he takes medication for depression and has for a while. ████ advised that the victim went over to one of his friend`s place a few days before he came to Charleston. And told her that if anything ever happens to him, to investigate it because he would never do anything to himself. ████ provided this friend`s information as: ████████████████

-I asked ████ if the victim had any medical conditions and she said that he takes medication, but she does not know what they`re for.

\*The above is a summary, review the recording for additional information. \*

\*\*\*\*\*\*\*\*\*\*

The recorded interview was entered into CPD evidence.

Nothing further.

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** DELUCIA, J. R. (2495)      **Date / Time:** *03/13/2024 16:05:33, Wednesday*

**Supervisor:** *TUTTLE, E. M. (1604)*      **Supervisor Review Date / Time:** *03/21/2024 15:58:28, Thursday*

**Contact:**      **Reference:** *Supplemental Report*

---

OCA: 24-03740
Incident Date: 03/09/2024
Incident: Suicide
Incident Location: 301 Savannah Hwy. Charleston, SC, 29407
Victim: John Barnett

---

*03/13/2024*
-Follow up at the incident location.
-Follow up at Waffle House (325 Savannah Hwy.)

---

On 03/13/2024 at approximately 0930 hours I (Det. DeLucia) followed up at the incident location. Upon arrival I met with ███████ (manager / listed other). I asked ███████ about the entrances/exits of the hotel and if all locations were covered/recorded by their surveillance footage and she responded in the affirmative. ███████ advised the following:
*****

CAM 5 - Lobby Entrance / Exit
CAM 2 - Entrance / Exit closest to SC 61 (near where the victim`s vehicle was located).
CAM 3 - Employee Entrance / Exit that lets out in the direction of Waffle house. If an individual leaves through this door they will then be captured on CAM 8.
CAM 7 - Entrance / Exit to the smoking area. A guest cannot reenter through this door if they leave & close the door.
*****

Furthermore, I asked ███████ if she would provide me with the victim`s room rental records and she obliged. The requested records were printed and provided to me. These records were entered into CPD evidence. The received records can be summarized as follows:
*****

+ Record #1
1 Page
Name: John Barnett
Address listed: ███████ Picher OK 74360 United States
Folio #: 517629
Room No: 0511
Arrival: 02/26/24
Departure: 03/02/24
Conf No: 87422379


+ Record #2
2 Pages

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                              Printed: 05/13/2024  09:42

*Charleston Police Department*                              OCA: **2403740**

<div style="background:yellow">THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</div>

**Case Status:** *PENDING ACTIVE*          **Case Mng Status:** *PENDING ACTIVE*          **Occurred:** *03/09/2024*
**Offense:** *DEATH INVESTIGATION*

**Investigator:** *DELUCIA, J. R. (2495)*          **Date / Time:** *03/13/2024 16:05:33, Wednesday*
**Supervisor:** *TUTTLE, E. M. (1604)*          **Supervisor Review Date / Time:** *03/21/2024 15:58:28, Thursday*
**Contact:**          **Reference:** *Supplemental Report*

---

Name: John Barnett
Address listed: ██████████ OK 74360 United States
Folio #: 517944
Room #:0511
Arrival: 03/02/24
Departure: 03/06/24
Conf No: 25905124

+Record #3
1 Page
Name: John Barnett
Address Listed: United States
Folio #: 518161
Room #: 0511
Arrival: 03/06/24
Departure:03/09/24
Conf no: 24808340

The card associated with purchases on all records is: Master Card ending in 1779.

*The above is a summary, review the records for additional information. *
*****
After leaving the incident location I followed up at Waffle House (325 Savannah Hwy.) and met with an employee who permitted me to access the surveillance system. Due to the length of the needed timeframe, I inquired if I could download the needed footage & the employee advised that the video request would have to be sent to corporate. I provided the employee with my business card & the needed dates & timeframe for the video footage (03/08/24 from 1900 hours through 03/09/24 at 1015 hours). The employee advised that I will be further contacted by corporate in reference to this request.

At approximately 1525 hours I received an email from Webb Redmond (██████@wafflehouse.com | Director of Security Waffle House Inc.) requesting that I call him. I contacted him via phone (██████) at approximately 1536 hours and a representative answered advising that Webb was not available, and he will contact me back.

Nothing further.

Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *SPRATT, L. F. (2311)*          **Date / Time:** *03/15/2024 13:17:36, Friday*

**Supervisor:** *BENNETT, H. R. (2442)*      **Supervisor Review Date / Time:** *03/16/2024 09:21:45, Saturday*

**Contact:**          **Reference:** *Crime Scene Log*

Crime Scene Supplemental Report

Case Number:  2403742
Date/Time of Response:     March 13, 2024 / 1145 hrs.
Location of Response:  Jennings Towing, 2026 Meeting Street Rd.
Rpt. Crime Scene Supervisor:  L. Spratt
Evidence Collected:     No
Evidence sent to Latent Recovery:  No
Photos taken:   Yes
Fingerprint processing at scene:     No
Number of latent lifts:  0
Weather:   Clear, Sunny, Warm

On March 13, 2024 at approximately 1145 hrs., reporting Crime Scene Supervisor (R/CSS) responded to Jennings Towing at 2026 Meeting Street Rd., in the City of Charleston, SC, in reference to a follow-up in a death investigation

Scene Description: Jennings Tow Lot, secured with standard fencing.

R/CSS spoke with Detective Tuttle by phone. A discussion was had about any additional searching to be conducted on the victim`s vehicle prior to its release. Based on the initial response and evidence it was determined a secondary search for the projectile should be conducted to attempt to recover it presumably from the interior roof area where the apparent hole was located.

R/CSS spoke with CSI Bennett about her initial search on scene. Details of this search can be read in her supplemental report. This initial search did not include any destructive or invasive searching which is typical- based on the facts of the case on scene. This type of search was now determined to be warranted and requested by Detective Tuttle.

Detective Galka was present on scene with keys for the vehicle. The keys were utilized to gain access to the vehicle.

Vehicle Information: Orange in color Dodge Ram 1500, LA tag: 

R/CSS photographed the vehicle for documentation. It should be noted that a memory card issue occurred with R/CSS`s issued Nikon camera preventing photographs from being taken on that device. Due to this, photographs were taken utilizing R/CSS`s assigned department cell phone.

_____                        _____
Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *SPRATT, L. F. (2311)* | **Date / Time:** *03/15/2024 13:17:36, Friday* |
| **Supervisor:** *BENNETT, H. R. (2442)* | **Supervisor Review Date / Time:** *03/16/2024 09:21:45, Saturday* |
| **Contact:** | **Reference:** *Crime Scene Log* |

R/CSS observed an apparent bullet hole in the roof lining above the front driver seat. Photographs were taken as that section of the roof lining was removed. A corresponding perforating hole was observed in a foam insulation piece above the roof lining. This hole perforated (or continued through) the foam insulation piece. Above this perforating hole, on the interior side of the metal roof of the vehicle was an apparent corresponding defect. No perforation through the metal portion of the roof was observed. Based on the perforating holes in the roof lining and foam insulation piece, with a defect (no perforation) of the interior side of the metal roof, the approximate trajectory of the projectile that caused this damage would have had to travel in an upward vertical direction. Additionally, the perforating hole in the foam insulation showed the projectile would have had to travel horizontally in a slightly right to left directionality.

A thorough search of the cavity between the roof lining and the interior side of the metal roof was conducted to attempt to locate the projectile. Additionally, other accessible interior panels of the vehicle were removed in the search as well as a search of the interior of the cab of the vehicle. This search led to negative results. It should be noted that there are numerous inaccessible cavities of the interior cab of the vehicle where the projectile could have come to rest. Additionally, the vehicle having been towed since the incident could have displaced the projectile within the vehicle cavities.

Additional photographs with a scale were taken of the perforating holes and the defect in the roof for documentation.

R/CSS was contacted by Digital Analyst Maria Heffron who requested vehicle information on the vehicle`s infotainment system to determine its compatibility with their extraction software. R/CSS accessed the vehicle`s infotainment system to gain access to this information. Analyst Heffron advised that the vehicle was not compatible.

Photographs were submitted to VeriPic Digital Evidence Manager under the assigned case number.

No further information at this time.

_____

END/ LFS

| | |
|---|---|
| _____ | _____ |
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024 09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *TUTTLE, E. M. (1604)*

**Supervisor:** *MELLETTE, M. (1805)*

**Contact:**

**Date / Time:** *03/15/2024 15:21:43, Friday*

**Supervisor Review Date / Time:** *03/20/2024 12:34:14, Wednesday*

**Reference:** *Supplemental Report*

OCA: 2403740
Incident: Death Investigation

-Friday, March 15, 2024-

Amy Pocklington and Max Welsh of Ogletree Deakins law firm contacted me around 15:00 hours in reference to this case. I, Detective Sergeant Eric Tuttle, conducted an audio recorded interview that may be summarized as follows:

Amy was one of the two attorneys for Ogletree representing Boeing during the deposition of the victim. She deposed him on Thursday, March 7, 2024 for about seven hours while at their (Ogletree office), located at 211 King Street. They completed their questioning on Thursday. The victim`s attorney began their questioning for the deposition around 11:00 hours. Friday lasted until around 17:00 hours, with a lunch break.

The victim appeared and expressed that he was tired and that he was eager to return to Louisiana. The attorneys met in private and agreed to return the following day (Saturday, March 9, 2024) at 10:00 to complete the deposition of the victim.

This deposition was the only time that Amy had met Mr. Barnett in person. She did not note anything unusual, aside from his fatigue from the deposition and his yearning to return home. She was not aware of any suicidal ideations from the victim or any threats against him.

She and Max were unable to comment on how the death would affect Boeing`s position with the case; however, she did note that victim`s attorney notified Ogletree they intended to continue the suit on behalf of the victim`s estate.

-End- (Refer to audio recording for full interview)

_____
Investigator Signature

_____
Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                    Printed: 05/13/2024  09:42

*Charleston Police Department*                                        OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | | |
|---|---|---|
| **Investigator:** *GENNA, G. (2351)* | **Date / Time:** *03/15/2024 19:05:05, Friday* | |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *03/21/2024 15:55:00, Thursday* | |
| **Contact:** | **Reference:** *Supplemental Report* | |

OCA: 2403740
Incident: Death Investigation
Incident Location: 301 Savannah Hwy., Charleston SC 29414 (Holiday Inn)
Incident Date: 3/9/2024
Victim: John Barnett

On 3/15/2024 at approximately 530pm, I (Det. Genna) made telephonic contact with ▮▮▮▮▮ in reference to any possible knowledge she has in refence to Mr. Barnett`s death.

The phone conversation was recorded on my CPD issued body worn camera and has been uploaded to the CPD IRSA Cloud. The conversation is summarized below.

Ms. ▮▮▮ and Mr. Barnett have known each other since the late 1970 when they were in high school. Mr. Barnett`s mother and her mother are best friends.

Ms. ▮▮▮ stated that Barnett moved back to Louisiana in 2017 and she sees him roughly once a month.
The last time ▮▮▮ saw Mr. Barnett was on February 24 2024, when Mr. Barnett was a pal bearer for her father`s funeral. When asked about any suicidal thoughts or ideations, she advised that Barnett was always upbeat and joking around.

Ms. ▮▮▮ was asked to explain the context of the statement she made to the media in regard to her saying Barnett told her "If I am found dead, it was not a suicide". ▮▮▮ stated that they were sitting around after her father`s funeral joking around when they began to speak about the depositions. She advised that Barnett wasn`t worried about them and just wanted to get over with them. She advised that they continue to make jokes and sarcastic comments about the situation (depositions).  She further stated that when Barnett made the comment, she added what are they going to "Clinton" you.

▮▮▮ was asked about how she came to talk to the media about the comment. ▮▮▮ stated that she told Barnett`s mother about his statement who told Barnett`s attorney. She then stated that the attorney contacted her, asked her a couple of questions then asked her if she would speak to Anna Emerson, who is a reporter for WCIV/ABC channel 4 in Charleston. ▮▮▮ agreed to speak with her.

▮▮▮ had no intimate knowledge of the death of have any additional information to provide.

Nothing further.

| | |
|---|---|
| _____ | _____ |
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *BROWN, Y. D. (1191)*    **Date / Time:** *03/19/2024 15:58:08, Tuesday*

**Supervisor:** *BROWN, Y. D. (1191)*    **Supervisor Review Date / Time:** *03/19/2024 16:03:26, Tuesday*

**Contact:**    **Reference:** *Supplemental Report*

Incident #: 24-03740
Incident Type: Death Investigation

On March 9, 2024 I, Sgt. Y. Brown requested receipts from Holiday Inn Manger, ▮▮▮▮▮ in reference to seeing the time frame in which the victim was a guest at the incident location. On March 18, 2024 I submitted those requested receipts (2 sheets) into CPD Evidence.

Nothing Further......

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*     **Case Mng Status:** *PENDING ACTIVE*     **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*     **Date / Time:** *04/06/2024 12:15:23, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*     **Supervisor Review Date / Time:** *04/06/2024 13:06:21, Saturday*

**Contact:**     **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 11th, 2024 I (Detective Malone) made myself familiar with the facts of this investigation.  At approximately 1030 hours, Detective Delucia and I made contact with the victim`s attorney (Rob Turkewitz, ██████████ ██ @rmtlegal.com) via telephone and obtained the following information related to the victim:

- The deposition took place at 411 King Street, the offices of the Ogletree Law firm.
- Thursday, March 7th was the first day of the deposition, with the deposition continuing through Friday, March 8th and into Saturday, March 9th.  The victim drove with Turkewitz on Thursday and drove himself to the deposition on Friday.
- The victim chose the Holiday Inn hotel himself and was not put up by his attorney`s office.
- The victim`s lawsuit, and subsequent depositions, were related to a whistleblower retaliation complaint from when the victim worked at Boeing.
- The victim`s case is set for Trial in June of 2024.  Per Turkewitz, the victim was in good spirits and was looking forward to his day in court.  Turkewitz also said that the deposition went well for the victim and a lot of damaging information against Boeing was relayed.
- The victim`s phone number is ██████████

At approximately 1200 hours, I spoke with Deputy Coroner Butler via telephone.  DC Butler notified me that the autopsy was completed.  The victim suffered from a single, close contact gunshot wound to the head.  The victim did not have any additional trauma to his body.  This information, in addition to the note left behind in the victim`s vehicle, is, at this point in the investigation, consistent with suicide.

I then began a review of Holiday Inn video footage which was gathered by Detective Delucia during the initial investigation.  During that review, I located the victim entering the hotel, by himself, at 19:26:18 hours on March 8th, 2024.  Further review is needed to capture the victim exiting the hotel.

The investigation continues...

_____     _____
Investigator Signature     Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/06/2024 12:16:41, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *04/06/2024 13:05:15, Saturday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 12th, 2024 I (Detective Malone) responded to the Charleston County Coroner`s Office and took possession of the victim`s notebook (containing the suicide statements) as well as other autopsy evidence (pulled head hair, entry wound shaved hair, tape lifts, fingernail clippings, hair found from L#5 tip).  Upon returning to CPD headquarters I logged these items into CPD evidence.  I also requested that the notebook and note containing the suicide statements be processed for fingerprints.

I also submitted a request that the firearm used in this incident be fully processed by CPD forensic lab to include test firing and processing through the National Integrated Ballistic Information Network.

The investigation continues...

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/06/2024 12:17:38, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *04/06/2024 13:07:24, Saturday*

**Contact:**    **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 13th, 2024 I (Detective Malone) received information from Robert Turkewitz in reference to the individual who sold the victim the Smith and Wesson firearm that was located in the victim's hand during the initial investigation. That individual identifies herself as ▇▇▇▇▇ ▇▇▇▇▇▇) and the email states that she sold the victim the firearm sometime between 1999-2000.

I then drafted a search warrant for the victim's CDR information (target # ▇▇▇▇▇▇) and presented the search warrant to the Honorable Judge Gosnell. I swore to the facts contained within the search warrant and it was signed. No other facts of the case were discussed. Upon returning to CPD headquarters, I submitted the search warrant to AT&T at 12:38 hours (ATT file code: 3880077).

I also submitted a request with the Charleston Police Department forensic services division requesting that the victim's notebook/suicide note be processed for fingerprints. I also requested that crime scene technicians photograph the pages in the notebook prior to the fingerprint processing.

I then continued the review of the Holiday Inn camera footage. During this review, I observed the victim entering the hotel, exiting the hotel and parking his vehicle in the parking spot where it was located. The exact time stamp of these activities are as follows:

March 8th, 2024:
-    19:26:18 hours:  Victim observed entering the hotel via the main entrance.  The victim is wearing dark pants and a plaid, cutoff shirt.
-    20:37:23 hours:  Victim is observed exiting the hotel via the main entrance.  The victim is wearing a dark jacket, however his plaid shirt is observed protruding from the bottom of the jacket.  Victim is also wearing the same dark pants and same shoes.
-    20:45 hours:  Vehicle backs into parking space where victim vehicle was located
-    21:17:56 hours:  Brake lights are illuminated in the parking spot.
-    21:19:44 hours:  Brake lights go out.  Once these lights extinguish, the vehicle does not move until it is located by law enforcement the next day.

Several hours later I received some of the victim's medical records from Robert Turkewitz. These medical records document that, since February of 2017, the victim has suffered from anxiety, depression, ongoing nightmares and often wakes in a panicked state. Additionally, these medical records indicate that "anytime he must engage with legal case he experience increased anxiety."

_____    _____
Investigator Signature    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*           **Case Mng Status:** *PENDING ACTIVE*           **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *MALONE, D. R. (2237)*                **Date / Time:** *04/06/2024 12:17:38, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*        **Supervisor Review Date / Time:** *04/06/2024 13:07:24, Saturday*

**Contact:**                                **Reference:** *Supplemental Report*

---

Per the provided medical records, the victim last reported these symptoms to Deborah Still, a Charleston based psychotherapist, on March 4th, 2024.  These medical records state, "Client continues to exhibit sxs of PTSD: anxiety, sadness, fear of impending death of others and intrusive thoughts."

The investigation continues...

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/06/2024 12:21:42, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *04/06/2024 13:03:14, Saturday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 14th, 2024 I (Detective Malone) received the eTrace on the firearm used by the victim during this incident (Smith and Wesson 9mm handgun, SN: ███████). This eTrace report indicates that the firearm was purchased on August 1st, 1996 from Oshman Sporting Goods located at 1101 Super Mall, Auburn, Washington. The firearm was purchased by ████████████, who is the individual that informed Robert Turkewitz that she sold the firearm to the victim between 1999-2000.

The investigation continues...

---

Investigator Signature                           Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*  **Case Mng Status:** *PENDING ACTIVE*  **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*  **Date / Time:** *04/06/2024 12:34:29, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*  **Supervisor Review Date / Time:** *04/06/2024 13:02:41, Saturday*

**Contact:**  **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 15th, 2024 I (Detective Malone) received a NIBIN lead notification indicating that the fired cartridge casing (FCC) recovered from inside the victim`s vehicle matches the silver-in-color Smith and Wesson firearm located in the victim`s hand.

The investigation continues...

Investigator Signature                    Supervisor Signature

CASE SUPPLEMENTAL REPORT

*Charleston Police Department*                                    OCA: **2403740**

<mark>THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY</mark>

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*                    **Date / Time:** *04/06/2024 12:35:24, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*      **Supervisor Review Date / Time:** *04/06/2024 13:02:21, Saturday*

**Contact:**                                    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 19th, 2024 I (Detective Malone) received the completed forensic extraction for the victim`s cell phone. That extraction is summarized as follows:

Device Info:
-    MSISDN: █████████

Text Messages/Phone calls:
-    2/21/2024 at 15:33:43 hours:  Messages █████████, "Boeing is taking my deposition on Wednesday… I might be done talking by Friday."
-    2/25/2024 at 14:03:13 hours:  Begins searching hotels in Charleston, SC
-    2/29/2024 at 19:09:44 hours:  Places phone call to █████████ (█████████) for 29m 38s
-    3/06/2024 at 11:38:44 hours:  Receives message from Robbie, "You ok little brother?"
-    3/06/2024 at 12:27:19 hours:  Messages Robbie, So far, so Good.  Tomorrow is a big day."
-    3/06/2024 at 21:31:49 hours:  Receives message from █████████, "Hey John, I can`t make it up there this weekend.  I have too much going on down here.  Hope to catch up with you soon!"
-    3/07/2024 at 15:07:28 hours:  Receives message from mom, "Did you get your medicine yesterday?"
-    3/07/2024 at 19:25:05 hours:  Receives message from █████████, "Really hope you had a successful day today."
-    3/07/2024 at 19:57:43 hours:  Messages Brian Knowles, Rob T, "Am I allowed to review documents tonight?"
-    3/08/2024 at 07:54:57 hours:  Messages Brian Knowles, "Can you talk?"
-    3/08/2024 at 08:05:06 hours:  Received phone call from Brian Knowles (2m 48s)
-    3/08/2024 at 18:31:47 hours:  Replies to mom, "Yes Ma`am."

Web searches:
-    2/05/2024: █████████
-    2/07/2024: █████████
-    2/13/2024: █████████
-    2/14/2024: █████████

Emails:
-    2/28/2021 at 09:19:56 hours:  Email sent to █████████, "I`m trying to figure out what it would take to "make me whole again". I really don`t know where to start answering that question. Looking at the definition, I found where it states… To restore (someone) to a sound, healthy, or otherwise favorable condition. To repair or

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                                    Printed: 05/13/2024  09:42

*Charleston Police Department*                                            OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:**  *PENDING ACTIVE*          **Case Mng Status:**  *PENDING ACTIVE*          **Occurred:**  *03/09/2024*

**Offense:**  *DEATH INVESTIGATION*

---

**Investigator:**  *MALONE, D. R. (2237)*                    **Date / Time:**  *04/06/2024 12:35:24, Saturday*

**Supervisor:**  *TUTTLE, E. M. (1604)*          **Supervisor Review Date / Time:**  *04/06/2024 13:02:21, Saturday*

**Contact:**                                        **Reference:**  *Supplemental Report*

---

restore (something). I fully understand the direct costs that we can establish, i.e. lost pay, lost bonuses, etc. What I am struggling with is, how do you repair or restore a person`s overall outlook on life? I used to be a very happy go lucky guy that loved his job, his Company and the products they built. I had a very positive outlook on life. Boeing has absolutely destroyed my outlook on life. I often sit here and think, what`s the use, what`s the point of life? A person works hard all their life, trying to do the right thing, treating others with respect, just to have their entire professional life destroyed because they were doing as they were trained and expected to do…follow the rules. What is a person`s "outlook on life" worth? And looking at the mental toll it has had on me. I suffer from anxiety attacks, depression, panic attacks, PTSD… I`ve got an anger inside me that I`ve never experienced before and I don`t understand how to control… How do you put a price on that? Sometimes I think…maybe if I go out and find a job, it will help. And then the anxiety hits just thinking about having to report to someone that has control over me and my performance ratings. I don`t have the mental fortitude to put myself in that position again…I just can`t do it, not right now anyway. How do you put a price on that? Each time I do an interview, deposition or other stressful discussion on what happened with me and Boeing, I re-live those years all over again. It puts me in a deep depression for a week or two, (depending on the intensity level of the discussion). I shut myself in, I don`t want family or friends coming over, I am angry at the world!…"

There were multiple other emails documenting the victim`s legal case against Boeing, however I did not locate any threats or other communication related to the victim`s lawsuit that occurred with anybody outside of his legal team.  I also did not observe any threats or harassment in any of the victim`s communication.

At approximately 1400 hours I received two fingerprint reports from the CPD forensics laboratory.  Report number 2 states that no fingerprints were recovered from the firearm located in the victim`s possession.  Report number 3 states that 8 fingerprints were recovered from the red notebook recovered in the victim`s vehicle.  Several of these fingerprints were suitable for comparison via the AFIS system, however not matches were discovered.

The investigation continues...

---

Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/06/2024 12:37:26, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *04/06/2024 13:00:24, Saturday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 21st, 2024 at approximately 0600 hours I (Detective Malone), received the victim`s CDR information from the AT&T Global Legal Demand Center. I forwarded that CDR information to the Charleston Police Department Crime Intelligence Unit for plotting and analysis.

Several hours later I received the plotted data from CIU Analyst Lalumia. The data plots were from midnight on March 8th, 2024 until the phone stopped communicating with the cell towers on March 8th, 2024 at 21:20:21 hours.

During this time frame, the victim`s cell phone is locating at the Holiday Inn located at 301 Savannah Highway. The cell phone remains at that location until approximately 10:12:55 hours, when the victim heads onto the peninsula to attend his deposition on King Street. The victim`s cell phone last communicates with the cell towers at 10:36:49 hours before beginning to communicate once again at 18:04:37 hours. It should be noted that this time frame is the approximate time that the victim was conducting his deposition on March 8th, 2024.

The victim`s cell phone then returns to 301 Savannah Highway where it remains until the cell phone stops communicating with the tower (more than likely running out of battery power).

During this entire time frame, the victim`s cell phone does not locate anywhere outside of the 301 Savannah Highway/downtown Charleston area.

The investigation continues...

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**    Printed: 05/13/2024  09:42

*Charleston Police Department*                                    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*          **Case Mng Status:** *PENDING ACTIVE*          **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*                **Date / Time:** *04/06/2024 12:46:23, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*     **Supervisor Review Date / Time:** *04/06/2024 12:59:56, Saturday*

**Contact:**                                        **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 26th, 2024 I (Detective Malone) made contact with Deputy Coroner Butler in reference to the fingerprints recovered from the notebook containing the suicide statements. DC Butler confirmed that the victim's fingerprints were rolled during the autopsy and I requested a copy of that fingerprint card in order to compare them against the fingerprints recovered from the notebook. I will pick up this fingerprint card at a later date.

At 1230 hours I, along with Sergeant Tuttle, met with the victim's mother (███████████████) and his brother (█████████████████████) at CPD headquarters in order to provide them an update into the investigation and answer any questions they may have. Our interview, which was recorded on Sergeant Tuttle's body worn camera, is summarized as follows:

Person Interviewed:

████████████

-    ████████ and her son, ████████████, came to the police station in order to clarify rumors and misleading information that they heard via multiple media outlets.
-    Sergeant Tuttle and I answered as many questions as possible and informed them of the on-going investigation.
-    Of note, Ms ██████ mentioned the note left behind by the victim, specifically the part in the note that states, "Bury me face down so Boeing and their lying ass leaders can kiss my ass." ██████ states that the victim used to say that to her all the time regarding this case and that it was a common thing for him to say.
-    I notified Ms. ██████ that I would remain in contact with her and that we would go over the case in its entirety once completed.

The interview was then concluded. For detailed viewing see the BWC video which was uploaded per CPD policy.

The investigation continues...

Investigator Signature                        Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                    Printed: 05/13/2024  09:42

*Charleston Police Department*                    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*          **Case Mng Status:** *PENDING ACTIVE*          **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *MALONE, D. R. (2237)*                    **Date / Time:** *04/06/2024 12:47:59, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*          **Supervisor Review Date / Time:** *04/06/2024 12:59:17, Saturday*

**Contact:**                    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 27th, 2024 I (Detective Malone) received a Record of Conversation from our FBI Task Force Officer (Detective Mapp).  This Record of Conversation was completed on March 19th, 2024 by Special Agent Ashley Strickland with the US Department of Transportation Officer of Inspector General and documents a conversation that took place between her and the victim`s attorneys (Rob Turkewitz and Brian Knowles).  A portion of this Record of Conversation indicates that a tow-truck driver for employed by Jenning`s Towing (identified as ████████, ██████████ spoke with Knowles and Turkewitz when the pair went to Jenning`s Towing to look at the victim`s truck.  Per the attorneys, ██████ stated that he towed the victim`s truck from the Holiday Inn.

While picking up the truck, Knowles and Turkewitz state that ██████ said that a Charleston Police Officer approached him and stated that the victim "sliced his wrists in the hotel room and then went outside and shot himself. ██████ said there had been a blanket on the body and that the police threw it into the back of the truck…"  The report also states, ██████ told Knowles and Turkewitz that it didn`t seem like a suicide to him."

I placed this Record of Conversation, along with several attached photographs of the victim`s truck (taken by the attorneys) into the case file.

The investigation continues...

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024 09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *MALONE, D. R. (2237)* | **Date / Time:** *04/06/2024 12:49:39, Saturday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *04/06/2024 13:02:29, Saturday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 28th, 2024 I (Detective Malone) received a request from the Charleston County Coroner's Office that the victim's pickup truck be x-rayed in order to locate the projectile from the firearm used in this incident. It should be noted that an effort was made by Detective Galka and Crime Scene Technician Spratt to locate the fired projectile in the victim's vehicle, however that attempt was unsuccessful.

I made contact with Sergeant Haithcock (CPD Explosive Devices Unit sergeant) who stated they would be able to x-ray the vehicle in an attempt to locate the projectile.
At approximately 1200 hours, I responded to Jennings Towing (2026 Meeting Street Road) and requested that the victim's vehicle be transported to 62 Brigade Street (CPD warehouse) in preparation for the EDU team to conduct their inspection.

While at Jennings, I spoke with ████████████ (████) who is the Jenning's employee mentioned by Knowles and Turkewitz in the DOT investigation report. ████ informed me that he was not the driver who towed the victim's truck on the date of the incident and stated that he was not on scene at the Holiday Inn hotel that morning. ████ did state that the two lawyers responded to Jenning's Towing several days later to inspect the truck and asked several questions, to include whether or not the pickup truck was processed at the CPD forensics building.

████ informed the attorneys that he has no knowledge of the Charleston Police Department's investigative techniques and that his only responsibility is transporting the vehicle when called upon to do so.

I directly asked ████ if he made any statements to the attorneys in reference to a CPD officer notifying ████ of the victim's injuries. ████ reiterated that he was not on scene that day, did not speak with any CPD officers, has zero knowledge of the victim's injuries and never stated to either attorney that he was approached by a CPD officer. ████ also informed me that nobody at Jenning's Towing was even aware of who the victim was until days later when details started emerging in the media.

I then followed the victim's pickup truck to the CPD warehouse and ensured it was properly stored and secured.

EDU will conduct their inspection on the morning of March 29th, 2024.

The investigation continues...

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/06/2024 12:51:26, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*    **Supervisor Review Date / Time:** *04/06/2024 12:56:52, Saturday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On March 29th, 2024 at approximately 0830 hours I (Detective Malone) responded to the Charleston County Coroner`s Office (4000 Salt Pointe Pkwy) and retrieved copies of the victim`s fingerprint cards. Upon returning to CPD headquarters I logged these fingerprint cards into CPD evidence. I also submitted a request that these known fingerprints be compared to the prints recovered from the notebook.

At approximately 0930 hours I responded to 62 Brigade Street (Charleston Police Department warehouse) to assist the Charleston Police Department EDU team in conducting a x-ray inspection of the vehicle. I briefed the EDU team on the facts of the case and they conducted their inspection. The EDU team took a radiograph of the roof of the vehicle directly over the victim`s head and observed a projectile shaped anomaly near the top door jamb of the driver`s door, just over where the victim`s left shoulder would have been.

Sergeant Haithcock conducted a physical search of the area and located the fired projectile lodged in the roof of the vehicle exactly where the anomaly appeared on the radiograph.
Upon obtaining the fired projectile, the inspection of the vehicle was concluded. I called Jenning`s Towing and had the vehicle towed back to the Jenning`s Towing yard.

I then returned to CPD headquarters and entered the fired projectile into CPD evidence. Of note, the projectile weighs approximately 7.41 grams, which is consistent with the average weight of a 9mm projectile. The projectile was also full metal jacket which is consistent with the other cartridges located in the victim`s handgun.

The investigation continues...

---

Investigator Signature                         Supervisor Signature

# CASE SUPPLEMENTAL REPORT

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*                    **Date / Time:** *04/06/2024 12:53:05, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*      **Supervisor Review Date / Time:** *04/06/2024 12:55:41, Saturday*

**Contact:**                                  **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On April 2nd, 2024 at approximately 1145 hours I (Detective Malone) responded to the Charleston County Coroner`s Office and retrieved the original copy of the victim`s fingerprint cards (the copies I obtained on March 29th were not suitable for making a comparison).

I then transported the fingerprint cards to the Charleston Police Department Forensic Services Building and signed them over to Nova Grilli, the Charleston Police Department Friction Ridge Manager. It should be noted that, due to this evidence belonging to the Coroner`s office and not being entered into the CPD evidence module, it was assigned a bag and item number (bag 30, item 1) that will not correspond to a number found in the CPD evidence module. Upon the completion of the fingerprint comparison, the victim`s fingerprint card will be returned to the Coroner`s office.

At approximately 1415 hours I submitted a request to have the recovered firearm (bag 1, item 101), recovered FCC (bag 4, item 104) and recovered fired projectile (bag 22, item 1) sent to SLED for forensic analysis.

The investigation continues...

---

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*          **Case Mng Status:** *PENDING ACTIVE*          **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*                          **Date / Time:** *04/06/2024 12:57:42, Saturday*

**Supervisor:** *TUTTLE, E. M. (1604)*          **Supervisor Review Date / Time:** *04/06/2024 12:59:28, Saturday*

**Contact:**                                                **Reference:** *Supplemental Report*

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On April 5th, 2024 at approximately 1100 hours, Detective Broadwater transported the recovered firearm, recovered FCC and recovered projectile to SLED for further forensic analysis.  The SLED lab number attached to this evidence is L24-05753.

The investigation continues...

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** | *DEATH INVESTIGATION* | | |

**Investigator:** *HAITHCOCK, J. L. (1625)*          **Date / Time:** *04/09/2024 12:00:45, Tuesday*

**Supervisor:** *WILSON, D. G. (1739)*          **Supervisor Review Date / Time:** *04/25/2024 14:03:10, Thursday*

**Contact:**          **Reference:** *Supplemental Report*

On 03/29/2024, I, Sgt. Haithcock, met Sgt. Kursh, Det. A. King, Det. M. Bryan, and Det. D. Malone at 62 Brigade St. (CPD Warehouse). It was in reference to locating a bullet that was used in the incident listed in the report. Once all parties were on scene. Det. Malone gave us access to the vehicle. I used my flashlight to locate the trajectory of the bullet. From a distance, it appeared as if the bullet had gone between the two pieces of sheet metal in the roof. Once you got closer, you could see that it had not penetrated the lower piece of metal but had been diverted towards the curtain airbag in the driver side rear seat. I had Sgt. Kursh place our X-ray panel on the top of the vehicle above the airbag. The X-ray source was placed on the floor. We shot the X-ray with 20 pulses at 4 feet from a Golden 150 X-ray device. We were able to locate the bullet inside of the curtain airbag. I cut the bullet out of the airbag with my knife. It fell to the floor of the warehouse where it was recovered by Det. M. Bryan. It was wrapped in a glove, and handed to Det. D. Malone. The bomb squad was done with the search and turned the vehicle back over to Det. Malone. We packed up and left the warehouse.

_____          _____
Investigator Signature          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*    **Case Mng Status:** *PENDING ACTIVE*    **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*    **Date / Time:** *04/17/2024 13:27:59, Wednesday*

**Supervisor:** *WILSON, D. G. (1739)*    **Supervisor Review Date / Time:** *04/25/2024 10:43:55, Thursday*

**Contact:**    **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On April 16th, 2024 at approximately 0900 hours I (Detective Malone) received the completed SLED ballistics report (L24-05753) related to the victim`s firearm. That report, which was completed by Chad M. Smith, SLED forensic scientist, states that both the Fired Cartridge Casing and fired projectile recovered from the victim`s vehicle were fired by the firearm located in the victim`s hand (silver-in-color Smith and Wesson 9mm pistol).

The following facts have been obtained as a result of this investigation:
-    The victim suffered from a single, close contact gunshot wound to the head.
-    The incident occurred within the locked vehicle, which was owned and known to be operated by the victim. There were no signs of struggle or forced entry into the vehicle prior to first responders arrival.
-    The victim was observed to have a firearm (silver-in-color Smith and Wesson, SN: ███████) gripped tightly in his right hand when located by officers.
-    This firearm was confirmed to belong to the victim which was purchased around the year 2000 from ████ ████████ This was confirmed via the eTrace report conducted on the firearm.
-    A single fired cartridge casing and single fired projectile were recovered from the victim`s vehicle. SLED ballistic analysis (L24-05753) confirms the FCC and projectile were fired by the victim`s firearm.
-The trajectory of the projectile is consistent with the gunshot wound.
-    A notebook containing what amounts to a suicide note was located, open, on the front, passenger seat of the vehicle.
-    Numerous fingerprints were recovered from this notebook and all of those recovered fingerprints (with the exception of 3 prints being inconclusive due to the prints not containing enough ridges for a positive identification) belong to the victim.
-    Per medical records provided by the victim`s lawyer, and emails located during an examination of the victim`s cell phone, the victim suffered from numerous mental health issues related to his whistleblower case. These mental health issues are documented as being exacerbated. whenever the victim had to deal with the legal process related to his case
-    The victim`s call detail records (CDR) revealed no unusual travel or activity on the part of the victim and indicate that the victim spent his time at the deposition site (on King Street) and back at the hotel.
-    A forensic examination of the victim`s cell phone revealed no usual activity or conversations. The victim did not receive any threats or usual phone calls/text messages during the time he was in Charleston.
-    The victim was observed on Holiday Inn security video entering the hotel, alone, on March 8th, 2024 at 19:26:18 hours.
-    The victim enters his room at 19:36 hours.
-    The victim is observed on Holiday Inn security video exiting the hotel, alone, on March 8th, 2024 at

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**                    Printed: 05/13/2024  09:42

*Charleston Police Department*                                    OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*          **Case Mng Status:** *PENDING ACTIVE*          **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*                    **Date / Time:** *04/17/2024 13:27:59, Wednesday*

**Supervisor:** *WILSON, D. G. (1739)*          **Supervisor Review Date / Time:** *04/25/2024 10:43:55, Thursday*

**Contact:**                                        **Reference:** *Supplemental Report*

20:37:23 hours.

-    The victim`s vehicle is observed on Holiday Inn security video backing into the parking space (where it was located the next morning) on March 8th, 2024 at 20:45 hours.

I am conferring with the Charleston County Coroner`s Office of the results of this investigation and await their official ruling on the cause and manner of the victim`s death.

The investigation continues...

Investigator Signature                              Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *GLADWELL, S. N. (1809)* | **Date / Time:** *04/25/2024 09:16:00, Thursday* |
| **Supervisor:** *BENNETT, H. R. (2442)* | **Supervisor Review Date / Time:** *04/27/2024 13:51:31, Saturday* |
| **Contact:** | **Reference:** *Crime Scene Log* |

Crime Scene Supplemental Report

Case Number:  2403740
Date/Time of Response:    03/14/2024 13:40
Location of Response:  Forensic Services Division
Reporting CSI: S. Gladwell
Evidence Collected:    No
Evidence sent to Latent Recovery:  No
Photos taken:    Yes
Video taken:    No
Fingerprint processing at scene:    No
Number of latent lifts:  0
Weather:    Interior

Scene:  Forensic Services Division

On the above date and time, R/I took additional photographs of a notebook that was collected by the Charleston County Coroner`s Office at a death investigation.

R/I photographed an orange `Boeing` notebook, along with any pages where handwriting was present.

Nothing else was requested of Crime Scene at this time.  Task completed.

END/SG

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *PENDING ACTIVE* | **Case Mng Status:** *PENDING ACTIVE* | **Occurred:** *03/09/2024* |
| **Offense:** *DEATH INVESTIGATION* | | |

| | |
|---|---|
| **Investigator:** *MALONE, D. R. (2237)* | **Date / Time:** *05/01/2024 12:16:06, Wednesday* |
| **Supervisor:** *TUTTLE, E. M. (1604)* | **Supervisor Review Date / Time:** *05/03/2024 12:32:59, Friday* |
| **Contact:** | **Reference:** *Supplemental Report* |

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On April 29th, 2024 at 0930 hours I (Detective Malone) received the completed autopsy/toxicology report from the Charleston County Coroner`s Office.  That report, which was completed by JC Upshaw Downs, MD, lists the victim`s cause of death as "gunshot wound of head" and the victim`s manner of death as "suicide."

Sergeant Tuttle and I spoke with Coroner Bobbi Jo O`neal and arranged to hold a meeting at her office with the family (via Zoom) to present the findings of this investigation.  Coroner O`neal informed us that the family has requested that their attorneys (Rob Turkewitz and Brian Knowles) be in attendance for this meeting.  She further informed us that the family granted approval for a Netflix filmimg crew to be present during the hearing, however Coroner O`neal informed us that she denied approval for Netflix to be present during the meeting with the family.

The meeting to discuss the findings with the victim`s family is set for May 3, 2024.

Due to all evidence in this case indicating suicide, and the final coroner`s report listing the victim`s manner of death as suicide, I recommend that this case be reclassified as Pending Inactive.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*     **Case Mng Status:** *PENDING ACTIVE*     **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

---

**Investigator:** *TUTTLE, E. M. (1604)*                    **Date / Time:** *05/01/2024 12:48:52, Wednesday*

**Supervisor:** *MELLETTE, M. (1805)*     **Supervisor Review Date / Time:** *05/06/2024 14:31:31, Monday*

**Contact:**                    **Reference:** *Supplemental Report*

---

April 11, 2024

I, Detective Sergeant Eric Tuttle, contacted Waffle House in reference to obtaining their exterior video from 325 Savannah Hwy (Store # 411).  They directed me to send a request via email to cctv@wafflehouse.com and I did so.  I requested video from 20:45 hours on March 8, 2024 through March 9, 2024 at 10:17 hours.

The provided me with a screen shot of their two exterior camera angles which face the incident location.  According to Google Maps, the distance between the cameras and the parking lot of the incident location is more than 250 feet.  Additionally, there is dense vegetation between the cameras and the parking lot, which obstructs the majority of the view of the parking lot.


April 26, 2024

Waffle House responded with a download link sent via email.


May 1, 2024

I downloaded the link which came in one zipped folder and contained three seperate folders.  The folders contained a proprietary software called VS Player.  The player then automatically loads the footage.  A brief initial review of the footage did not show the victim`s vehicle.

The videos were added to the case folder.

Nothing further.

---

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 05/13/2024  09:42

*Charleston Police Department*

OCA: **2403740**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *PENDING ACTIVE*      **Case Mng Status:** *PENDING ACTIVE*      **Occurred:** *03/09/2024*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *MALONE, D. R. (2237)*           **Date / Time:** *05/06/2024 15:39:08, Monday*

**Supervisor:** *TUTTLE, E. M. (1604)*      **Supervisor Review Date / Time:** *05/08/2024 23:23:43, Wednesday*

**Contact:**                                       **Reference:** *Supplemental Report*

---

Incident Type: Death Investigation
Incident Location: 301 Savannah Highway
Incident Date and Time: 3/09/2024 at approximately 1017 hours
OCA: 2403740

On May 3rd, 2024 at approximately 1000 hours I (Detective Malone), along with Sergeant Tuttle, arrived at the Charleston County Coroner`s Office to provide the investigation results to the victim`s family.  Upon arriving at the office I was notified by Coroner O`neal that the family attorneys (Rob Turkewitz and Brian Knowles) hired an investigative consultant, identified as Ray Nash, who would be sitting in on the meeting with the family in order to review the investigation.

I then observed the family attorneys arrive at the office accompanied by several Netflix production vehicles.  I observed the Netflix production crew actively filming the attorneys and actively filming outside the front of the office, in direct contradiction to what Coroner O`neal told us earlier in the week.

Based upon these developments, and upon consultation with Charleston Police Department command staff, it was decided that we would not be participating in the meeting.  Sergeant Tuttle and I then left the office and returned to CPD headquarters.

At approximately 1500 hours I made telephone contact with the victim`s brother, ███████.  I explained the reasons that we were unable to participate in the morning meeting, and informed Mr. Barnett that I would be more than happy to brief the family on the findings of the CPD investigation should they wish.  Mr. Barnett stated that the family would like to speak with us regarding the investigation, and stated that he would notify me of a date and time that the meeting could take place.

---

Investigator Signature                                    Supervisor Signature

# EXHIBIT C



**Decedent: Barnett, John Mitchell**

**Case: 2024-0841 Suicide**
**Race:** White
**Sex:** Male
**Age:** 62 years

**Date of Death:** 03/09/2024
**Time of Death:** Unknown
**County:**        Charleston, SC
**Investigator:**   Ella Butler

## Coroner's Report

On March 9, 2024, the Charleston County Coroner's Office was notified by Charleston County EMS of a death of an unidentified male as a result of an apparent self-inflicted gunshot wound.

Per reports from EMS and the Charleston Police Department, the decedent, later identified as John Barnett, a 62-year-old white male, was discovered unresponsive in his vehicle in the parking lot of the round Holiday Inn by hotel staff during a welfare check. Hotel staff called 9-1-1 at 1013 hours. Upon EMS arrival, the Charleston Fire Department forced entry into the locked vehicle. Charleston Police Department personnel removed the weapon from his right hand, disarmed it, and placed it securely on the console for further evaluation. The death was verified at 1033 hours by EMS.

Deputy Coroner Butler responded to the incident location and met with law enforcement, hotel staff, and the decedent's attorneys who had requested a welfare check. The decedent was in a seated position in the driver's seat of an orange in color Dodge Ram truck with Louisiana license tag # ▮▮▮▮▮ The cab of the vehicle was warm, and the truck was out of fuel. The decedent was clad in a multicolored sleeveless shirt, denim pants, and black belt. A pair of blue denim slip-on shoes were noted on the floor of the driver's seat adjacent to the gas pedal. The body was warm, rigor had not yet set in, lividity blanched with light pressure and was consistent with the body positioning. An external exam of the body revealed two correlating defects that appeared to be from a single, perforating gunshot wound. The hard-contact entrance wound was to the right temple and an exit wound was located to the parietooccipital region. There were no other signs of injury. Black powder/discoloration, which appeared to be gunshot residue, was noted on the decedent's right hand. A semi-automatic Smith & Wesson pistol, a loaded magazine, and unfired 9mm Luger cartridges were located on the vehicle console. A defect in the truck's headliner, directly above the driver's seat, was noted and documented. A search of the vehicle revealed a single-fired shell casing. A notebook containing writing resembling a suicide note was located on the passenger seat.

After the decedent and vehicle were photographed and examined, the body was placed in a body bag and locked with tag number ▮▮▮▮. The body was transported by Charleston County Rescue 4 to the Charleston County Coroner's Office to await an autopsy. The forensic pathologist was provided pertinent information. The autopsy was scheduled for March 11, 2024.

The decedent's hotel room was photographed, searched, and documented. Mr. Barnett's attorneys remained on scene and were interviewed.

**Decedent: Barnett, John**                                    **Case: 2024-0841 Suicide**

Notification to Mr. Barnett's next of kin was made in person with assistance from the Avoyelles Paris Sheriff's Office in Louisiana. Deputy Coroner Butler spoke with the decedent's mother and brother, gathered relevant social and medical information, answered questions, and discussed the next steps.

After the autopsy, the body was released to Hixon Brothers Funeral Home, per the family's request.

The decedent's vehicle was examined further by the Charleston Police Department resulting in the recovery of a projectile that caused the defect in the headliner. The recovered weapon, projectile, and fired cartridge case were forensically evaluated by the South Carolina Law Enforcement Division Firearms Department. Examinations concluded the recovered projectile was discharged from the Smith & Wesson which was registered to Mr. Barnett. Furthermore, during the autopsy, the trajectory of the wound path was documented. All findings were consistent with a self-inflicted gunshot wound.

A review of body-worn camera footage from the first responding officers verified the firearm was initially discovered in the decedent's right hand. Charleston Police Department personnel disarmed the weapon and placed it securely on the console for further evaluation.

Per reports from family and colleagues, Mr. Barnett traveled to Charleston on February 26, 2024, from his residence in Louisiana to participate in a deposition pertaining to a lawsuit with the Boeing Corporation. Mr. Barnett was deposed by Boeing attorneys on March 7, 2024, and was deposed by his attorneys on March 8, 2024. Per reports, the deposition on the 8th was paused early to give participants a rest period with plans to reconvene the following morning on March 9, 2024, at 1000 hours.

At approximately 0900 hours on March 9, 2024 a courtesy phone call was made to the decedent by his attorneys; however, he did not answer. As a result, his attorneys called the hotel to request a welfare check. Hotel staff searched the hotel and parking lot and discovered Mr. Barnett in his vehicle as described above.

The Charleston County Coroner's Office retrieved original surveillance video recordings from inside the hotel as well as of the hotel parking lot. A thorough review of the footage revealed Mr. Barnett entered the hotel lobby on March 8, 2024, at 1926 hours. He exited the hotel at 2037 hours. At 2045 hours, his truck was observed backing into the parking space where it was later discovered. Video surveillance recordings continuously record his vehicle. Throughout the review of surveillance video spanning the evening of March 8th through the morning of March 9th, from the time the vehicle was backed into the parking space until the Charleston Fire Department gained entry to the vehicle, no other individuals were seen entering or exiting Mr. Barnett's vehicle. At no time did anyone engage or try to make contact with Mr. Barnett. The vehicle brake lights were captured blinking on and off at 0720 hours on March 9, 2024.

A review of medical records and interviews with Mr. Barnett's family, attorneys, and healthcare professionals, revealed Mr. Barnett was under chronic stress in the context of the lawsuit, suffered from anxiety and post-traumatic stress disorder, and grieved the death of his wife. During his time in Charleston, his attorneys reported Mr. Barnett discussed increasing the dose of his anti-anxiety medication. The writings found in the vehicle were examined by the Charleston Police Department and found only Mr. Barnett's fingerprints on the notebook. The writings contained information known only to his family.

The cause of death was determined to be: Gunshot Wound of the Head. The manner of death is best deemed, "Suicide."

Bobbi Jo O'Neal, Charleston County Coroner
Ella Butler, Deputy Coroner

Electronically Signed by **Bobbi Jo O'Neal** on 05/16/2024 at 17:25

# EXHIBIT D

# U.S. DEPARTMENT OF LABOR

John M. Barnett,                                       ) CASE NO.: 4-0520-17-015
                                                      )
                  Complainant,                        )
                                                      )
v.                                                    )
                                                      ) **<u>AFFIDAVIT OF CYNTHIA KITCHENS</u>**
The Boeing Company,                                   )
                                                      )
                  Respondent.                         )
                                                      )
_____              )

     PERSONALLY APPEARED before me, Cynthia Kitchens, who being duly sworn deposes and says:

    1. I live at ███████████████████████████ and I am over the age of 18 years old.

    2. I was hired at the North Charleston, South Carolina Boeing facility as a Product Quality Manager K from November 16, 2009 until June 30, 2016, when I was forced to resign due to the hostile work environment.

    3. My educational background includes the Technology National Aviation Academy, Specialized Associates of Science Aviation Maintenance, and FAA Accountable Manager for 145 Repair Station. I have held my Airframe License since September 2000 and my Powerplant License since September 2000. I currently hold an FCC Element I and an FAA Inspection Authorization which I received in March 2006. I also hold FAA Technical Personnel Examiner DME███. Manager/Supervisor Training December-2006/Boeing Manager Training-2010, Boeing Inside Out Training 2015 (Executive Leadership Program 2014), Executive Leadership Coaching 2015 and Lycoming Engine Service Factory School January of 2007.

    4. During my assignment to the 787 BSC-Mid Assembly Quality Department at Boeing's North Charleston Facility, I observed numerous quality, development and assembly issues, including, but not limited to: metal shavings (FOD) in the wiring bundles from the suppliers being installed on aircraft, with knowledge; instructions from management to make repairs without the required documentation and engineering dispositions; the voiding of non-conformances in order to meet production schedule by senior managers; installing of damaged and/or non-conforming parts onto the aircraft at the direction of senior managers; individuals being told by senior management to not find or write non-conformances; individuals being instructed to write pick-ups, instead of non-conformances, in order to meet production deadlines. The pick-ups were not associated with any aircraft for the purpose of avoiding a document trail and further association with work on a particular aircraft. Additionally, the pick-ups were destroyed on a regular basis to prevent any paper trail. Furthermore, tools were improperly calibrated for work on certain jobs, and lost on a regular and routine basis. I also observed the failure to follow the ISO9001 building guidelines of the aircraft certification; failure of employees to log into Velocity to make an accurate build record of the aircraft (employees were having other employees signing in to do the work on

their behalf, in violation of FAA regulations) and serious safety issues involving use of improper lubricant on the jackscrew fittings on numerous 787 aircraft. All the above-mentioned observations were submitted in a 2011 complaint to the USDOTOIG. *See* Exhibit A with photographs.

5.   In 2011, I made an ethics complaint against a co-manager ███████ where I addressed several issues about ███████ and his aggressive behavior towards employees and others. Consequently, a week later ███████ physically assaulted and battered me on the plant floor. ███████ charged me on the plant floor and shoved and pinned me with his forearm and elbow up against a metal railing, he placed his face inches from my face, raised his other hand, and shoved his pointed finger into my face, screaming that "I needed to learn to get on the good old boy system or I will go nowhere in the company." ███████ was also upset that I checked out Boeing issued cameras that I was using to photograph and document defects of ███████ and his crew's work that I had previously complained about. Immediately after, alarmingly ███████ warned me that I could go to jail or sued for using cameras that were otherwise provided by Boeing for the purpose of documenting such defects.

6.   Shortly after the Boeing assault and battery, another witness of the assault complained to Corporate Ethics about the incident. Instead of Boeing reporting his conduct to outside law enforcement, ███████ was promoted as my direct supervisor. Following the incident, my complaint was taken up with the Corporate Ethics Department, wherein Ethics was made aware of the incident. When I inquired to the Corporate Office as to ███████'s promotion despite the incident, Corporate Ethics responded that "the selection process of promotion does not require approval or any feedback from Ethics. Most individuals on the selection team were probably unaware of any prior issues with this individual." *See* Attached as Exhibit B. Instead of disciplining ███████ in any fashion, Boeing promoted him as my direct line supervisor and sent a company wide email (including to me) congratulating ███████ and commending "his demonstrated leadership has proven to be of great value to our operations" and further commending ███████'s "leadership style." *See* Attached as Exhibit C.

7.   Moreover, ███████ stated in an email to me that the incident was a "beautiful story." *See* Attached as Exhibit D.

8.   In 2012, my performance evaluation scores were generally reduced in retaliation for reporting my supervisor for inappropriate remarks in the workplace, and for reporting unprofessional behavior of other senior managers.

9.   The following year I was diagnosed with cancer. I underwent extensive treatment and was out of work. Prior to going out of work, I had a score of 19 on my evaluation. While I was out of work receiving treatment, my supervisor reduced my evaluation to a score of 14. I was never told that my score was being reduced. As a result of my score being lowered, I was removed from the leadership program that I was enrolled in. Later on, my supervisor forged my signature on my evaluation to falsely indicate that I reviewed the evaluation and adhered to the results.

10. During the year 2015, I applied for 14 different positions and, despite being qualified for all of them, I was not selected for any of the positions.

11. The hostile work environment at Boeing Commercial Airplanes caused me a high level of stress and impacted my ability to ▮▮▮▮▮▮▮ while at work. The daily stress that I had accumulated caused my doctor to put me on leave for two weeks, and soon thereafter I started seeing a cardiologist.

12. During my employment, my colleagues scored me the highest of any manager at the North Charleston Boeing Site. I was told by ▮▮▮▮▮ who was E level management, that he was impressed by my scores from the employees on my performance. However, after being diagnosed with cancer, my scores lowered, and I believe the reason behind it was that they were trying to get rid of me in retaliation for my safety complaints. The scores of 15 and 16 were false.

13. I strongly believe the retaliation was caused by my decision to report very serious safety concerns to the FAA/USDOTOIG.

14. The North Charleston Boeing Plant is a hostile work environment. By reporting the safety concerns to the FAA/USDOTOIG I engaged in protected conduct. I continually and repeatedly insisted that FAA regulations be followed. I faced a repetitive and systematic pattern of being requested to violate the law, ignore the law, or otherwise threatened with unwarranted discipline or placed on performance watch. When complaints were filed, I was advised that "I needed to get on board" and thus be silent about any issues I observed. As a condition of my employment, I was required to violate the law which in my opinion resulted in a *per se* hostile work environment.

Cynthia Kitchens

Sworn to before me this __3__ day of ~~August~~, 2020. *September*

Notary Public for ▮▮▮▮
My Commission Expires:_____

**See attached State of ▮▮▮▮
Jurat Notary Certificate**
*V. Y*

3

**Document Name:** AFFIDAVIT OF CYNTHIA KITCHENS

<div align="center">

**State of** ███ **Jurat Notary Certificate**

</div>

**STATE OF** ███
**COUNTY OF** ███

Sworn to (or affirmed) and subscribed by personally appearing before me by physical presence this 03rd   day of September, 2020, by, Cynthia Kitchens.



VERONIKA YEGONYANTS
Notary Public, State of ███
Commission# GG 359742
My comm. expires July 28, 2023

_____
*(Signature of notary public)*

*Veronika Yegonyants*
*(Name of notary public)*

**My commission expires:** July 28, 2023

**Official Seal**

Personally known     OR
Produced identification   ✓   Type of identification produced: ███ driver license

05-74-0432NSB  02-2020