# EXHIBIT A

**IN THE UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | |
|---|---|
| JOHN M. BARNETT, | ) CASE NO.: 2021-AIR-00007 |
| | ) |
| Complainant, | ) |
| v. | ) **FIRST AMENDED COMPLAINT** |
| | ) |
| THE BOEING COMPANY, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

Complainant John M. Barnett, by and through his counsel, Robert M. Turkewitz, of the Law Office of Robert M. Turkewitz, LLC, and Brian M. Knowles of Knowles Law Firm, PC, respectfully submits this First Amended Complaint alleging the following:

## I. INTRODUCTION

1)      This is an action for wrongful retaliation under Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"), in which Complainant, John M. Barnett ("Barnett"), a long-term Boeing Quality Manager, alleges that throughout his seven-year tenure at Boeing South Carolina ("BSC") made numerous ethics complaints about a deep-rooted and persistent culture of concealment at BSC in which he and other quality personnel were pressured by Boeing upper management to violate Federal Aviation Administration ("FAA") Standards and Regulations, as well as Boeing's processes and procedures by not properly documenting and remedying defects. Notably, failing to properly document and remedy defects results in an incomplete build record, which constitutes a criminal felony offense and has the potential to adversely impact the safety of the flying public. Barnett refused to bend to the pressure and continually raised issues that needed to be properly documented and addressed. In retaliation for his complaints and identifying issues that needed to be properly documented and addressed, Barnett was given low Performance Management ("PM") scores, he was separated from his team

and moved to other areas in the plant, and blacklisted and blocked from transferring to other Boeing divisions outside of BSC. In addition, he was subjected to a gaslighting campaign in which he was harassed, denigrated, humiliated, and treated with scorn and contempt by upper management, which was calculated to discourage him and others from raising such issues and complying with the law. Based on the totality of the circumstances, such conduct amounted to a hostile work environment and it led to Barnett's constructive discharge.[1]

## II. FACTUAL BACKGROUND REGARDING BARNETT'S EMPLOYMENT WITH BOEING

2)      Barnett worked for Boeing for 32 years, 17 of which he worked as a Quality Manager. Prior to his transfer to BSC, Barnett worked at Boeing's Everett facilities, where he worked as an electrician on the 747 program, and as an inspector, planner, auditor, Quality Assurance Inspector ("QA"), and First Line Quality Assurance Manager in over dozens of programs (including 747, 767, 777 and 787, and included assignments in the Material Review Segregation Area ("MRSA"). He worked as a Second Level Manager over the Everett Receiving Inspection Organization with a $10 Million annual budget, supporting the entire Everett, Washington site. He traveled to various countries as a Boeing Quality Representative developing, implementing, and driving quality improvement plans with suppliers and assuring they met Boeing's Quality requirements and delivery schedules. Barnett also traveled around the U.S. representing Boeing Everett Quality in High Level Executive meetings. He was constantly and consistently recognized as a top performer regardless of the area or Organization he was in. Barnett took over 1000 hours of specialized off-hour Boeing training in auditing, production, inventory management, management, and

---

[1] Because of Boeing's culture of concealment, there is a mounting list of 787 defects needing to be addressed. Boeing's customers and shareholders are now paying that price, which could be in the billions. See     https://www.aerotime.aero/27357-boeing-costs-787-issues#google_vignette     Barnett remains concerned that the concealed issues will result in a catastrophic event.

communicating across cultures. He has also taken College courses at night working towards a Bachelor's Degree in Production and Inventory Control Systems with an emphasis in Management.

3)    Barnett began working as a Quality Multi-family Manager at BSC in November 2010. On Jan, 16, 2017, he filed this AIR-21 wrongful retaliation action with OSHA/FAA. On January 23, 2017, Barnett went on a medical leave of absence at the advice of his treating physician because of the stress and emotional duress that he was subjected to as a result of Boeing's retaliatory conduct. Although he had planned to work at Boeing for at least another ten years, he took an early retirement on March 1, 2017 due to the employment-related stress. As discussed below, Barnett was subjected to a hostile work environment that led to his constructive discharge.

4)    The FAA's safety and quality standards and regulations require aircraft manufacturers to document all work performed, all defects detected and remedial work conducted and trace every part assembled on an aircraft. As a result, Boeing is required to document and trace every single part of its aircraft. For the 787 program, Boeing accomplishes this with its proprietary software system known as Velocity. The documentation contained in Velocity constitutes the build record for each 787 aircraft.

5)    The basic premise of quality is if it is not documented, it did not happen. Because of that, FAA's Standards and Regulations, as well as Boeing's processes and procedures, require that all violations of such processes and procedures and defects be properly documented.

6)    As a Quality Assurance manager, Barnett was legally obligated to follow the FAA's safety and quality standards, which includes the requirement that all inspections of work performed on aircraft be properly conducted and documented, and that all defects be properly documented and

remedied. As a QA manager, Barnett also had an ethical obligation to the flying public to ensure that the legal obligations set forth above were properly fulfilled.

7)      In order to comply with the law and to ensure the safety of the flying public, it is essential for QA managers at Boeing to require FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed, that all process and procedure violations and defects be documented in writing, that any defects be noted and corrected, and that all parts be properly traced and documented. It is also important to ensure that corners are not cut and that work not be performed in the "gray area."

8)      Under FAA regulation 14 CFR §21.146, all Boeing employees who work on or inspect a 787 aircraft are required to log into Velocity and document all work and inspections performed. Defects in workmanship that require engineering disposition are noted with the use of "non-conformances," which are identified by mechanics and entered into Velocity by Quality Inspectors. Intentionally failing to log into Velocity is a violation of Boeing's Quality Management System ("QMS"), and intentionally failing to document a defect in Velocity is a violation of Boeing's Production Certificate granted by the FAA pursuant to 14 CFR §21.146 (c) and (f). Furthermore, intentionally falsifying an aircraft build record is a violation of 14 CFR §43.12 (Maintenance Records: Falsification, reproduction, or alteration). In addition, falsifying or concealing a material fact or making a materially false writing is in violation of 18 U.S.C §38.[2]

---

[2] 18 U.S.C. §38. Fraud involving aircraft or space vehicle parts in interstate or foreign commerce

(a)  Offenses.—Whoever, in or affecting interstate or foreign commerce, ***knowingly and with the intent to defraud—***
  (1)
    (A) **falsifies or conceals a material fact concerning any aircraft** or space vehicle part;
    (B) **makes any materially fraudulent representation concerning any aircraft** or space vehicle part; or

### III. BARNETT'S PROTECTED ACTIVITY

9)       During his employment at Boeing, Barnett engaged in the following protected activity: a) continually objected to Boeing creating and maintaining a program not approved by the FAA that allowed mechanics to inspect and approve their own work, known as the Multi-function Process Performer (MFPP); b) continually insisted verbally and in writing that BSC's processes and procedures be followed and that defects be properly documented in the face of management pressure to deviate from the rules in order to allow production to meet deadlines; c) sent emails in 2012 to BSC Quality Director ███████ complaining about Barnett's Senior Second Level Quality Manager, ███████; d) filed a 2014 Ethics Complaint regarding manager ███████; d) refused to pencil whip lost nonconforming parts[3]; e) objected to Foreign Object Debris ("FOD") found in the form of titanium slivers from e-nuts not being fixed and cleaned up; f) objected to the investigation of defective oxygen squibs being shut down; g) insisted that missing/incomplete/incorrect serial number data and Aircraft Readiness Log/Serial Number Control (ARL/SNC) data be corrected on all delivered aircraft; and h) filed an October 2016 Ethics

---

(C) **makes or uses any materially false writing, entry, certification, document, record, data plate, label, or electronic communication concerning any aircraft** or space vehicle part;

(2) **exports from or imports or introduces into the United States, sells, trades, installs on or in any aircraft or space vehicle any aircraft or space vehicle part using or by means of a fraudulent representation, document, record, certification, depiction, data plate, label, or electronic communication**; or

(3) **attempts or conspires to commit an offense** described in paragraph (1) or (2), shall be punished as provided in subsection (b).

(b) Penalties.—The punishment for an offense under subsection (a) is as follows:

(1) Aviation quality.—**If the offense relates to the aviation quality of a part and the part is installed in an aircraft or space vehicle, a fine of not more than $500,000, imprisonment for not more than 15 years, or both.**

[3] Pencil whipping is a term used to describe the documentation of an inspection or other activity that is not actually performed.

Complaint regarding his manager, ███████████, and for retaliation, a hostile work environment and for being blacklisted and blocked from other positions.

> **a)** **Barnett's continuing objections to the MFPP program and his continuing insistence that Boeing's QMS processes and procedures be followed and that defects be properly documented in the face of management pressure to deviate from the rules in order to allow production to meet deadlines.**

10)     Barnett first reported to ██████████ Senior Quality Manager at BSC. ████████pushed his quality managers to insist that FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed, and that quality not be sacrificed, or corners cut. Notably, Boeing management pushed for quality to deviate from the rules in order to allow production to meet deadlines. In particular, BSC upper management implemented the MFPP program whereby Boeing mechanics were given authority to inspect and approve their own work. Notably, the MFPP program was implemented without FAA approval and was in violation of Boeing's Production Certificate granted by the FAA pursuant to 14 CFR §21.146 (c) and (f). When ████████objected to implementation of the MFPP program and insisted that Boeing not deviate from the rules, he was threatened with termination. He utilized his contacts at Seattle and arranged to be transferred back to Washington State with a down grade in 2012.

11)     Notably, Barnett was very vocal in supporting ████████position that the MFPP program was illegal and that FAA safety and quality standards, as well as Boeing's own processes and procedures be strictly followed. Throughout Barnett's tenure at BSC, he was vocal in his refusal to deviate from FAA's safety and quality standards and regulations, as well as Boeing's processes and procedures.

> ~~**b)**~~ **Barnett's emails in 2012 to BSC Quality Director ████████ complaining about Senior Second Level Quality Manager, ███████████**

12)     ████████, who was appointed as Senior Second Level Quality Manager began pushing Barnett to work outside the proper procedures. In 2012, Barnett emailed the BSC Director███

████ twice complaining about being pushed to work outside the proper procedures. ████ told Barnett orally that he did not believe him. No investigation was conducted.

13)     Barnett continually insisted on the proper procedures being followed. Barnett complained about countless instances where parts were being stolen from one airplane and installed on an incomplete airplane without any documentation, traceability or engineering review. In most cases, the mechanic would come to work to find that the parts s/he installed the day before were gone. Upper Management ignored the stolen parts problem and insisted that Barnett stop documenting them in e-mails and on CA's (corrective action EPDs). All corrective action EPD's for stolen parts were cancelled per Leadership direction without any investigation or corrective action. (Ethics has the records).

14)     In October 2012, ████ denigrated Barnett in front of his team and moved him to 2nd shift in retaliation for insisting that the proper procedures be followed. Following up on Barnett's previous emails to the Quality Director ████, Barnett's team submitted an ethics complaint regarding ████ conduct. In June 2013, ████ was demoted and removed from management for his "unethical behavior."

c)     **Barnett's Objection to FOD in the Form of Titanium Slivers from E-Nuts Not Being Fixed and Cleaned up.**

15)     In August 2014, Barnett discovered that fasteners used to hold down the floorboards (screws and "e-nuts") were leaving up to 3" long titanium slivers when they were installed, allowing the titanium slivers to fall onto wire bundles, electrical boxes and electronic components located between the floor panels and cargo compartment ceiling panels, as well as above the center wing tank area and all of the electronic equipment located there. Slivers were found all over the wiring, in electrical boxes and other places.

16)    When Barnett discovered the FOD, ███ ordered him to let it go because it would cost too much to remove all the ceiling panels to clean and they might get damaged during removal. Barnett strongly disagreed at the time and insisted the panels be removed and the electrical components cleaned to eliminate the risk of electrical shorting in service. Barnett was removed from the project and another manager was put in charge of it. Leadership decided to let the FOD remain instead of removing the cargo ceiling panels and cleaning the FOD.

**d)  Barnett's June 2014 Ethics Complaint Regarding Manager ███**

17)    ███ was appointed as Senior Quality Manager, and he immediately split up Barnett's quality inspection team in retaliation for them submitting the ethics complaint. Notably, ███ continued where ███ left off on insisting that quality not document work performed outside the proper procedures, that process violations be ignored, that parts being stolen from completed aircraft be ignored, etc. In June 2014, Barnett submitted a complaint to Corporate Ethics against ███ for violating procedures, ignoring process violations, pushing Barnett to "work in the grey areas," and having another manger spy on Barnett. Although Barnett's complaint was substantiated by Corporate Ethics, no action was taken to address the complaints. One month later, in retaliation for his complaints, ███ downgraded Barnett's performance rating to a 15, and penalized Barnett for not "working in the grey areas of the procedures," for documenting process violations, for not agreeing to allow Manufacturing to violate processes. The downgraded rating was also based on false rumors started by Leadership that Barnett did not get along with his peers.

18)    When ███ learned that Barnett was writing to HR regarding his rating, ███ threatened to pull his emails.

19)    In September 2014, Barnett learned that ███ had previously placed him on a 60-day corrective action plan without even notifying Barnett. Barnett met with ███, the BSC Ethics Manager, and complained about being placed on a 60-Day Corrective Action Plan without being

notified and based on false information and misrepresentations. ███ said it was an HR issue and that he couldn't do anything about it. Barnett e-mailed the BSC VP of Quality, ███████ asking for a short meeting with him to discuss Barnett's concerns with the Leadership Team. Barnett never received a response or acknowledgement of any kind from ██████

20)    In February 2015, ██████ and ████████ reassigned Barnett to MRSA, reporting to ████████. As Barnett was packing his desk later that day to relocate to MRSA, ██████ told him he couldn't believe that Barnett reported "The Quality Organization to Ethics" and that he should be ashamed. It "made the whole Organization look bad."

21)    In April 2015, Barnett received an e-mail from ████████ stating they substantiated his complaints from June 2014 and informed him they opened a second investigation against ████ for "behavioral issues." Barnett provided HR with e-mails and other documents to support his complaint of a hostile work environment, being set up for failure, the ambush of the 60-Day Corrective Action Plan, the misrepresentations and false information in it, the fact that he had been reassigned in retaliation by the very person against whom he filed a complaint. Barnett was not provided a close out meeting to report the results of his complaint (as he should have been), and from Barnett's perspective, no action was taken.

22)    In July 2015, Barnett was informed that some of his team had been reassigned without his knowledge. This left areas over which Barnett had responsibility unsupported and without the critical skills needed to accomplish the mission. This generated multiple complaints from Manufacturing against Barnett for not supporting them.

   e)    **Barnett's Refusal to Pencil Whip Lost Nonconforming Parts**

23)    In July 2016, Barnett was assigned to handle lost nonconforming parts Shop Order Instance (SOI) closure activity at MRSA, and was given 2 days to "close out" over 400 lost nonconforming parts SOIs without investigating them. Barnett had discovered close to 200 SOIs had already been

pencil whipped and closed out by another group without investigating them. Barnett strongly objected and pressed that they be reopened and investigated. He was ordered to let it go, which would be a violation of FAA regulations which required that lost parts be documented and reported to the FAA.[4]

### f)    Barnett's Objection to the investigation of Defective Oxygen Squibs Being Shut Down

24)    In August 2016, Barnett became aware that the squibs in the emergency passenger oxygen tanks in MRSA were defective and failed to activate and release oxygen as required. Out of a sample size of 300 PSU emergency oxygen bottles, 75 of them did not fire properly when activated. Barnett was criticized for documenting this issue and was immediately removed from any responsibility for investigating this problem. In September 2016, after placing the 75 defective squibs (that were removed from the oxygen bottles) in quarantine and pushing Leadership to have them analyzed for defect analysis, Barnett was removed from the investigation. Upon information and belief, no defect analysis has been performed on the squibs, no root cause has been positively identified and no actions have been taken to address the defects. Evidence shows 25% of the emergency passenger oxygen bottles in service on 787s will not operate when activated in an emergency.[5]

---

[4] The lost nonconforming parts themselves were evidence of processes and procedures not being followed since Boeing's policies and procedures do not allow for parts being lost when those instructions are followed.

[5] BSC Quality Leadership has told 3 different stories in response to Barnett's AIR-21 Complaint on why they have failed to perform the failure analysis on the defective squibs. BSC first stated that Barnett reported that the bottles were already empty, so there was no concern. BSC then claimed it didn't perform a defect analysis because there was "damage from handling that caused the failures. BSC later told the FAA there was a very large investigation ongoing with the squibs that included the Supplier. However, upon information and belief, no "large investigation" has to date been conducted.

**g)  Barnett's Insistence that Missing/Incomplete/Incorrect Serial Number Data and ARL data Be Corrected on All Delivered Aircraft**

25)    On August 18, 2016, Barnett was assigned to investigate the findings regarding a Serial Number Control ("SNC") FAA Audit Finding, and to identify root cause, actions needed to correct the issues, and complete follow through utilizing Boeing's BPSM ("Boeing Problem Solving Method") which is very detailed in all of its requirements.

26)    In September 2016, after leading a cross functional team identifying root causes, actions needed, etc., for the Serial Number FAA Audit Finding, Barnett noticed that all previously delivered airplanes built at BSC had missing/incomplete/incorrect Serial number data and ARL data. Barnett urged ███████████ that they needed to investigate and correct all the records on all delivered airplanes and notify BSC Customers, so they could address their fleets. Barnett was removed as the SNC FAA Audit Response Team Leader.

**h)  Barnett's September 2016 Ethics Complaint Against Manager ██████████ for Process and Procedure Violations.**

27)    In September 2016, Barnett's Manager, ████████████ took a defective part from the MRSA scrap bin and gave it to Manufacturing for installation on an airplane without any documentation, rework or authority, which is a violation of FAA requirements as well as BSC's own procedures. Barnett's team tried to stop ██████ and reported the violation to Barnett, who then made a complaint to HR.

28)    Barnett was contacted by Ethics regarding his report to HR and he provided information and documentation of the violation, which was substantiated. Barnett was subsequently blocked from a 737 Propulsion Quality Manager position in North Charleston.

### i) Barnett's October 2016 Ethics Complaint Against his Leadership for Retaliatory Conduct, Including Maintaining a Hostile Work Environment and for Blacklisting and Blocking Barnett from Other Positions.

29)     In October 2016, Barnett filed an Ethics complaint in Chicago, Illinois against his Leadership for retaliation, a hostile work environment and for being blacklisted and blocked from other positions. He asked that his complaint be investigated by someone outside of BSC. After being assured it would be handled outside of BSC, the investigation was turned over to local HR in BSC.

30)     Later that month, Barnett sent an e-mail to ████████ (VP of Boeing Corp. Ethics, Washington, DC) and voiced his concerns about how his complaint was handled. ██████ assured Barnett that his concerns would be properly investigated. However, it was again turned over to local BSC.

31)     BSC failed to conduct an adequate investigation. On January 5, 2017, Barnett was informed that his Ethics complaint of Oct. 2016 was found to be "unsubstantiated" and determined that the complaint that he was unlawfully blacklisted and blocked from the propulsion job was found to be "unsubstantiated." The other complaints involving the hostile work environment were not even investigated.

32)     On January 13, 2017, Barnett was notified that his name was 1 of 49 listed in an e-mail on Quality Director ████████ desk, entitled "Quality Managers to get rid of."

33)     On January 16, 2017, Barnett filed a complaint through the AIR21 with OSHA for Boeing's retaliation against him for engaging in protected conduct, including maintaining a hostile work environment and blacklisting and blocking him from transferring to another division. Barnett was informed that his complaint was left on a community printer for Boeing employees to see.

## IV. BOEING'S ADVERSE ACTIONS AGAINST BARNETT IN RETALIATION FOR THE PROTECTED ACTIVITIES

34)     Because of his ethics complaints and his refusal to compromise on safety and quality (as discussed previously and herein), Barnett was retaliated against and treated differently in a number of ways, including, but not limited to the following: a) Barnett's supervising managers, ██████ ████████████ and ███████████ downgraded Barnett's performance management reviews; b) Barnett's supervising manager, ██████ issued a 60-Day Corrective Action Plan against Barnett without cause and without placing him on notice; c) Barnett was removed from investigations of defects in retaliation for his insistence that the problems be fully investigated and remedied, including investigations into defective e-Nuts causing titanium slivers to litter the tops of flight control and other wires and equipment, defective oxygen squibs, and incorrect serial numbers; d) Barnett was blocked from transferring to QA manager positions, including the third shift position in final assembly, Boeing's Aerospace Division in New Orleans, Louisiana, and a Quality Manager position at the Propulsion Division in North Charleston, South Carolina, and e) Barnett's supervising managers, including ███████, █████████████, █████████████ and ██████ ██████ continually harassed, denigrated, humiliated, and treated Barnett with scorn and contempt.[6]

### a)    Boeing downgraded Barnett's Performance Management ("PM") Reviews.

35)     Performance Management scores and ratings determine yearly raises, bonuses, and eligibility for participation in special leadership teams, and other perks for top performing managers. At BSC, scores/ratings of 18 or higher is the threshold for satisfactory work.

36)     After vocally supporting ██████████ regarding the illegality of the MFPP program, demanding that Boeing adhere to FAA and Boeing safety standards and procedures, and for not

---

[6] This type of retaliatory conduct is known as gaslighting.

approving certain processes and procedures that violated a multitude of Boeing's Process Instructions and Procedures, including the illegal removal of parts from one aircraft after being installed and inspected to another aircraft without properly documenting the transfer, Barnett was retaliated against with lower performance ratings. Barnett's rating went from a 40 to 16. Barnett continued to have his performance ratings downgraded throughout his tenure at BSC.

37)     In Barnett's July 2014 PM, under the heading, "Interim Manager Comments," Senior Quality Manager, ████████████ stated, "John is very knowledgeable almost to a fault as it gets in the way at times when issues arise. John likes to be right and at times rechallenges issues that appear to [be] resolved at a round table."

38)     The round table discussion referenced by ████████ was a situation where Manufacturing was pushing to use a spreadsheet in place of writing Emergent Removals (ERs) for products removed from an aircraft after it had been installed and inspected. Per Boeing Process Instruction ("BPI") 1581, ERs are required for each part being removed from an aircraft after its final Quality inspection and approval ("buy off"). The ER has specific items that must be reviewed and approved (known as buying it off) by Quality <u>prior</u> to removing a part.[7] In particular, Quality is required to review whether the part removal will interfere with any FAA conformity inspections that had been previously completed. If it does, it is required to contact the FAA prior to removing the part so they are aware and can decide if it will void their conformity inspection or not.

39)     If a spreadsheet or form is used to document build information, it is required to be an official Boeing form and must have: 1) a form number showing it is in the Boeing system and

---

[7] In the past, Boeing referred to Quality as Quality Control, but stopped using this descriptive title because it could not control quality. Boeing then referred to it as Quality Assurance, but again, stopped using this descriptive title because it could not assure quality. As a result, Boeing now describes the title as simply, "Quality."

approved; 2) detailed instructions on how the form is to be completed; and 3) a documented process describing it's use. (*See* Boeing Procedure "PRO" 3019). In the event of a catastrophic failure of the aircraft, the build record must provide traceability and accountability for all parts.

40)    Barnett was asked to approve the use of a spreadsheet for ERs for Line #172,[8] and was told that a spreadsheet had been used in place of ERs on Line #168. Barnett reviewed Line 168's build records and discovered that manufacturing had failed to record any of the ERs for the parts removed and that the spreadsheet that was supposedly used to record part removals was purposefully left blank. Therefore, the build record did not comply with BPI-1581, nor did it provide traceability of what parts were removed.[9]

41)    In Barnett's June 9, 2014 email, he stated "Manufacturing is pressing us to use a spreadsheet instead of ERs because they did it on 168… That is not per process…" *Id*. After being urged by ▮▮▮▮ to make use of the spreadsheet, Barnett noted the problems with the data and stated, "based on this info, I do not agree that the spreadsheet should be used as it does not meet our procedural requirements. In addition, Line 168 had issues with the documentation used and bought off." *Id.* Barnett elevated the issue of Line 168 documents being out of compliance, but no action was taken to correct the documentation.

42)    Barnett's PM was downgraded because he continued to object and raise the fact that the build record was not being properly completed and maintained. Barnett was also penalized on his PM for documenting the process and procedure violations in e-mails.

43)    In Barnett's July 2014 PM, under the heading, "Delivers Results," Barnett received a score of 2 out of 5 "Opportunity for Improvement," because he addressed issues in writing. In particular,

---

[8] Boeing refers to each aircraft as a line number, so Line 168 is the 168th 787 aircraft being built.
[9] Barnett had been advised by Manufacturing that at least 25 parts had been removed for Line 168.

Barnett's PM stated, "John still needs to learn the art of F2F ("face to face") engagement to address and follow up on issues instead of using e-mail to express process violations."

44)    Further, Barnett was penalized on his PM Reviews for not working in the "grey areas" of the processes and procedures. In Barnett's July 2014 PM, under "Interim Manager Comments," ██████ stated, "I would like to see him use his knowledge and experience to find a way to work through issues and the grey areas." (*See Id.*, at 3).

45)    In response to the Interim Manager Comments, Barnett explained the need for process violations to be documented in writing and that there should be no "grey areas" in Boeing's processes:

> After a lengthy discussion regarding process violations, e-mail use and communication, we agreed to disagree with the opinions and assumptions made above. As we discussed, there are no grey areas in our processes once a person fully understands them. As a Quality Manager, it is my responsibility to assure our procedures are followed, we maintain configuration control of the product and we produce a safe conforming product.

*Id.* at 4.

46)    On September 11, 2014, Senior Quality Manager, ██████ sent Barnett an e-mail chastising him for documenting process issues in writing. In his e-mail, ██████ states, "This is one of the items on your PM that brought your score down."

47)    ██████ continued to pressure Barnett to work in grey areas and to not document process violations in writing. In addition, Barnett was pressured by other Boeing senior quality managers to work in grey areas and not document process violations in writing. These managers included ██████, ██████ and ██████.

48)    In addition, Boeing management started rumors that Barnett did not get along with my peers (which was untrue) and used this as a further basis for downgrading his performance evaluations.

49)    Notably, Barnett continued to be penalized and his PMs wrongfully downgraded throughout his time at BSC as a result of his refusal to compromise and work in the grey zone and his insistence that defects be documented in writing as required by FAA Standards and Regulations, as well as Boeing's processes and procedures.

**b)    Boeing issued a 60-day corrective action plan against Barnett.**

50)    On September 12, 2014, Barnett was advised by ███████████ that he issued a Corrective 60 Day Action Plan ("AP") against Barnett, and would send it to him via email. The next day, September 13, 2014, Barnett received ██████email, attaching the AP issued against him for documenting process violations in writing. In Item 4, it states, "Use F2F (face-to-face) meetings and phone calls to resolve issues and stop using e-mail to argue or stress a point or quality requirement."

51)    Notably, the AP was issued on August 15, 2014 and Barnett was not made aware that the AP was issued until September 12, 2014 when ██████informed Barnett about it.

52)    On September 15, 2014, Barnett submitted his comments and noted that the AP was provided to him almost one month after being issued, and that it was an example of a "surprise attack."[10]

53)    In Barnett's September 15, 2014 comments, he also stated, "Leadership wants nothing in e-mail so they maintain plausible deniability," and he concluded, "It is obvious Leadership is just looking for items to criticize me on so I stop identifying issues. I will conform!" *Id.*

---

[10]Boeing's rules specifically require that any individual who is the subject of an AP be notified <u>immediately</u>.

54)     In addition, the AP had several entries with the notation, "September Discussion 9/9/14." Since Barnett was not made aware of the AP until September 12, 2014, it was not possible for ███ ███ and Barnett to have had a discussion regarding the AP on September 9, 2014.[11]

55)     Shortly after this surprise attack, Barnett began experiencing chest pains, shortness of breath, nausea and vomiting, which his treating physician attributed to the stress caused by being pressured to work in grey areas, to not document process and procedure violations, and from the hostile work environment that was created.

### c) Barnett was Removed from Investigations of Defects in Retaliation for his Insistence That the Problems be Fully Investigated and Remedied.

56)     In October 2016, without any explanation, Barnett was removed from the investigation of the defects in the squibs (firing pins) for emergency oxygen bottles, the BPSM Team and all other connections with the Corrective Action Plan for the FAA. Barnett was also removed as the manager of the ARL Team. ███████ told him that he was being "benched" and that if they needed him, they would "pull him off the bench."

57)     Barnett was removed from investigations of defects in retaliation for his insistence that the problems be fully investigated and remedied.

58)     At the time Barnett went out on Medical Leave, there had been no action taken to investigate and/or correct the already delivered build records, which is a violation of FAA regulations and Boeing's own process instructions.

---

[11] Falsifying records and providing false information to the Company is against Boeing's processes and procedures and is subject to corrective action, up to and including discharge. (*See* PRO-1909 and the ECA guidelines table, BPI-4332).

**d) Barnett was Black Listed and Blocked from Transferring to Various Positions.**

**i) Quality Manager Position on Third Shift in Final Assembly**

59)    In September 2014, Barnett applied for a 3rd shift position for which he was determined to be the most qualified by Senior Manager, ██████. He was then denied the position by ██████ ████ in retaliation for his complaints.

60)    During a morning meeting with all First Line Managers, Second Level Manager, ████ ████ announced that they had a third shift Quality Manager position coming available soon and were looking for volunteers. When asked how they would decide if more than one Manager volunteered, ████ stated they would select the individual with the most experience in BSC Final Assembly and if that was a tie, they would select who had the most time with the Company. At that time, Barnett immediately volunteered for the position. Another manager spoke up and stated that Barnett had the most time with the Company and had been in Final Assembly since day one, so he should have the job and ████ agreed. Notably, ██████ gave the position to ████ ████, who had been with the company far less time than Barnett and had transferred to Final Assembly the week before.

**ii) Quality Manager Position at Boeing's Aerospace Division in New Orleans, Louisiana**

61)    In March 2016, Barnett applied for a Quality Manager Position at Boeing's Aerospace Division in New Orleans, Louisiana. In August 2016, after a structured interview over the phone, Barnett was notified that he had made it past the first phase and was one of two finalists for the position, and he was invited by the hiring manager, ██████, to New Orleans for an in-person interview.

62)    During the in-person interview, Barnett interacted with the NASA Director, other Quality Managers, and the Quality Team. During each conversation, Barnett successfully addressed each

department's struggles and offered his expertise in finding solutions for each struggle. At the conclusion of the interview, the hiring manager, ██████████, informed Barnett that his expertise was a perfect fit for the needs of the position and that he would be a great asset for the team.

63)     Despite the exceptional skill set Barnett presented to the hiring manager and the NASA team, and despite the fact that the hiring manager indicated that he possessed the exact skill set they were looking for, Barnett was informed that he did not obtain the job.

64)     Barnett informed his manager, ██████████, about the results of Barnett's interview and indicated that something was not right in the process. Barnett indicated that he believed someone in Leadership yanked the job out from under him.

65)     While ██████████ told Barnett that she was "looking for a different skill set," she had previously told Barnett that he had precisely the skills they were looking for. Further, the re-post for the job was exactly the same as the first post for the skills needed.

66)     On October 20, 2016, Barnett filed a complaint with Boeing's Ethics Department and asked for it to be handled by an investigator from outside Charleston, South Carolina. Over Claimant's objection, it was turned over to Boeing's local HRG. HR (██████████) told Boeing that ██████ ██████ decided she needed someone who had "Government Contract" experience.

67)     This explanation was highly questionable since the re-post of the job description did not change and it failed to state that Government Contract experience was a requirement. In fact, the job postings were identical, with the exception of the re-posting mentioning that the job would be for second shift.

68)     In Boeing OSHA Position Statement, it gave a third reason than the ones provided by ██████ ██████ and ██████ as to why Barnett was not hired. ██████████ said they decided to hire

someone with a "different skill set," and ▮▮▮▮▮ said they "were looking for someone with government contracting experience." Boeing subsequently told a different story, that it was looking for a second shift manager, and the decision was based on the Employee Survey scores and PM scores and that "Boeing hired a much more qualified individual than Mr. Barnett…" BPS, at 6.

69)    Boeing's explanation did not comport with reality. First, Boeing seemed to be taking the position that "second shift" was somehow a qualification for the job. "The hiring manager, ▮▮▮▮▮ ▮▮▮▮▮, was looking for a second shift manager to fill the position. However, she neglected to place this in the initial job posting." BPS, at 6. Whether a manager is first, second or third shift would not have mattered, and Barnett was ready, willing, and <u>qualified</u> to work on any shift.

### iii) Quality Manager position at the Propulsion Division in North Charleston, South Carolina

70)    In January 2016, Boeing South Carolina plant circulated an electronic mail internally containing a job opening for a Quality Manager position at the Propulsion Division in North Charleston, South Carolina.

71)    This position did not go through the standard hiring process and structured interviewing process, but rather it was what is referred to as a "no-post" job. What this means is that there is no job requisition posted on the Boeing Employment page. The hiring decision is handled via e-mail. There is not an interview process, there is no documentation showing how the decision for hire was made or any other evidence to support a hiring decision. No-post jobs are handled in secrecy, behind closed doors with no transparent oversight on decisions made.

72)    Barnett immediately replied expressing his interest, attaching a copy of his resume.

73)    On or around October 2016, ▮▮▮ ▮▮▮▮▮▮the hiring manager, asked two of the Propulsion South Carolina Quality Managers to select their top three candidates for the position,

out of an extensive list of candidates. The Quality Managers selected Barnett as the first applicant on the list, indicating their desire to work with Barnett especially because of his expertise and skills set. Their final decision was to hire Barnett.

74)    A few hours later, ▮▮▮▮▮▮▮ stated that he was told that "We will not be getting John Barnett, they didn't care how bad I wanted him. They said John Barnett is not going anywhere."[12]

### e)    Barnett was continuously denigrated, humiliated, and treated with scorn and contempt.

75)    In addition to the previously mentioned adverse actions taken by Boeing in retaliation for Barnett's refusal to compromise and violate the above standards, regulations, processes, and procedures, Barnett was subjected to a gaslighting campaign in which he was continually harassed, denigrated, humiliated, and treated with scorn and contempt by upper management.

76)    For example, there were weekly quality meetings scheduled with Barnett's quality team. During these meetings, Barnett's senior manager, ▮▮▮▮▮▮▮, on numerous occasions, announced in front of the team that Barnett was responsible for a certain production delay, or that Barnett was responsible for the entire team having to work over-time and being away from their families. These comments were the result of Barnett's documentation of processes, procedure violations, and defects in writing, and Barnett's refusal to work in grey areas and conceal problems.

77)    When Barnett questioned decisions that violated standards, regulations, processes, and procedures, ▮▮▮▮▮▮ raised his hands in the air, waving them around in an animated manner and loudly and aggressively stated, "John, are you just waiving your hands in the air or do you have an idea". Barnett never saw this type of reaction displayed towards any other Manager or employee.

---

[12] This took place after Barnett filed his most recent ethics complaint. Notably, one of the witnesses in Propulsion was warned by their Manager to "stay out of the Barnett thing. Forget it ever happened."

78)    These meetings were always very tense, and the comments made about Barnett were disrespectful, denigrating, sarcastic, degrading, humiliating, mean, and unprofessional. Notably, this gaslighting campaign against Barnett was done in order to punish Barnett for identifying problems, insisting on the rules being followed, and documenting in writing all process and procedure violations and defects. This gaslighting was also directed against Barnett publicly in front of his team to discourage Barnett and others from complying with the law.

79)    The denigrating comments caused Barnett a tremendous amount of stress, made it very difficult for Barnett to concentrate and perform his job, and caused him emotional suffering to the point of taking medical leave of absence and ultimately leaving Boeing, at the advice of Barnett's physician and mental health counselor.

80)    These retaliatory attacks were continuing throughout Barnett's time at BSC and occurred within 90 days of the filing of Mr. Barnett's Air-21 complaint.

### V. Elements Under AIR-21

81)    Pursuant to AIR-21, "No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment" when the employee provides information regarding violations "relating to air carrier safety" to his or her employer or federal authorities. 49 U.S.C. §42121(a)(1); 29 C.F.R. §1979.104(b)(1).

82)    In order to establish a *prima facie* claim of retaliation under the AIR-21, one must allege the existence of facts and evidence sufficient to show that: (i) the employee engaged in protected activity; (ii) the employer knew or suspected that the employee engaged in protected activity; (iii) the employee suffered an adverse action; and (iv) circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action. 29 C.F.R. §1979.104(b)(1).

### i) Mr. Barnett engaged in protected activity

83)     Barnett's protected conduct is laid out in Section III. In general, Barnett was continuously pressured by senior quality management at Boeing to work in grey areas and to avoid documenting process and procedure violations and defects. This was seen with various issues, including: 1) the hundreds of defective parts that were missing and that Boeing's Quality Management insisted be "bought off" without any investigation; 2) Boeing's failure to investigate the 25% failure rate with emergency oxygen bottles; and 3) Boeing knowingly maintaining inaccurate and incomplete build records. Barnett refused to work in grey areas, cut corners and white wash problems, and vocally complained that to do so would be unethical and violate Boeing and FAA rules.[13] In addition, Barnett filed numerous ethics complaints against Boeing management for its violations and retaliatory conduct.

### ii) Mr. Barnett suffered adverse action.

84)     Boeing's retaliatory adverse action is laid out in Section IV. Through Boeing's adverse action, Boeing created and maintained hostile work environment that led to Mr. Barnett's constructive discharge.

### iii) Boeing black listed and/or blocked Barnett's transfers to other divisions within Boeing.

85)     As discussed in Section IV.d, Barnett sought to transfer to other Boeing divisions and was blocked by Boeing management in retaliation for his protected conduct.

86)     These positions offered numerous benefits in their conditions, terms and opportunities for advancement.

---

[13] In response to Mr. Barnett's insistence that Boeing follow the rules, he was denigrated, humiliated, and treated with scorn and contempt by senior quality managers at Boeing.

#### iv) Boeing created and maintained a hostile work environment.

87)     Boeing–engaged in a pattern of conduct, which created and maintained a hostile work environment in retaliation for Barnett's protected activities (discussed herein a Section III.)

88)     The Supreme Court stated in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 103 (2002):

> Hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the "unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21. Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 23.

89)     In *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 221 (4th Cir. 2016), [14] the Fourth Circuit set forth the elements of a hostile work environment claim:

> To prevail on a hostile work environment claim, "a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" Okoli, 648 F.3d at 220 (quoting Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) ).

90)     Looking at the totality of the circumstances, including all of the adverse actions taken against Barnett, the elements set forth by the Fourth Circuit (*See Guessous*) are satisfied and

---

[14] In *Guessous,* the Court reversed the lower court's finding of summary judgment in favor of employer for the Court's failure to review the totality of the circumstances of allegations of the employee's claim of a hostile work environment.

amounted to a hostile work environment. Barnett has made a *prima facie* showing that he engaged in protected conduct and that he was subjected to a hostile work environment.

91)    The circumstances also amounted to a hostile work environment *per se*. It is a criminal felony offense to not properly document the build record of an aircraft. By pressuring Barnett to not follow processes and procedures and to not properly document defects in the build records, Boeing was ordering Barnett to commit a felony offense. Barnett faced a repetitive and systemic pattern of being requested to violate, circumvent, and ignore the law, and to place profits over safety and quality.

92)    Further, in "at will" states like South Carolina, an employer can fire an employee at any time and for any reason, except where it violates the law or is a violation of "public policy." For example, public policy is violated when an employee is terminated for refusing to take unlawful action. A myriad of cases exist that stand for the proposition (rightfully so) that an employer cannot wrongfully discharge an employee for refusing to violate the law. For instance, as the District of Columbia, Court of Appeals has stated:

> It seems to be universally accepted that an employer's discharge of an employee for the employee's refusal to violate a statute is a wrongful discharge in violation of public policy. **An employer cannot be allowed to require his or her employees to break the law as a condition of continued employment.** […] The employer engages in tortious conduct by affirmatively forcing the employee to choose between breaking the law and keeping his job. **The wrongful discharge of an at-will employee in violation of public policy is thus an intentional tort.**

*Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32; 1991 D.C. App. LEXIS 258 (*citations omitted, and emphasis added*). *See e.g. Burton v. Zwicker & Assocs., PSC*, 577 Fed. Appx. 555, 2014 U.S. App. LEXIS 16358 (6th Cir., 2014).

93)    As mentioned herein, Barnett was given responsibility for documenting lost defective parts while assigned to the MRSA. Barnett knew that FAA regulations require manufacturers to track

all parts, document the disposition of parts deemed to be defective, and to notify the FAA when the disposition of lost parts went unresolved. Boeing ordered Barnett to merely sign off on the lost parts without conducting a full investigation to determine the disposition of the parts. Further, Boeing forbade Barnett from disclosing to the FAA the fact that the disposition of numerous parts went unresolved.

94)     In fact, Boeing created an environment in which Barnett was being harassed, denigrated, humiliated, and treated with scorn and contempt by quality management in the presence of his team, all for insisting that regulations and laws be followed. Boeing certainly intended for Barnett to disregard and violate the law, and Boeing was aware that Barnett had an obligation to fully comply with the law. Boeing's conduct is illegal.

**a)     Barnett was constructively discharged.**

95)     Barnett resigned because of the stress he experienced as a result of Boeing's insistence that he engage in illegal and unethical conduct. Further, such conditions as those imposed on Barnett are intolerable and actually mandate resignation. Notably, others have resigned because they were faced with the decision to either violate FAA rules and regulations and be rewarded, or follow the law, be harassed, and have no future with the company. Boeing's conduct resulted in the constructive discharge of Barnett.

**b)     Barnett's complaint was timely filed.**

96)     Barnett anticipates that Boeing will claim that his hostile work environment and his constructive discharge claims are untimely. Barnett's complaint against Boeing for creating and maintaining a hostile work environment is not time barred because Boeing's adverse action took place within 90-days of filing and the hostile work environment was continuous and systemic. The law is clear that where such conduct is continuous and systemic, conduct outside the statute of limitations may be considered.

> The question whether a court may, for purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, turns on the statutory requirement that a charge be filed within a certain number of days "after the alleged unlawful employment practice occurred." **Because such a claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," it does not matter that some of the component acts fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability. That act need not be the last act. Subsequent events may still be part of the one claim, and a charge may be filed at a later date and still encompass the whole.**

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 103 (S.Ct. 2002) (*emphasis added*).

97)      Further, Barnett's claim for constructive discharge is timely since the facts for this claim arise out of the conduct, transactions, and occurrences set out in Barnett's Air-21 complaint and to the extent the claim is not included, it relates back to his filing. In that event, Barnett moves to amend his complaint to add his claim for constructive discharge. *See Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 346 (4th Cir. 2014)( Under Rule 15(c), an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B)).

### i) Boeing Knew That Barnett Engaged In Protected Activities.

98)      Boeing knew that Barnett engaged in protected activity.

### ii) The Circumstances Are Sufficient To Raise The Inference That Barnett's Protected Conduct And Activity Were A Contributing Factor To The Unfavorable Action.

99)    Barnett's protected conduct was a contributing factor in the unfavorable action taken against him. First, Barnett's protected activity occurred at or shortly before the adverse action.[15] For example, it was in June 2016 that Barnett was assigned the missing parts in Buildings 88-19 and 88-20, and learned that 176 missing defective parts had been closed out without any investigation. Barnett insisted that these missing parts be fully investigated.  In the face of opposition, in mid-October Barnett attended Boeing's Quality Special Attention Meeting (QSAM) and argued that the parts needed to be fully investigated and that Boeing needed to self-disclose to the FAA if parts are not located. It was at this meeting that Boeing's Quality Director stated that Boeing would not disclose this information to the FAA

100)    Barnett's discussions and complaints regarding the 176 missing parts took place between June and October 2016. As in the past, he was treated like he was a troublemaker and gaslighted following his complaints. It was clear to Barnett that Boeing was isolating him. In addition to being denigrated and treated with scorn and contempt, he was stripped of responsibilities, including participation on the serial number ARL team and oxygen bottle investigation. As discussed below, it was around this same time period that Boeing blocked him from transferring to other positions in retaliation for his efforts to get the missing parts investigated and documented properly.

---

[15] "Normally the burden is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action." 29 C.F.R. §1979.104(b). *See also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2013) (citing cases in which temporal proximity of three months between protected conduct and retaliatory discharge was sufficient to show causation). *Hochstadt v. Worcester Found. For Experimental Biology, Inc.*, 425 F.Supp. 318, 324-25 (D.Mass.) (holding that discharge six months after EEOC settlement and a month after an informal complaint satisfies causation requirement), aff'd, 545 F.2d 222 (1st Cir. 1976).

101)    In addition, Barnett had become aware in September 2016 that his senior manager, ███████ ███████ went into the MRSA, removed a scrapped part from the scrap bin and released it to the production floor for installation on an aircraft without following proper procedures and in violation of FAA Regulations and Boeing's own procedures. Barnett filed a complaint with HR on September 17, 2016, and he submitted an ethics complaint against ███████ on October 20, 2016.[16]

102)    The following facts and circumstances, when taken separately and together, are more than sufficient to raise the inference that Barnett's protected activity was a contributing factor for the adverse action taken against him:

    1. Barnett's approach to Quality Assurance was to follow Boeing's procedures and FAA regulations and standards and not compromise, work in grey areas, or cut corners; In addition, Boeing's "Code of Conduct" that must be signed annually by each Boeing employee as a condition of continued employment states "Without exception, I will comply with all applicable laws, rules and regulations". It also states "I will promptly report any illegal or unethical conduct to management or other appropriate authorities (i.e., Ethics, Law, Security, EEO);

    2. Senior quality management at Boeing pressured Barnett to work in grey areas and to avoid documenting in writing process and procedure violations and defects. This was most recently seen with the issues involving missing defective parts, incorrect build records and defective emergency oxygen bottles;

    3. Barnett was subjected to a continuing pattern of retaliatory conduct directed against him, including denigrating, humiliating, and treating him with scorn and contempt;[17]

    4. Barnett was denied job transfers for which he was qualified and under circumstances where he had reason to believe that Boeing senior quality management prevented him from being hired;

---

[16] Once again, it was around this same time period (September and October 2016) that Boeing blocked Barnett from transferring to other positions.

[17] Retaliatory intent may be expressed through "ridicule, openly hostile actions or threatening statements." *Frady v. Tennessee Valley Authority*, 1992-ERA-19 and 34, slip op. at 5 (Sec'y Oct. 23, 1995); *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2nd Cir. 2003)(viewing protected activities as a "betrayal of the department."

5. Barnett was denied the transfer positions at the same time he was pushing Boeing to fully investigate the missing parts, incomplete build records and defective oxygen bottle issues;

6. In its OSHA Position Statement, Boeing made numerous misrepresentations of the facts that seek to place the blame on Barnett for Boeing's failures.;[18] and

7. The FAA has found Barnett's complaints to be valid.[19]

## VI. RELIF SOUGHT BY BARNETT

103)    As a direct result of Boeing's retaliatory actions for protected activity, Barnett has incurred damages including, but not limited to: 1) back pay; 2) front pay for a period of 10 years; 3) lost bonuses, past and future; 4) lost health and life insurance benefits; 5) medical expenses; 6) loss of 401-K retirement and matching benefits, past and future; 7) emotional distress and mental anguish; 8) pecuniary losses; and 9) attorney's fees, expenses and costs.

## VII. STIPULATION OF UNCONTROVERTED FACTS AND LEGAL ISSUES

104)    Complainant's counsel has communicated with Respondent's counsel in a good faith effort to identify uncontroverted facts and legal issues to which the parties can stipulate. Counsel have agreed to continue discussions following counsels' receipt of the filed Pleadings.

## VIII. BARNETT'S ADMINISTRATIVE COMPLAINT FILED WITH THE OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

105)    On January 16, 2017, Barnett filed an administrative complaint with the Occupational Safety and Health Administration.

---

[18] *See Reeves v. Sanderson Plumbing*, 120 S. Ct. 2097, 2108 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that it is probative of intentional discrimination and it might be quite persuasive...in appropriate circumstances, the trier of fact can infer from falsity of the explanation that the employer is dissembling to cover up the discriminatory purpose.").

[19] Evidence that the whistleblower's concerns were correct and the magnitude of the problem identified by the whistleblower is circumstantial evidence that the protected activity was a contributing factor in the unfavorable action. *See Seater v. Southern California Edison Co.*, 95-ERA-13, D&O of Remand by ARB, at 4-6 (September 27, 1996).

LAW OFFICE OF ROBERT M. TURKEWITZ, LLC

/s/Robert M. Turkewitz
Robert M. Turkewitz
███████████████████
█████████████
████████████████
███████████
███████████
██████████████

KNOWLES LAW FIRM, PC
Brian M. Knowles, Esquire (███████████████████)
████████████████████
███████████████████
██████████████████
█████████████

Attorneys for Complainant

May 4, 2021
Charleston, South Carolina